**UNITED STATES BANKRUPTCY COURT**      <u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re                                                                    Chapter 11

ARCAPITA BANK B.S.C.(c), *et al.*                      Case No. 12-11076 (SHL)

               Reorganized Debtors.      (Jointly Administered)
----------------------------------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA BANK B.S.C.(c),
*et al.*,

                 Plaintiff,

         vs.
                                 Adv. No. 13-01434 (SHL)
BAHRAIN ISLAMIC BANK,

                 Defendant.
----------------------------------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA BANK B.S.C.(c),
*et al.*,

                 Plaintiff,
         vs.
                                 Adv. No. 13-01435 (SHL)
TADHAMON CAPITAL B.S.C.,

                 Defendant.
----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S :

MILBANK, TWEED, HADLEY & McCLOY LLP
*Counsel for Official Committee of Unsecured Creditors*
*of Arcapita Bank B.S.C.(c), et al.*
   By:   Dennis F. Dunne, Esq.
          Evan R. Fleck, Esq.
1 Chase Manhattan Plaza
New York, New York 10005

     -and-

By:  Andrew M. Leblanc, Esq.
      Nicholas A. Bassett, Esq.
1850 K Street, NW, Suite 1100
Washington, D.C. 20006

K&L GATES LLP
*Counsel for Bahrain Islamic Bank and Tadhamon Capital B.S.C.*
By:  John A. Bicks, Esq.
      Lani A. Adler, Esq.
      Robert Honeywell, Esq.
599 Lexington Avenue
New York, New York 10022

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are motions to dismiss filed by defendants Bahrain Islamic Bank

("BisB") and Tadhamon Capital B.S.C. ("Tadhamon") (together, the "Defendants") in these

adversary proceedings brought by the official committee of unsecured creditors in the above-

captioned Chapter 11 cases (the "Committee" or the "Plaintiff").[1]  The Committee seeks the

return of funds invested with the Defendants by Debtor Arcapita Bank B.S.C.(c) ("Arcapita")—a

Bahraini investment bank—just before Arcapita's bankruptcy filing.  Given the foreign aspects of

the transactions that form the basis of the complaints, the Defendants contend that these claims

should be dismissed based on the presumption against extraterritoriality and the principle of

international comity.  For the reasons stated below, however, the Court disagrees.

## BACKGROUND

Arcapita is licensed as an Islamic wholesale bank by the Central Bank of Bahrain.  BisB

Compl. ¶ 12 [Adv. No. 13-01434, ECF No. 1]; Tadhamon Compl. ¶ 12 [Adv. No. 13-01435, ECF

No. 1].  Headquartered in Bahrain, Arcapita is operated as an investment bank and is a global

manager of Shari'ah compliant alternative investments.  BisB Compl. ¶ 12; Tadhamon Compl. ¶

---

[1]      Because the motions in the two cases raise the same issues, the Court will address them together.

12. Defendant BisB is an Islamic commercial bank headquartered in Bahrain. BisB Compl. ¶ 13.

Defendant Tadhamon is a Bahraini corporation and a subsidiary of Tadhamon International

Islamic Bank ("TIIB"), a Yemeni bank that offers Islamic banking and investment services to

customers in Yemen and abroad. Tadhamon Compl. ¶ 13. Tadhamon serves as the investment

arm of TIIB. *Id.*

### A.  The Placements

Prior to its bankruptcy filing, Arcapita made several discrete short-term investments

through the Defendants (the "Placements"). BisB Compl. ¶¶ 27, 30; Tadhamon Compl. ¶¶ 27, 31.

The Placements were made under two separate investment agreements between Arcapita and each

of the respective Defendants (the "Placement Agreements"). BisB Compl. ¶¶ 27; Tadhamon

Compl. ¶¶ 27. Both of the Placement Agreements were negotiated and signed in Bahrain and

provided that the laws of the Kingdom of Bahrain govern, except to the extent that such laws

conflicted with the principles of Islamic Shari'ah, in which case Shari'ah law would prevail.

Rashdan Decl. ¶ 13 & Ex. A § 7.1 [Adv. No. 13-01435, ECF No. 8]; Mohammed Decl. ¶ 5 & Ex.

A § 12 [Adv. No. 13-01434, ECF No. 8].

Under the Placement Agreements, Arcapita appointed the Defendants to serve as its agent

in the purchase of the Placement investments on Arcapita's behalf. BisB Compl. ¶¶ 23-24;

Tadhamon Compl. ¶¶ 22, 24. The Defendants were obligated to repurchase the Placements from

Arcapita on a deferred payment basis for an amount equal to the original investment, plus an

agreed-upon return (the "Placement Proceeds"). BisB Compl. ¶¶ 2, 24; Tadhamon Compl. ¶ 2,

24. The Defendants were to transfer the Placement Proceeds to Arcapita on the designated

maturity date of the Placements. BisB Compl. ¶¶ 2, 24; Tadhamon Compl. ¶ 2, 24.

Consistent with these Placement Agreements, Arcapita entered into a Placement with BisB in the amount of $10 million on March 14, 2012 (the "BisB Placement"). BisB Compl. ¶ 27. To execute the BisB Placement, Arcapita transferred funds from its account at JP Morgan Chase Bank in New York to a correspondent bank account maintained by BisB at JP Morgan Chase Bank in New York. BisB Compl. ¶ 15. On the same day as the transfer, BisB purchased the commodities for Arcapita through a London broker. Mohammed Decl. ¶ 10.

Arcapita entered into two Placements with Tadhamon on March 15, 2012, each for $10 million (the "Tadhamon Placements"). Tadhamon Compl. ¶ 27. To execute the Tadhamon Placements, Arcapita transferred funds from its account at JP Morgan Chase Bank in New York to an account at HSBC Bank in New York. Tadhamon Compl. ¶ 28. The HSBC account was a correspondent bank account maintained by Khaleeji Commercial Bank B.S.C., Tadhamon's bank in Bahrain. Rashdan Decl. ¶ 7. The funds were then immediately transferred from the HSBC account to an account held by Tadhamon at Khaleeji Commercial Bank in Bahrain. Tadhamon Compl. ¶ 28; Rashdan Decl. ¶ 7.

## B. The Bankruptcy Case and Prior Proceedings in These Adversary Proceedings

Less than a month after entering into the Placements, Arcapita filed for protection under Chapter 11 of the Bankruptcy Code. Although the Placements matured within a month after Arcapita's bankruptcy filing, the Defendants failed to deliver the Placement Proceeds to Arcapita. BisB Compl. ¶¶ 31, 32, 34; Tadhamon Compl. ¶¶ 27, 35, 36, 38. Instead, the Defendants informed Arcapita that, pursuant to Bahraini law, they were setting off the Placement Proceeds against prepetition debt owed to them by Arcapita. BisB Compl. ¶ 34; Tadhamon Compl. ¶ 38.[2]

---

[2]    Based on Arcapita's pre-existing relationship with the Defendants, Arcapita already owed millions in unmatured debt to each of the Defendants at the time of the Placements. Arcapita owed $9,774,096.15 to BisB as a result of investments that BisB made with Arcapita on December 1, 2011. BisB Compl. ¶¶ 3, 16-20. Arcapita owed

The Committee alleges that the outstanding balance of Placement Proceeds due and owing to Arcapita is $10,002,292.00 from BisB and $18,480,269.00 from Tadhamon.[3]  BisB Compl. ¶ 36; Tadhamon Compl. ¶ 40.  The Committee filed these cases against the Defendants for breach of contract, turnover, the avoidance of a preferential transfer, violation of the automatic stay, and claims disallowance.  BisB Compl. ¶¶ 1, 36; Tadhamon Compl. ¶¶ 1, 40.[4]  The Committee seeks, among other things, to compel the Defendants to comply with their obligations under the Placement Agreements by turning over the Placement Proceeds or to avoid the Placements and recover the Placement Proceeds as an improper payment of antecedent debts.  BisB Compl. ¶ 6; Tadhamon Compl. ¶ 6.

The Defendants' current motions do not take place in a vacuum.  The parties have already litigated the issue of personal jurisdiction in this case.  On that issue, the United States District Court for the Southern District of New York held that the Defendants' use of New York correspondent bank accounts to receive funds from Arcapita met the threshold of minimum contacts necessary to assert personal jurisdiction over the Defendants.  *See Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahrain Islamic Bank (In re Arcapita Bank*

---

$18,497,734.48 to Tadhamon as a result of multiple investments that Tadhamon made with Arcapita between September 2009 and January 2012.  Tadhamon Compl. ¶¶ 17-19.

[3]      In December 2012, Tadhamon returned to Arcapita the portion of the Placement Proceeds that exceeded its purported setoff.  Tadhamon Compl. ¶ 40.

[4]      There are five counts in the complaint.  Count I of the Committee's complaints asserts breach of contract of the Placement Agreements for failure to transfer the Placement Proceeds as required under the agreements.  BisB Compl. ¶¶ 38-42; Tadhamon Compl. ¶¶ 42-47.  Count II asserts a cause of action pursuant to Sections 541, 542 and 550 of the Bankruptcy Code for turnover of the Placement Proceeds as estate assets wrongfully held by the Defendants.  BisB Compl. ¶¶ 43-48; Tadhamon Compl. ¶¶ 48-53.  Count III asserts a cause of action for avoidance of the Placements as preferential transfers under Section 547(b) of the Bankruptcy Code and recovery of the Placement Proceeds from the Defendants pursuant to Section 550(a) of the Bankruptcy Code.  BisB Compl. ¶¶ 49-57; Tadhamon Compl. ¶¶ 54-62.  Count IV asserts a cause of action under Sections 362(a)(3) and 362(a)(7) of the Bankruptcy Code for violation of the automatic stay due to the exercise of control over the Placement Proceeds and the setoff of antecedent debt against the Placement Proceeds.  BisB Compl. ¶¶ 58-65; Tadhamon Compl. ¶¶ 63-70.  Count V seeks a judgment pursuant to Section 502(d) of the Bankruptcy Code disallowing the Defendants' claims in the Debtors' bankruptcy cases.  BisB Compl. ¶¶ 66-69; Tadhamon Compl. ¶¶ 71-74.

B.S.C.(c)), 549 B.R. 56, 67-71 (S.D.N.Y. 2016), *reversing Official Comm. of Unsecured*

*Creditors of Arcapita Bank B.S.C.(c) v. Bahrain Islamic Bank (In re Arcapita Bank B.S.C.(c))*,

529 B.R. 57 (Bankr. S.D.N.Y. 2015).  The District Court further held that the assertion of

jurisdiction was reasonable under the circumstances of the cases.  *See id*. at 71-2.  In reaching its

decision, the District Court examined the issue of personal jurisdiction under both the New York

long-arm statute and federal case law.  *See id*. at 67-70.

The District Court first held that the Defendants' use of the correspondent accounts in

New York was purposeful, constituted a "transaction of business" in New York, and established

the minimum contacts necessary to assert specific jurisdiction over the Defendants.  *See id*. at 68-

70.  Given the allegations in the complaints, the District Court found that the Defendants had

selected U.S. dollars as the currency for the transactions and had designated the New York

correspondent bank accounts to receive the funds from Arcapita.  *See id.* at 68-69.  The District

Court stated that, despite the Defendants' decision to use the funds for investments overseas, the

Defendants "deliberately chose to receive Arcapita's funds in U.S. dollars and designated

correspondent bank accounts in New York to receive the funds, even though they presumably

could have performed the Placement transactions without ever directing the funds through New

York or anywhere else in the United States."  *Id*. at 70.  The Defendants therefore made a

"deliberate choice to utilize the New York correspondent bank accounts and, more generally,

New York's and the United States's banking system. . . ."  *Id*.

Importantly for the present motions, the District Court also held that the Committee's

avoidance claim under Section 547 of the Bankruptcy Code arose from the Defendants' use of the

New York correspondent accounts.  *See id*. at 69-70.  The District Court stated that the

Defendants' "New York contacts—*i.e.*, the receipt of the transferred funds in New York

correspondent bank accounts—are at the heart of this cause of action.  The receipt of the funds in

New York is precisely the conduct targeted by the Committee, and the activity that the cause of

action seeks to have voided." *Id*. at 69.  In coming to this conclusion, the District Court observed

that "when a defendant purposely selects and uses a correspondent bank account to effectuate a

particular transaction, and a plaintiff later files a lawsuit asserting a cause of action arising out of

that transaction, the defendant can hardly claim that it could not have foreseen being haled into

court in the forum in which the correspondent bank account it had selected is located." *Id*. at 68;

*see id*. at 71.

The District Court also concluded that "the United States has a strong interest in

adjudicating claims that arise under its Bankruptcy Code so that both creditors and debtors can

obtain the remedies and relief that the United States Congress has determined are fair and

equitable. . . . Indeed, it does not seem prudential to allow foreign creditors to potentially obtain

priority over domestic creditors based simply on their foreign status." *Id*. at 71-72.  The District

Court observed that the Committee had "a strong interest in obtaining convenient and effective

relief, and it is unclear whether it would be able to bring [] similar causes of action to those

grounded in the United States bankruptcy code in a non-U.S. forum." *Id*. at 72.

Against this backdrop, the Defendants now request dismissal based on the doctrines of

international comity and the presumption against extraterritorial application of federal statutes.

The parties each provided supplemental briefing on those issues.  *See* Adv. No. 13-01434, ECF

Nos. 43-45, 47-53; Adv. No. 13-01435, ECF Nos. 39-41, 43-49.  With respect to international

comity, the Defendants argue that these cases should be dismissed because there is a conflict

between U.S. bankruptcy law and the laws of Bahrain, and that it would be unreasonable to apply

U.S. law in these circumstances.  The Committee responds by arguing that the doctrine of

international comity is inapplicable in this case due to the lack of a parallel foreign legal proceeding to which this Court should defer. As to the presumption against extraterritoriality, the Defendants argue that the transfers at issue took place overseas and that there is no clear indication of congressional intent for the sections of the Bankruptcy Code at issue here to be applied extraterritorially. The Committee counters that the transfers challenged by the Committee do not require extraterritorial application because they occurred domestically and that, in any event, Congress intended the statutory sections at issue here to apply extraterritorially.

## DISCUSSION

### A. International Comity

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Under international comity, "states normally refrain from prescribing laws that govern activities connected with another state when the exercise of such jurisdiction is unreasonable." *Maxwell Comm'n Corp. v. Societe Generale (In re Maxwell Comm'n Corp.)*, 93 F.3d 1036, 1047-48 (2d Cir. 1996) ("*Maxwell II*") (quoting Restatement (Third) of Foreign Relations § 403(1)). The doctrine is "concerned with maintaining amicable working relationships between nations, a 'shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards.'" *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005) (quoting *British Airways Bd. v. Laker Airways Ltd.*, [1984] E.C.C. 36, 41 (Eng. C.A.)).

"'The decision to grant comity is a matter within a court's discretion and the burden of proof to establish its appropriateness is on the moving party.'" *Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*, 18 F. Supp. 3d 375, 382 (S.D.N.Y. 2014) (quoting *Maersk, Inc. v. Neewra, Inc.*, 2010 U.S. Dist. LEXIS 69863, at *29 (S.D.N.Y. July 9, 2010)).  The doctrine is a form of abstention; it "is not an imperative obligation of courts but rather is a discretionary rule of 'practice, convenience, and expediency.'" *JP Morgan*, 412 F.3d at 422-23 (quoting *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 854 (2d Cir. 1997)); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 2016 Bankr. LEXIS 4067, at *32 (Bankr. S.D.N.Y. Nov. 21, 2016) ("*Madoff II*").  "When considering a motion to abstain, a 'court is not restricted to the face of the pleadings, but may review affidavits and other evidence to resolve factual disputes concerning its jurisdiction to hear the action.'" *Madoff II*, 2016 Bankr. LEXIS 4067, at *33 (quoting *Kingsway Fin. Servs. v. Pricewaterhouse-Coopers, LLP*, 420 F. Supp. 2d 228, 233 n.5 (S.D.N.Y. 2005)).  An analysis based on international comity is distinct from one under the presumption against extraterritoriality.  *See Maxwell II*, 93 F.3d at 1047.

The Committee argues that international comity may not be invoked here given the lack of a parallel foreign proceeding.  Stated another way, there is no foreign proceeding to which this Court should defer.  But while the Court agrees with the Defendants that the doctrine may apply in such instances, it nonetheless concludes that comity does not preclude this lawsuit from proceeding.

When addressing this issue, it is necessary to assess the contours of the doctrine of international comity itself, which are not well-defined.  Indeed, the doctrine has been described as having "borders [that] are marked by fuzzy lines of politics, courtesy, and good faith." *JP Morgan*, 412 F.3d at 423 (quoting Harold G. Maier, *Extraterritorial Jurisdiction at a Crossroads:*

9

*An Intersection Between Public and Private International Law*, 76 Am. J. Int'l L. 280, 281

(1982)).  The Second Circuit has explained that international comity conflates two distinct

doctrines.  *See Maxwell II*, 93 F.3d at 1047; *S. African Apartheid Litig. v. Daimler AG*, 617 F.

Supp. 2d 228, 283 (S.D.N.Y. 2009).  The first—often referred to as legislative or prescriptive

comity—is "a canon of construction" which serves to "shorten the reach of a statute."  *Maxwell II*,

93 F.3d at 1047; *see also Mujica v. Airscan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) ("[L]egislative

or 'prescriptive comity' . . . guides domestic courts as they decide the extraterritorial reach of

federal statutes.") (internal citations and quotations omitted).  The second, referred to as "comity

among the courts" or adjudicatory comity, "may be viewed as a discretionary act of deference by

a national court to decline to exercise jurisdiction in a case property adjudicated in a foreign

state."  *Maxwell II*, 93 F.3d at 1047; *see also Mujica*, 771 F.3d at 599 ("[A]djudicatory comity

'involves . . . the discretion of a national court to decline to exercise jurisdiction over a case

before it when that case is pending in a foreign court with proper jurisdiction.'") (quoting *JP*

*Morgan*, 412 F.3d at 424).

As there is no parallel foreign proceeding in the case before the Court, adjudicatory

comity is inapplicable.  *See Madoff II*, 2016 Bankr. LEXIS 4067, at *37 (citing *Royal & Sun*

*Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92-97 (2d Cir. 2006)).  To

evaluate prescriptive comity, courts often refer to the factors set out in Restatement (Third) of

Foreign Relations § 403.  *See, e.g., F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155,

165 (2004); *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 818-19 (1993) (Scalia, J.,

dissenting); *Gucci America, Inc. v. Bank of China*, 768 F.3d 122, 139 (2d Cir. 2014); *French v.*

*Liebmann (In re French)*, 440 F.3d 145, 153 (4th Cir. 2006).  The Restatement "provides that

states normally refrain from prescribing laws that govern activities connected with another state

'when the exercise of such jurisdiction is unreasonable.'" *Maxwell II*, 93 F.3d at 1047-48

(quoting Restatement (Third) of Foreign Relations Law of the U.S. § 403(1)).  In determining

whether the exercise of jurisdiction is reasonable, a court considers the following non-exclusive

factors, where appropriate:

> (a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
> (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
> (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
> (d) the existence of justified expectations that might be protected or hurt by the regulation;
> (e) the importance of the regulation to the international political, legal, or economic system;
> (f) the extent to which the regulation is consistent with the traditions of the international system;
> (g) the extent to which another state may have an interest in regulating the activity; and
> (h) the likelihood of conflict with regulation by another state.

Restatement (Third) of Foreign Relations Law of the U.S. § 403(2).  These factors "correspond to

familiar choice-of-law principles," *Maxwell II*, 93 F.3d at 1048 (noting that "[t]he analysis must

consider the international system as a whole in addition to the interests of the individual states,

because the effective functioning of that system is to the advantage of all the affected

jurisdictions.").

The Court finds that these factors weigh in favor of asserting jurisdiction in this case and

against abstention based on international comity.  The Defendants argue that the parties expected

Bahraini law to apply as provided for under the Placement Agreements and that the United States

has no interest in regulating these transactions involving Bahraini parties for investments made

outside of the U.S.  But the link between the U.S., as the regulating state, and the regulated

activity in question is sufficiently strong here given that the transfers took place through use of correspondent bank accounts in the United States.  As noted by the District Court, the Defendants' "New York contacts—*i.e.*, the receipt of the transferred funds in New York correspondent bank accounts—are at the heart of this cause of action.  The receipt of the funds in New York is precisely the conduct targeted by the Committee, and the activity that the cause of action seeks to have voided." *In re Arcapita*, 549 B.R. at 69.  Moreover, while the transferor Arcapita is a foreign entity, it created a further connection between itself and the United States by availing itself of U.S. law through its filing for bankruptcy and creating an estate pursuant to the Bankruptcy Code.

As to the existence of justified expectations of the parties, the parties cannot be surprised to be litigating in this forum.  As the District Court observed, "when a defendant purposely selects and uses a correspondent bank account to effectuate a particular transaction, and a plaintiff later files a lawsuit asserting a cause of action arising out of that transaction, the defendant can hardly claim that it could not have foreseen being haled into court in the forum in which the correspondent bank account it had selected is located." *In re Arcapita,* 549 B.R. at 68; *cf. Official Comm. of Unsecured Creditors v. Transpacific Corp. (In re Commodore Int'l, Ltd.)*, 242 B.R. 243, 261 (Bankr. S.D.N.Y. 1999) ("A debtor-in-possession or trustee, or by implication a committee whose authority derives from them, is not bound by a forum selection clause in an agreement provided the litigation at issue amounts to a core proceeding and is not inextricably intertwined with non-core matters.").  The potential application of Bahraini law also does not mandate abstention based on comity given that the Court is competent to apply foreign law.  *See, e.g., Bickerton v. Bozel S.A.(In re Bozel S.A.)*, 434 B.R. 86, 107 (Bankr. S.D.N.Y. 2010) ("[I]t is not uncommon for U.S. courts to apply foreign law under the appropriate circumstances.") (citing

*Bigio v. Coca-Cola*, 448 F.3d 176 (2d Cir. 2006); *United States v. Schultz*, 333 F.3d 393 (2d Cir.

2003); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d

70 (2d Cir. 2002)); *see also MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 2010 WL

2757351, at *10 (W.D. Va. July 13, 2010) ("[W]hile the potential application of foreign law is a

factor that weighs in favor of dismissal, the application of foreign law is still a task that the courts

are competent, and often called-upon, to perform.").

    With regard to the nature of the regulated activity and its importance to this jurisdiction as

compared to the international system, the composition of a debtor's estate is clearly central to a

U.S. bankruptcy case.  The laws at issue in this case—Sections 362, 542, 547 and 550 of the

Bankruptcy Code—are designed to protect and pool the assets of the Debtor's estate for the

equitable benefit of all its creditors.  These provisions are the bedrock of the protections afforded

to creditors under the Bankruptcy Code.  As the District Court noted,

> the United States has a strong interest in adjudicating claims that arise under its
> Bankruptcy Code so that both creditors and debtors can obtain the remedies and
> relief that the United States Congress has determined are fair and equitable. . . .
> Indeed, it does not seem prudential to allow foreign creditors to potentially obtain
> priority over domestic creditors based simply on their foreign status.

*In re Arcapita*, 549 B.R. at 71-72; *but c.f. Maxwell II*, 93 F.3d at 1052 (stating that the Court of

Appeals could not say that the United States had a significant interest in applying its own

avoidance law, but noting that a different result might be warranted if there was no alternative

foreign mechanism available for voiding preferences).[5]

---

[5]    Congress has recognized the importance of the preference provisions of the Bankruptcy Code:

   First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period
   before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor
   during his slide into bankruptcy. . . .  Second, and more important, the preference provisions
   facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any

The existence of the Committee's claim of turnover and violation of the automatic stay also does not support a dismissal based on international comity. *See* BisB Comp. ¶¶ 58-65; Tadhamon Compl. ¶¶ 63-70 (asserting a violation of the automatic stay based on Defendants' setoff of antecedent debt against the Placement Proceeds). A claim for turnover "invokes the court's most basic equitable powers to gather and manage property of the estate." *Braunstein v. McCabe*, 571 F.3d 108, 122 (1st Cir. 2009); *see also Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363-64 (2006) ("Critical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property [and] the equitable distribution of that property among the debtor's creditors. . . ."). Similarly, the automatic stay is a central protection afforded to a debtor. *See Shieldalloy Metallurgical Corp. v. New Jersey Dep't of Envtl. Prot.*, 743 F. Supp. 2d 429, 440 (D.N.J. 2010) ("Violating the automatic stay directly interferes with the exercise of exclusive jurisdiction over all of the debtor's property [and] the equitable distribution of that property among the debtor's creditors, critical features of every bankruptcy proceeding.") (internal citations and quotations omitted); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 522 F. Supp. 2d 569, 578 (S.D.N.Y. 2007) ("The automatic stay is a crucial provision of bankruptcy law. It prevents disparate actions against debtors and protects creditors in a manner consistent with the bankruptcy goal of equal treatment by ensuring that no creditor receives more than an equitable share of the bankrupt's estate.") (quoting *In re Parr Meadows Racing Ass'n, Inc.*, 880 F.2d 1540, 1545 (2d Cir. 1989)); *Florsheim Grp. Inc. v. USAsia Int'l Corp. (In re Florsheim Grp. Inc.)*, 336 B.R. 126, 132-33 (Bankr. N.D. Ill. 2005).

---

creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.

H.R. Rep. No. 95-595, at 177-78 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6138.

The Defendants rely on the Second Circuit's statement that international comity is particularly "important in the context of the Bankruptcy Code." *Madoff II*, 2016 Bankr. LEXIS 4067, at *33 (citing *Maxwell II*, 93 F.3d at 1048). But the Second Circuit's international comity decisions primarily emphasize the doctrine's bankruptcy significance in the context of parallel insolvency proceedings. *See Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) (the Second Circuit has "repeatedly noted the importance of extending comity to foreign bankruptcy proceedings."); *JP Morgan*, 412 F.3d at 424 ("We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding."); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) ("[W]e have recognized that comity is particularly appropriate where, as here, the court is confronted with foreign bankruptcy proceedings."). American courts defer in such instances "[b]ecause the 'equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding. . . .'" *Vitro*, 18 F. Supp. 3d at 383 (quoting *Finanz AG*, 192 F.3d at 246). But no such parallel proceedings exist here. *See Maxwell II*, 93 F.3d at 1052-53 (holding that the purposes underlying the avoidance provisions of the Bankruptcy Code would not be significantly thwarted specifically because of the presence of a parallel proceeding in England with British provisions that were counterpart of U.S. avoidance provisions); *id.* at 1052 (noting that the principal policies underlying the avoidance provisions "are equal distribution to creditors and preserving the value of the estate through the discouragement of aggressive pre-petition tactics causing dismemberment of the debtor.") (citing *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991)). Importantly, the Second Circuit in *Maxwell II* observed that "a different result [than dismissal based on comity] might be warranted were there

no parallel proceeding in England—and, hence, no alternative mechanism for voiding

preferences. . . ." *Maxwell II*, 93 F.3d at 1052.

Given the lack of foreign insolvency proceeding, it is questionable whether the Committee

would be able to obtain relief under Bahraini law.  The District Court itself observed that "it is

unclear whether [the Committee] would be able to bring [] similar causes of action to those

grounded in the United States bankruptcy code in a non-U.S. forum."  *In re Arcapita*, 549 B.R. at

72; *see also* Memo. of Law in Support of BisB Mtn. to Dismiss at 4-5 (Case No. 13-01434, ECF

No. 9) (arguing that set-off is permitted under the provisions of Bahraini law); Memo. of Law in

Support of Tadhamon Mtn. to Dismiss at 6 (Case No. 13-01435, ECF No. 9) (same).  That raises

a grave concern that the Bankruptcy Code's "avoidance and recovery provisions [might] cease[]

to be effective at the borders of the United States," thus allowing parties to do an "end run [of] the

Code by 'simply arrang[ing] to have the transfer made overseas,' thereby shielding them from

United States law and recovery by creditors."  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC (In re Bernard L. Madoff)*, 480 B.R. 501, 525 (Bankr. S.D.N.Y. 2012) (quoting *Maxwell*

*Commc'n Corp. PLC v. Societe General plc (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 816

(S.D.N.Y. 1995) ("*Maxwell I*")).

The Defendants' reliance on *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In*

*re Madoff Sec.)*, 513 B.R. 222 (S.D.N.Y. 2014) ("*Madoff I*")) is misplaced.  That case involved

transfers by a debtor to its foreign customers where the funds were subsequently transferred to

other foreign individuals and entities.  The trustee for the debtor's estate sought to recover these

funds from the subsequent transferees as avoidable transfers under Sections 548 and 550 of the

Bankruptcy Code.  *See id*. at 231-32.  In dismissing the actions, the Court noted that "given the

indirect relationship between [the U.S. debtor] and the transfers at issue here, these foreign

jurisdictions have a greater interest in applying their own laws than does the United States." *Id*. at

232. But the defendants in *Madoff* were subsequent transferees, one step removed from the

underlying transfers of the debtor. By contrast, this case involves parties who structured their

deal the way they wanted—using U.S. banks—and are merely being held accountable for the

consequences of that structure. In *Madoff*, moreover, the foreign subsequent transferor entities

were involved in parallel liquidation proceedings in their home countries, raising concerns that

the relief sought in the United States might conflict with foreign court determinations. *See id*.

For all these reasons and keeping in mind the "'virtually unflagging obligation" of the

federal courts "to exercise the jurisdiction given them," the Court rejects the Defendants' request

to abstain from making a determination in this case based on international comity. *Royal & Sun

Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) (quoting

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

## B. <u>The Presumption Against Extraterritoriality</u>

The presumption against extraterritoriality "is a longstanding principle of American law

'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the

territorial jurisdiction of the United States.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247,

255 (2010) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*")). It is

not a limitation on the power of Congress to legislate, but rather a presumption that such

legislation ordinarily relates to domestic, and not foreign, matters. *See Morrison*, 561 U.S. at 255.

The presumption "serves to protect against unintended clashes between our laws and those of

other nations which could result in international discord." *Aramco*, 499 U.S. at 248. However,

the presumption will apply "regardless of whether there is a risk of conflict between the American

statute and a foreign law." *Morrison*, 561 U.S. at 255. The party asserting that the statute in

question applies extraterritorially has the burden of making an "affirmative showing" of the same. *See Aramco*, 499 U.S. at 250.

To determine whether the presumption against extraterritoriality applies, the Court addresses two questions that can be examined in either order. *See Madoff II*, 2016 Bankr. LEXIS 4067, at *8 (noting a two-step extraterritoriality analysis that can be examined in either order."); *cf. Ramasamy v. Essar Glob. Ltd.*, 825 F. Supp. 2d 466, 467 n.1 (S.D.N.Y. 2011) (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 431 (2007) ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits.")).

Under the first inquiry, the Court examines whether Congress intended for the relevant statute to apply extraterritorially. *See Spizz v. Goldfarb Seligman & Co. (In re Ampal-American Israel Corp.)*, 562 B.R. 601, 605 (Bankr. S.D.N.Y. 2017); *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 148 (Bankr. S.D.N.Y. 2016). The Court does so by examining "'whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially.'" *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). "'[U]nless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions.'" *Morrison*, 561 U.S. at 255 (quoting *Aramco*, 499 U.S. at 248). The effect of the presumption is that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id*. at 255. The standard is not, however, a "clear statement rule." *Id*. at 265. The context of the statute, including surrounding provisions of the Bankruptcy Code, may be consulted "to give the most faithful reading of the text. . . ." *Id*. (internal citations and quotations omitted); *see also In re Lyondell*, 543 B.R. at 151 (citing *Madoff*

*I*, 513 B.R. at 228).  If it is determined that the statute applies extraterritorially, then the inquiry is complete.  *See Ampal*, 562 B.R. at 605.

The second inquiry examines whether the litigation at issue involves an extraterritorial application of the statute in question.  *Id.* at 605.  This is done by "'identifying the conduct proscribed or regulated by the particular legislation in question,' and [then] considering whether that conduct 'occurred outside of the borders of the U.S.'"  *In re Lyondell*, 543 B.R. at 148 (quoting *Maxwell I*, 186 B.R. at 816).  When determining the conduct regulated by the statute, the Court examines the "focus" of the statute, *i.e.*, the "objects of the statute's solicitude," *Madoff II*, 2016 Bankr. LEXIS 4067, at *9 (quoting *Morrison*, 561 U.S. at 267), or "those transactions that the statute seeks to regulate."  *In re Lyondell*, 543 B.R. at 150 (quoting *Morrison*, 561 U.S. at 267).  "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  *Nabisco*, 136 S. Ct. at 2101.

For the reasons explained below, the Plaintiff's claims are either based on domestic conduct or based on statutes that apply extraterritorially and, therefore, the Defendants' extraterritoriality defense is rejected.

### 1.   **The Avoidance Claim**

Count III of the complaints asserts a cause of action for avoidance of the Placements as preferential transfers under Section 547(b) of the Bankruptcy Code and recovery of the Placement Proceeds from the Defendants pursuant to Section 550(a) of the Bankruptcy Code.  BisB Compl. ¶¶ 49-57; Tadhamon Compl. ¶¶ 54-62.  Among other disputes, the parties disagree about whether

this claim satisfies the second prong of the test, which examines whether a litigation involves extraterritorial application of the statute.

Focusing on the transfers here among correspondent bank accounts in the United States, the Plaintiffs argue that the challenged conduct in this case is domestic, not foreign. The Plaintiffs argue that this is so notwithstanding the Defendants' contention that all other aspects of the transactions occurred overseas. *See* Plaintiffs' Letter, dated May 23, 2017 [Adv. No. 13-01434, ECF No. 51; Adv. No. 13-01435, ECF No. 47] (citing *United States v. Prevezon Holdings, Ltd.*, 2017 WL 1951142 (S.D.N.Y. May 10, 2017)). The Defendants disagree, arguing that the transfers in the United States by themselves are not enough. The Defendants look to not only "the location of the transfers" but also "the component events of [the] transactions." *Madoff I*, 513 B.R. at 227 (quoting *Maxwell I*, 186 B.R. at 817). For example, the Defendants maintain that the focus should be on when the payment was "completed" so as to give the payee "full rights over the payment." Defendants' Letter, dated May 30, 2017, at 3-4 [Adv. No. 13-01434, ECF No. 52; Adv. No. 13-01435, ECF No. 48] (contending that the inquiry must determine where the defendant "acquired full title and control of the funds") (citing *Madoff II*, 2016 Bankr. LEXIS 4067, at *81-83); *see also Maxwell I*, 186 B.R. at 817 (considering "the location of the transfers as well as the component events of those transactions. . . ."); *Lyondell*, 543 B.R. at 149 (identifying component events as "whether the participants, acts, targets, and effects involved in the transaction at issue are primarily foreign or primarily domestic.") (quoting *French*, 440 F. 3d at 150).

To decide between the parties' competing positions, the Court must assess whether "the relevant conduct . . . 'sufficiently touch[ed] and concern[ed] the territory of the United States.'" *Prevezon*, 2017 WL 1951142, at *5 (S.D.N.Y. May 10, 2017) (quoting *Licci by Licci v. Lebanese*

*Canadian Bank, SAL*, 834 F.3d 201, 215 (2d Cir. 2016)).  That assessment must be done through

"the lens of the charging statute."  *Prevezon*, 2017 WL 1951142, at *5 (citing *Mastafa v. Chevron

Corp.*, 770 F.3d 170, 189 (2d Cir. 2014); *Nabisco*, 136 S. Ct. at 2101).  The Supreme Court has

instructed courts to "target [their] inquiry on 'the focus of congressional concern,' or, in other

words, the 'transactions that the statute seeks to regulate.'"  *In re Lyondell*, 543 B.R. at 150

(quoting *Morrison*, 561 U.S. at 266-67).  Courts in this jurisdiction have held that "the focus of

the [Bankruptcy Code's] avoidance and recovery provisions is the initial transfer that depletes the

property that would have become property of the estate." [6]  *Ampal*, 562 B.R. at 613 (citing *SIPA*,

480 B.R. at 524; Edward R. Morrison, *Extraterritorial Avoidance Actions: Lessons From Madoff*,

9 Brook. J. Corp. Fin & Comm. L. 268, 271 (Fall 2014)); *accord Begier v. Internal Revenue

Serv.*, 496 U.S. 53, 58 (1990) ("[T]he purpose of the avoidance provision is to preserve the

property includable within the bankruptcy estate—the property available for distribution to

creditors."); *French v. Liebmann (In re French)*, 440 F.3d 145, 154 (4th Cir. 2006) ("[T]he

Code's avoidance provisions protect creditors by preserving the bankruptcy estate against

illegitimate depletions.").

   Applying these principles here, the Court concludes that the conduct here touched and

concerned the United States in a manner sufficient to displace the presumption against

extraterritoriality.  As the District Court observed, the Defendants' "receipt of the transferred

funds in New York correspondent bank accounts" is at "the heart of this cause of action."

*Arcapita*, 549 B.R. at 69.  Indeed, "[t]he receipt of the funds in New York is precisely the conduct

---

[6]      The cases on extraterritoriality do not distinguish between Sections 547 and 548 of the Bankruptcy Code
for purposes of the extraterritoriality analysis because the relevant language is the same in both.  *See Ampal*, 562 B.R.
at 612 n.11 (noting that both statutory sections "permit a trustee to 'avoid any transfer of an interest of the debtor in
property.'").  Accordingly, the Court has examined cases on both statutes.

targeted by the Committee, and the activity that the cause of action seeks to have voided." *Id*.[7]

Thus, the District Court concluded that the transfers in New York are central to the Plaintiff's

preference claim.[8]  Indeed, courts have found the use of bank accounts in the United States to be

sufficient to displace the presumption against extraterritoriality.  For example, the court in

*Prevezon* concluded that "[t]he use of correspondent banks in foreign transactions between

foreign parties constitutes domestic conduct within" the reach of 18 U.S.C. § 2314, a statute that

criminalizes the transportation of property stolen or taken by fraud.  *Prevezon*, 2017 WL

1951142, at *5.  *Prevezon* involved a civil forfeiture action relating to the laundering of proceeds

derived from a fraud perpetrated in Russia.  *See id*. at *1.  The scheme involved the use of foreign

bank accounts by foreign companies with several transfers that were processed through

correspondent bank accounts in New York.  *See id*. at *5.  Similarly, the court in *United States v.*

*Zarrab*, 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016), found that "an international wire transfer

from the U.A.E. to a Canadian Company . . . which was processed by a United States bank" was a

sufficient domestic tie to prosecute the defendant for a conspiracy to defraud the United States

and to impede the functions of the U.S. Department of Treasury's Office of Foreign Asset Control

---

[7]    The complaints characterize the transfer of funds as the operative fact upon which the Committee's preference claims are based.  *See* BISB Compl. ¶ 50 ("Arcapita transferred the placed funds to [BISB] under the Placement (the "Placement Transfer") on March 14, 2012."); Tadhamon Compl. ¶ 55 ("Arcapita transferred $20 million to Tadhamon under the Placements (the "Placement Transfers") on March 15, 2012.").  The complaints then set forth facts to demonstrate how the Placement Transfers meet the elements of Section 547 of the Bankruptcy Code. BISB Compl. ¶¶ 51-55; Tadhamon Compl. ¶¶ 56-60.  Count III of each of the complaints then concludes with the statement that "[t]he Placement Transfer constitutes a preferential transfer avoidable pursuant to [S]ection 547(b) of the Bankruptcy Code and recoverable from [the Defendants] pursuant to [S]ection 550(a)."  BISB Compl. ¶ 56; Tadhamon Compl. ¶ 61.

[8]    The Defendants note that the District Court decision was on personal jurisdiction, not extraterritoriality.  Of course, "the [legal] tests for personal jurisdiction and extraterritoriality are not the same."  *Madoff II*, 2016 Bankr. LEXIS 4067, at *58 (citing *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012)); *cf. Morrison*, 561 U.S. at 266 ("[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.").  But the District Court decision is nonetheless relevant to the extraterritoriality inquiry given its characterization of the alleged misconduct and how it construed the avoidance claims.  *Cf. United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (discussing the law of the case doctrine).

under 18 U.S.C. § 371.  *Id.* at *3.  The court in *Zarrab* found unpersuasive the defendants'

argument that the alleged conspiracy was not covered under the text of Section 371 because it had

"only touched the U.S. twice, when foreign banks directed funds transfers through U.S. banks en

route to other foreign banks" and was therefore "overwhelmingly (if not entirely) foreign, with

effects felt almost entirely abroad."  *Id.* at *4-5.

     The Second Circuit has reached a similar conclusion in *Mastafa v. Chevron Corp.*, 770

F.3d 170 (2d Cir. 2014).  In that case, the court found that a foreign bank's role in carrying out

"numerous New York-based payments and 'financing arrangements' conducted exclusively

through a New York bank account" maintained by the foreign bank was specific and domestic

conduct that touched and concerned the U.S. "with sufficient force to displace the presumption

against extraterritoriality and establish jurisdiction" under the Alien Tort Statute.  *Id.* at 191.  In

*Mastafa*, a foreign bank was accused of illicitly diverting funds to the regime of Saddam Hussein,

which was then under United Nations economic sanctions, in violation of customary international

law.  *See id.* at 174.  The bank in question was an escrow bank through which payments were

diverted.  *See id.* at 175.  Similarly, the New York Court of Appeals in *Licci by Licci v. Lebanese

Canadian Bank, SAL*, 834 F.3d 201, held that a foreign bank that used "its correspondent banking

account in New York to facilitate dozens of international wire transfers" on behalf of Hezbollah

was a "sufficient connection[] with the United States" with respect to the Alien Tort Statute.  *Id.*

at 214-15; *see also id.* at 217.[9]

---

[9]    The Defendants are correct that there was more conduct at issue in *Mastafa* than simply payment into an
account in the United States.  *See Mastafa*, 770 F.3d at 175-76, 189-91 (noting allegations that the defendant actually
maintained the account and actively helped others disguise the payments that were being made into it).  The record
here does not contain information about the maintenance or use of the accounts here, which presumably could be the
subject of discovery.  *Cf. O'Toole v. MyPlace Dev. SP. Z O.O. (In re Sledziejowski)*, 2016 Bankr. LEXIS 3791, at *31
(Bankr. S.D.N.Y. Oct. 21, 2016) (citing *Tymoshenko v. Firtash*, 2013 U.S. Dist. LEXIS 43543, 2013 WL 1234943, at
*7 (S.D.N.Y. Mar. 27, 2013) ("At the jurisdictional stage,'. . . courts enjoy broad discretion in deciding whether to
order discovery.")).  But given the Supreme Court's edict to focus on the issue of Congressional concern—the

The Defendants cite to a number of cases that reach the opposite result in purportedly similar situations. This is not surprising given that the question of extraterritoriality depends very heavily on the specific facts of each case. But importantly, some of these cases did not involve instances where, as here, both sides of the challenged transfer used a U.S. bank to complete the transfer.[10] *See* BisB Compl. ¶ 15 (stating that to execute the BisB Placement, Arcapita transferred funds from its account at JP Morgan Chase Bank in New York to a correspondent bank account maintained by BisB at JP Morgan Chase Bank in New York); Tadhamon Compl. ¶ 28 (stating that to execute the Tadhamon Placements, Arcapita transferred funds from its account at JP Morgan Chase Bank in New York to an account at HSBC Bank in New York which was a correspondent bank account maintained by Khaleeji Commercial Bank B.S.C., Tadhamon's bank in Bahrain); Rashdan Decl. ¶ 7 (same); *see also Kiobel v. Royal Dutch Petroluem Co.*, 133 S. Ct. 1659, 1669 (2013) ("[E]ven where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application.").

Some of the cases cited by the Defendants appear to place a greater focus on the component events of a transaction while others appear to minimize the significance of correspondent bank accounts. *See, e.g.*, Defendants' Supp. Brief at 6-7 [Adv. No. 13-01434, ECF No. 43; Adv. No. 13-01435, ECF No. 39], citing *Madoff I*, 513 B.R. at 228 n.1 ("Nor is the fact

---

transfers rather than the facts and circumstances surrounding the transactions and the Defendants—such discovery is not necessary to resolve these Motions.

[10]     For example, two cases cited by the Defendants involve a U.S. bank on only one side of the challenged transfer. *See Maxwell I*, 186 B.R. at 817 n.5 (court held that transfer was not domestic where U.K. debtor made a payment from its London bank account to a U.K creditor's U.S. bank account "through which all payments made to [defendant] in dollars are routed," and then immediately credited to an overdraft account the creditor maintained in London); *see also Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (despite Russian plaintiff transferring funds to a bank account in New York that was controlled by the defendant, the court found that "[t]hese transfers . . . were actions needed to carry out the transactions, and not the transactions themselves—which were previously entered into when the contracts were executed in Russia. The direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction.").

that some of the defendants here allegedly used correspondent banks in the United States to

process dollar-denominated transfers sufficient to make these foreign transfers domestic.");

*Maxwell I*, 186 B.R. at 816-817 (finding transfers occurred overseas where the debtor and

transferee banks were foreign entities, whose relationship was centered abroad and the antecedent

debts arose abroad pursuant to agreements governed by foreign law).  These cases are more in

tune with the Defendants' focus not on the transfers but on the component events of the

transactions, including the nationality of the parties, the location where the antecedent debt was

incurred, where negotiation and execution of the underlying agreement took place and the other

financial aspects of the transaction outside of the transfers.  *See* Defendants' Reply Memo. of Law

at 13 [Adv. No. 13-01434, ECF No. 17; Adv. No. 13-01435, ECF No. 16].  It is not clear,

however, how much of the more broad-ranging component event test suggested by the

Defendants survives after the Supreme Court's decision in *Morrison* that instructs courts to

examine the focus of the statute.  The first case to assess the component events of a transaction

was *Maxwell I*, a case still frequently cited on extraterritoriality questions.  *See, e.g.*, *In re*

*Lyondell*, 543 B.R. at 149.  But *Maxwell I* was decided before *Morrison*, which changed the legal

landscape on this issue.  *See Madoff II*, 2016 Bankr. LEXIS 4067, at *69 (finding irrelevant

"'where the defendants engaged in business regarding the transaction' and 'where the parties'

relationship was centered when conducting the transaction underlying the debt that triggered the

transfers'" and noting that such an analysis was similar to the "conduct and effects" test abrogated

by the Supreme Court in *Morrison*) (citing *Morrison*, 561 U.S. at 256, 261); *see id*. at *70 (noting

25

that conduct-related component events relied on by the plaintiff call for the type of analysis rejected by *Morrison*).[11]

The Defendants argue that the *Prevezon* case, and the cases cited therein, can be distinguished because they involve criminal statutes and related civil remedies, such as RICO and the Alien Tort Statute. *See* Defendants' Letter, dated May 30, 2017, at 3. The Defendants argue that the focus of Section 547 is different from these criminal statutes, and examines "the nature of the money transfer from payor to payee in the United States, rather than a transfer by a single defendant of a specific type of property (stolen property) through the United States." *Id*. But the Court sees no reason why this should matter given the Supreme Court's clear instructions in *Morrison* to target the focus of congressional concern and the case law in this circuit that the focus of the avoidance provisions is on the transfers. As noted by the Committee, moreover, *Prevezon* focused on the use of a U.S. correspondent account giving rise to a claim under a statute that focuses on the transfer or transportation of property. *See* Committee Letter, dated June 12, 2017, at 2 [Adv. No. 13-01434, ECF No. 53; Adv. No. 13-01435, ECF No. 49]. Section 547 of the Bankruptcy Code, which provides for the avoidance of a "transfer of an interest of the debtor in property," is comparable. 11 U.S.C. § 547(b); *see also Ampal*, 562 B.R. at 613 ("[T]he focus

---

[11]    Moreover, the court in *Maxwell I* expressed a concern that does not appear implicated here. In *Maxwell I*, the court observed that looking only at the location where an entity "parted with the transferred funds" for purposes of extraterritoriality

> [W]ould have potentially dangerous implications for the future application of [Section] 547: a creditor—be it foreign or domestic—who wished to characterize a transfer as extraterritorial could simply arrange to have the transfer made overseas, a result made all too easy in the age of the multinational company and the information superhighway.

*Maxwell I*, 186 B.R. at 816. No party in this case has raised a concern about the creditors here structuring these transactions with the goal of avoiding judicial review in the United States. In fact, the parties structured their transaction to include use of U.S. bank accounts.

of the [Bankruptcy Code's] avoidance and recovery provisions is the initial transfer that depletes the property that would have become property of the estate.").

The Defendants also argue that *Prevezon* and the cases it cites should be distinguished factually because they involve defendants engaging in "years-long criminal activity." *See* Defendants' Letter, dated May 30, 2017, at 3. With respect to *Prevezon*, the Defendants note that the case involved four money transfers between foreign accounts that passed through U.S. correspondent bank accounts and note that the Defendants here were "the one-time recipients" of funds. *Id.* at 2-3. But this focus on the number of transactions and the extent of the U.S. activity appears to conflate the personal jurisdiction inquiry, which focuses on the foreseeability of being subject to jurisdiction within the United States. The question for purposes of the extraterritoriality analysis is the focus of the statute, which in this case looks to the "transfer of an interest of the debtor in property." 11 U.S.C. § 547(b). The Defendants cite to nothing in *Prevezon* that suggests a numerosity requirement for activity to be considered sufficiently domestic for purposes of extraterritoriality. Indeed, no part of the criminal scheme in *Prevezon*, other than the use of the correspondent account, was located in the United States. *See Prevezon*, 2017 WL 1951142 at *5 (holding use of U.S. correspondent bank accounts to make transfers defeated presumption against extraterritoriality despite the fact that the transfers were part of a Russian fraud that otherwise "occurred exclusively among foreign companies using foreign bank accounts.").[12]

---

[12]    Having concluded that the transfers here were domestic rather than foreign, the Court need not resolve whether the avoidance provisions of the Bankruptcy Code apply extraterritorially. There is a split of authority on that question. *See French v. Liebmann (In re French)*, 440 F.3d 145, 151-52 (4th Cir. 2006) (holding that Congress intended extraterritorial application of Section 548 of the Bankruptcy Code); *Emerald Capital Advisors Corp. v. Baerische Moteren Werke Aktiengesellschaft (In re FAH Liquidating Corp.)*, 2017 Bankr. LEXIS 1609 at *13-14 (Bank. D. Del. June 13, 2017) (adopting the reasoning of *Lyondell* and finding that Section 548 applies extraterritorially); *In re Lyondell*, 543 B.R. 127 (Bankr. S.D.N.Y. 2016) (adopting the reasoning of *French* and holding that Congress intended extraterritorial application of Section 548); *Sec. Investor Prot. SIPA Liquidation Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 480 B.R. 501, 527-28 (Bankr. S.D.N.Y. 2012) (holding that Sections 548 and 550 apply extraterritorially); *but see Madoff I*, 513 B.R. at 228-29; *Ampal*, 562 B.R. at 612 (holding that Section 547 does not apply extraterritorially); *Barclay v. Swiss Fin. Corp. Ltd. (In re Midland Euro Exchange Inc.)*, 347 B.R.

Finally, the Defendants reliance on the *Madoff* cases is also misplaced. As discussed earlier, *Madoff* involved circumstances in which the U.S. debtor had made transfers to its foreign customers, which funds were subsequently transferred by those foreign customers to other foreign individuals and entities. *See Madoff I*, 513 B.R. at 225. These subsequent transferees were one step removed from the underlying domestic transfer involving the debtor, in contrast to the transfers here from the debtor Arcapita's New York bank to the Defendants' New York correspondent banks.

## 2. <u>Claims Under Other Sections of the Bankruptcy Code</u>

The Defendants contend that Counts II and IV must also be dismissed based on the presumption against extraterritoriality. Count II asserts a cause of action pursuant to Sections 541, 542 and 550 of the Bankruptcy Code for turnover of the Placement Proceeds as estate assets wrongfully held by the Defendants. BisB Compl. ¶¶ 43-48; Tadhamon Compl. ¶¶ 48-53. Count IV asserts a cause of action under Sections 362(a)(3) and 362(a)(7) of the Bankruptcy Code for violation of the automatic stay based on Defendants' exercise of control over the Placement Proceeds and the setoff of antecedent debt against the Placement Proceeds. BisB Compl. ¶¶ 58-65; Tadhamon Compl. ¶¶ 63-70. The Defendants argue that the Committee's request for turnover—upon which both Counts II and IV rest—depends on whether Arcapita's transfer of funds to the Defendants has first been avoided under Section 547 and that funds from such an avoidance action are not property of the estate under the Second Circuit's decision in *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992). The Defendants also argue that neither

---

708, 717 (Bankr. C.D. Cal. 2006) (holding that "neither the plain language of the statute nor its reading in conjunction with other parts of the Code establish congressional intent to apply § 548 extraterritorially. . . ."); *Maxwell I*, 186 B.R. at 819 ("[N]othing in the language or legislative history of § 547 expresses Congress' intent to apply the statute to foreign transfers.").

Section 542 (the basis of Count II) nor Section 362 (the basis of Count IV) apply

extraterritorially.  The Court disagrees with both of the Defendants' arguments.

First, the Court finds fault with Defendants' characterization of the Committee's claims.

Contrary to the Defendants' assertion, the Committee's claims under Sections 542(b) and 362(a)

are independent of the avoidance claims.  Counts II and IV allege that the Defendants owe

Arcapita debt in the form of matured Placement Proceeds and that, rather than pay this matured

debt to Arcapita, the Defendants instead chose to retain that property of the Debtor by virtue of a

setoff.  *See* BISB Compl. ¶¶ 6, 32-33; Tadhamon Compl. ¶¶ 6, 36-37; *see also Securities Investor*

*Protection Corp. vs. Rossi (In re Cambridge Capital, LLC)*, 331 B.R. 47, 57 (Bankr. E.D.N.Y.

2005) (noting that the trustee's turnover claim sought the "collection rather than the creation,

recognition, or liquidation of a matured debt.") (citation omitted).  The avoidance claims focus on

the initial transfer of funds by Arcapita to the Defendants in March 2012; the turnover and

automatic stay claims focus on the maturation of the Placement Proceeds after Arcapita filed

bankruptcy and the Defendants' retention of such Placement Proceeds based on setoff.  Of course,

the right to setoff is explicitly reserved in the Bankruptcy Code.  *See* 11 U.S.C. § 542(b) (noting

"an entity that owes a debt that is property of the estate and that is matured, payable on demand,

or payable on order, shall pay such debt . . . except to the extent that such debt may be offset

under section 553 of this title against a claim against the debtor."); *see* 11 U.S.C. § 553 (setting

forth conditions for setoff).  But the right of setoff presupposes the existence of a valid debt owed

to the estate.  *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) ("The right of

setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts

against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'")

(*quoting Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913); *see also In re Davidson*, 901

F.2d 1533, 1537 (10th Cir. 1990) (noting that setoff requires that "each debt be valid and enforceable") (citations omitted).[13]

The Committee's complaints are drafted in a manner consistent with these legal principles. Unlike the Committee's avoidance claim under Section 547, the Committee alleges that the monies in question in Counts II and IV are already "property of the estate" under Section 541. *See* BisB Compl. ¶ 46 (stating in Court II that "[b]y virtue of the Placement, after accounting for amounts previously remitted, BIB is wrongfully in possession of property of the Arcapita Estate in the amount of $10,002,292, plus accrued interest thereon from the Placement's maturity date."), ¶ 61 (stating in Count IV that "BIB has and continues to exercise control over the Placement Proceeds, which are property of the Arcapita Estate."); Tadhamon Compl. ¶ 51 (stating in Court II that "[b]y virtue of the Placement, after accounting for amounts previously remitted, Tadhamon is in possession of property of the Arcapita Estate in the amount of $18,480,269, plus accrued interest thereon from the Placement maturity dates."), ¶ 66 (stating in Count IV that "Tadhamon has and continues to exercise control over the Placement Proceeds, which are property of the Arcapita Estate.").[14]

Second, the Court rejects the Defendants' contention that Sections 542(b) and 362 do not apply extraterritoriality.  Section 542(b) of the Bankruptcy Code provides that a trustee may recover "a debt that is property of the estate and that is matured, payable on demand, or payable

---

[13]    Given that the Defendants do not dispute the validity of their matured debt to Arcapita arising out of the Placement Agreements, the cases relied upon by Defendants are distinguishable.  *See Savage & Assoc., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137-38 (Bankr. S.D.N.Y. 2005) (in case dealing with turnover of property that was the subject of a contested avoidance action, the court found that Section 542(a) was not applicable until the transfer was avoided, and that Section 542(b) did not apply to disputed debts); *Andrew Velez Contr., Inc. v. Consolidated Edison Co. of New York, Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 272-73 (Bankr. S.D.N.Y. 2007) (same).

[14]    Indeed, the Committee's complaints assert its preference claim in the alternative, to the extent that the Court holds that the Placement was actually a disguised payment of antecedent debt.  BISB Compl. ¶¶ 6, 32-34; Tadhamon Compl. ¶¶ 6, 36-37.

on order. . . ." 11 U.S.C. § 542(b).  Unlike Section 547, Section 542(b) explicitly references

property of the estate.  Section 541 defines "property of the estate" as including all "interests of

the debtor in property."  11 U.S.C. § 541(a)(1).  Section 541 gives the trustee title over the

debtor's property "wherever located and by whomever held[,]" whether that property is located in

the United States or a foreign jurisdiction.  11 U.S.C. § 541(a); *see* H.R. Rep. No. 82-2320, at 15

(1952), reprinted in 1952 U.S.C.C.A.N. 1960, 1976 (stating that the addition of the "wherever

located" language to the statute "ma[de] clear that a trustee in bankruptcy is vested with the title

of the bankrupt in property which is located without, as well as within, the United States.").

Thus, it is clear that Congress intended to apply extraterritorially the provisions of the Bankruptcy

Code that relate to property of the estate, such as Section 542(b).  *See, e.g., Thurmond v.*

*Rajapakse (In re Rajapakse)*, 346 B.R. 233, 235-36 (Bankr. N.D. Ga. 2005).

The same is true for Section 362.  That section incorporates the definition of property of

the estate provided in Section 541, which includes property "wherever located."  *See* 11 U.S.C. §

362; 11 U.S.C. § 541; *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (Picard*

*v. Maxam Absolute Return Fund, L.P.)*, 474 B.R. 76, 82 (S.D.N.Y. 2012) (noting that "the

automatic stay applies extraterritorially" and that "the efficacy of the bankruptcy proceeding

depends on the court's ability to control and marshal the assets of the debtor wherever located.")

(internal citations and quotations omitted); *In re Soundview Elite, Ltd.*, 503 B.R. 571, 584 (Bankr.

S.D.N.Y. 2014) ("U.S. law is clear that immediately upon the filing of the Debtors' chapter 11

petition, the U.S. automatic stay became effective, both in the U.S. and extraterritorially.").[15]

---

[15]    The parties focused their briefing almost exclusively on Counts II, III and IV of these Complaints.  They say
very little about the two remaining counts:  Count I for breach of contract and Count V based on Section 502(d) of
the Bankruptcy Code.  As to Count I, Defendants argue simply that this Court has no constitutional authority to enter
a judgment on such a contract claim under *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  *See Defendants' Memo. of Law
in Support of Motion to Dismiss* at 26 [Adv. No. 13-01434, ECF No. 9; Adv. No. 13-01435, ECF No. 9].  But that
alone does not provide a basis for dismissal.  *Cf. Walker, Truesdell, Roth & Assocs. v. Blackstone Grp., L.P. (In re
Extended Stay, Inc.)*, 466 B.R. 188 S.D.N.Y. 2011) (denying motion to withdraw the reference based on *Stern*);

## CONCLUSION

For the reasons stated above, the Court denies the Defendants' motions to dismiss based on the doctrines of international comity and the presumption against extraterritoriality. The Committee is directed to settle a proposed order on seven days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon counsel to the Defendants.

Dated: New York, New York
      October 13, 2017

 

                             /s/ *Sean H. Lane*
                             UNITED STATES BANKRUPTCY JUDGE

---

*Messer v. Bentley Manhattan Inc. (In re Madison Bentley Assocs.)*, 474 B.R. 430 (S.D.N.Y. 2012) (same). As to Count V, the Committee seeks to disallow the Defendants' claims in the Debtors' bankruptcy cases under Section 502(d). *See* BisB Compl. ¶¶ 66-69; Tadhamon Compl. ¶¶ 71-74. As the Defendants never filed a proof of claim in these cases, however, it appears that Count V is directed at the Debtors' listing of the obligation to the Defendants as undisputed claims on the bankruptcy Schedules in these cases. *See* BisB Compl. ¶ 68 ("Arcapita included on its Schedule F liabilities in the amount of $9,774,096.15 owing to BIB on account of the Antecedent Debt. Absent objection by a party in interest or an amendment to Schedule F, BIB will have allowed claims against Arcapita in the amount of $9,774,096.15."); Tadhamon Compl. ¶ 73 ("Arcapita included on its Schedule F aggregate liabilities in the amount of $18,497,734.48 owing to Tadhamon on account of the Antecedent Debt. Absent objection by a party in interest or an amendment to Schedule F, Tadhamon will have allowed claims against Arcapita in the amount of $18,497,734.48."). The parties' briefing says nothing about the legal significance of this fact.

      Given the Court's ruling today that rejects the Defendants' arguments on extraterritoriality for Counts II, III, and IV, the obvious overlap between all five Counts of the complaints, and the lack of briefing by the parties explicitly addressing Counts I and V, the Court declines to dismiss Counts I and V based on the presumption against extraterritoriality.