**UNITED STATES BANKRUPTCY COURT**　　　　<u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re　　　　　　　　　　　　　　　　　　　　　　Chapter 11

ARCAPITA BANK B.S.C.(c), *et al.*　　　　　　　Case No. 12-11076 (SHL)

　　　　　　　　　Reorganized Debtors.　　　　(Jointly Administered)
-----------------------------------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA BANK B.S.C.(c),
*et al.*,

　　　　　　　　　Plaintiff,

　　　　　vs.
　　　　　　　　　　　　　　　　　　　　　　Adv. Pro. No. 13-01434 (SHL)
BAHRAIN ISLAMIC BANK,

　　　　　　　　　Defendant.
-----------------------------------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA BANK B.S.C.(c),
*et al.*,

　　　　　　　　　Plaintiff,

　　　　　vs.
　　　　　　　　　　　　　　　　　　　　　　Adv. Pro. No. 13-01435 (SHL)
TADHAMON CAPITAL B.S.C.,

　　　　　　　　　Defendant.
-----------------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S :

MILBANK, TWEED, HADLEY & McCLOY LLP
*Counsel for Official Committee of Unsecured Creditors*
*of Arcapita Bank B.S.C.(c), et al.*
　By:　Dennis F. Dunne, Esq.
　　　　Evan R. Fleck, Esq.
1 Chase Manhattan Plaza
New York, New York 10005

　　　-and-

By:  Andrew M. Leblanc, Esq.
1850 K Street, NW, Suite 1100
Washington, D.C. 20006

K&L GATES LLP
*Counsel for Bahrain Islamic Bank and Tadhamon Capital B.S.C.*
   By:  Robert T. Honeywell, Esq.
        John A. Bicks, Esq.
        Lani A. Adler, Esq.
599 Lexington Avenue
New York, New York 10022

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are cross-motions for summary judgment (the "Motions") filed in the above-captioned adversary proceedings by Bahrain Islamic Bank ("BisB"), Tadhamon Capital B.S.C. ("Tadhamon" and, together with BisB, the "Defendants"), and the official committee of unsecured creditors (the "Committee" or the "Plaintiff") appointed in the bankruptcy cases of Arcapita Bank B.S.C.(c) ("Arcapita") and its affiliated debtors.[1]  *See* Adv. Pro. No. 13-01434 [ECF Nos. 72, 79]; Adv. Pro. No. 13-01435 [ECF Nos. 69, 77].  The Committee seeks, among other things, the turnover of funds that Arcapita invested with the Defendants in the days prior to Arcapita's bankruptcy filing.[2]  The Defendants assert that they have properly exercised their

---

[1]      Because the Motions filed in both adversary proceedings raise substantially similar issues, the Court has chosen to address them together in this decision.

[2]      The parties submitted numerous declarations as part of the record, accompanied by hundreds of exhibits. These exhibits included numerous expert reports submitted in support of the parties' cases.

The declarations, exhibits and expert reports submitted by the Committee with respect to BisB include:

- Decl. of Kavon M. Khani in Supp. of Comm. Mot. for Summ. J., dated April 20, 2018 [Adv. Pro. No. 13-01434, ECF No. 73] (the "Khani BisB Decl."), attaching Exhibits A through V;

- Decl. of Kavon M. Khani in Supp. of Official Comm. of Unsecured Creditors' Reply in Supp. of Mot. for Summ. J. and Opp. to Bahrain Islamic Bank's Cross-Mot. for Summ. J., dated July 20, 2018 [Adv. Pro. No. 13-01424, ECF No. 84] (the "Khani BisB Reply Decl."), attaching Appendix I and Exhibits A through B;

rights under Bahraini law to setoff those funds against debts owed to them by Arcapita, and that

that their actions in retaining the funds are further shielded by the safe harbor provisions of the

Bankruptcy Code.[3]  For the reasons set forth below, the Committee's Motion is granted and the

Defendants' Motions are denied.

---

- Rebuttal Expert Report of Nezar Raees, dated July 20, 2018, attached as Ex. A to the Khani BisB Reply Decl.  (the "Raees BisB Report");

- Rebuttal Expert Report of Harris Irfan, dated July 20, 2018, attached as Ex. B to the Khani BisB Reply Decl. (the "Irfan BisB Report").

The declarations, exhibits and expert reports submitted by the Committee with respect to Tadhamon include:

- Decl. of Kavon Khani in Supp. of Comm. Mot. for Summ. J., dated April 20, 2018 [Adv. Pro. No. 13-01435, ECF No. 70] (the "Khani Tadhamon Decl."), attaching Exhibits A through Z;

- Decl. of Kavon M. Khani in Supp. of the Official Comm. of Unsecured Creditors' Reply in Supp. of its Mot. for Summ. J. and Opp. to Tadhamon's Cross-Mtn. for Summ. J., dated July 20, 2018 [Adv. Pro. No. 13-01435, ECF No. 82] (the "Khani Tadhamon Reply Decl."), attaching Appendix I and Exhibits A through B.

- Rebuttal Expert Report of Nezar Raees, dated July 20, 2018, attached as Ex. A to the Khani Tadhamon Reply Decl. (the "Raees Tadhamon Report");

- Rebuttal Expert Report of Harris Irfan, dated July 20, 2018, attached as Ex. B to the Khani Tadhamon Reply Decl. (the "Irfan Tadhamon Report").

[3]      The declarations, exhibits and expert reports submitted by BisB include:

- Decl. of Robert T. Honeywell in Supp. of Bahrain Islamic Bank's Cross-Mot. for Summ. J. and in Opp. to Creditors Comm. Mot. for Summ. J., dated May 18, 2018 [Adv. Pro. No. 13-01424, ECF No. 76] (the "Honeywell BisB Decl."), attaching Exhibits 1 through 61;

- Decl. of Robert T. Honeywell in Further Supp. of Bahrain Islamic Bank's Cross-Mtn. for Summ. J., dated September 7, 2018 [Adv. Pro. No. 13-01434, ECF No. 87] (the "Honeywell Supp. BisB Decl."), attaching Exhibits 1 through 11;

- Expert Report by Zeenat A. Al Mansoori, dated May 17, 2018, attached as Ex. 59 to the Honeywell BisB Decl. (the "Mansoori BisB Report");

- Expert Report of Abdulkader Thomas, dated May 17, 2018, attached as Ex. 60 to the Honeywell BisB Decl. (the "Thomas BisB Report").

The declarations, exhibits and expert reports submitted by Tadhamon include:

- Decl. of Robert T. Honeywell in Supp. of Tadhamon Capital B.S.C.'s Cross-Mtn. for Summ. J. and in Opp'n to Creditors Comm. Mot. for Summ. J., dated May 18, 2018 [Adv. Pro. No. 13-01435, ECF No. 73] (the "Honeywell Tadhamon Decl."), attaching Exhibits 1 through 94;

- Decl. of Robert T. Honeywell in Further Supp. of Tadhamon Capital B.S.C.'s Cross-Mtn. for Summ. J., dated September 7, 2018 [Adv. Pro. No. 13-01435, ECF No. 86] (the "Honeywell Tadhamon Supp. Decl."), attaching Exhibits 1 through 11;

## **BACKGROUND**

On March 19, 2012 (the "Petition Date"), Arcapita filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Official Comm. of Unsecured Creditors' Stmt. of Undisputed Facts ¶ 67 [Adv. Pro. No. 13-01434, ECF No. 71] (the "Comm. BisB SMF"); Official Comm. of Unsecured Creditors' Stmt. Of Undisputed Facts ¶ 69 [Adv. Pro. No. 13-01434, ECF No. 68] (the "Comm. Tadhamon SMF"). Prior to the bankruptcy filing, Arcapita was licensed as an Islamic wholesale bank by the Central Bank of Bahrain. Comm. BisB SMF ¶ 1; Comm. Tadhamon SMF ¶ 1. Arcapita employed 268 people and, together with the above-captioned debtors and their non-debtor subsidiaries, maintained offices in Bahrain, Atlanta, London, Hong Kong and Singapore. Comm. BisB SMF ¶ 1; Comm. Tadhamon SMF ¶ 1. Arcapita operated as an investment bank and was a global manager of Shari'a-compliant alternative investments. Comm. BisB SMF ¶ 1; Comm. Tadhamon SMF ¶ 1. "Islamic banking and finance is a revival of faith based rules governing how commercial and financial transactions are executed." Thomas Tadhamon Report at 6; Thomas BisB Report at 6. One of the religiously mandated rules of governance in Islamic banking and finance is a prohibition on interest, which in turn impacts the manner in which Islamic banks and investment funds manage liquidity, comply with applicable foreign and domestic regulations, and operate in the financial markets. *See* Thomas Tadhamon Report at 6; Thomas BisB Report at 6. This prohibition on interest means that such entities "neither borrow nor lend in the traditional sense." *Id.*

---

- Decl. of Ahmed Hatam Sultan in Supp. of Tadhamon Capital's Cross-Mtn. for Summ. J. and Opp. to Creditors Committee's Mot. for Summ. J., dated May 17, 2018 [Adv. P. No. 13-01435, ECF No. 74], attaching Exhibits A and B;

- Expert Report by Zeenat A. Al Mansoori, dated May 17, 2018, attached as Ex. 92 to the Honeywell Tadhamon Decl. (the "Mansoori Tadhamon Report");

- Expert Report by Abdulkader Thomas, dated May 17, 2018, attached as Ex. 93 to the Honeywell Tadhamon Decl. 2018 (the "Thomas Tadhamon Report").

Defendant BisB is a Bahraini corporation that operates as an Islamic commercial bank and is headquartered in Bahrain.  Comm. BisB SMF ¶ 2.  It is owned by, among other investors, the National Bank of Bahrain, the Islamic Development Bank and the Bahrain Social Insurance Organization.  Comm. BisB SMF ¶ 2.  Defendant Tadhamon is a Bahraini corporation and a subsidiary of Tadhamon International Islamic Bank ("TIIB"), a Yemeni bank that offers Shari'a-compliant banking and investment services to customers in Yemen and abroad.  Comm. Tadhamon SMF ¶ 2.  Tadhamon serves as the investment arm of TIIB and offers Shari'a-compliant financial services and alternative investments, manages various TIIB assets and creates new investments for TIIB and other investors.  Comm. Tadhamon SMF ¶ 2.

## A.  **Investments Made by the Defendants Through Arcapita**

Well before the Petition Date, the Defendants began their business relationships with Arcapita by making certain short-term investments through Arcapita.  The Defendants were each party to separate master investment agreements with Arcapita (the "Investment Agreements"), under which the Defendants entered into investment transactions with Arcapita.  Comm. BisB SMF ¶ 3; Comm. Tadhamon SMF ¶ 5.  In these transactions, Arcapita acted as agent for the investment of the Defendants' funds for the purchase of commodities from a third party in the Defendants' name, with Arcapita then purchasing those same commodities from the Defendants on a deferred payment basis.  Comm. BisB SMF ¶ 3; Comm. Tadhamon SMF ¶ 5.

Under the structure of these investment transactions, the Defendant that was the investing party first deposited funds with Arcapita, which Arcapita then used to purchase specific Shari'a-compliant commodity investments on behalf of the Defendant.  Comm. BisB SMF ¶ 4; Comm. Tadhamon SMF ¶ 7.  Arcapita then immediately repurchased those same commodities from the Defendant for the original investment amount plus an agreed upon return, to be paid to the

5

Defendant on an agreed-upon maturity date.  Comm. BisB SMF ¶ 4; Comm. Tadhamon SMF ¶ 7.  The investment amounts were sometimes reinvested (or "rolled over") by agreement of the parties prior to or upon maturity of the investment.  Comm. BisB SMF ¶ 6; Comm. Tadhamon SMF ¶ 9.  These rollovers were executed pursuant to new and separate contractual arrangements, which continued to be governed by the Investment Agreements.  Comm. BisB SMF ¶ 6; Bahrain Islamic Bank's Resp. to the Official Comm. of Unsecured Creditor's Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. ¶ 6 [Adv. Pro. No. 13-01434, ECF No. 80] (the "BisB Resp. to Comm. SMF"); Comm. Tadhamon SMF ¶ 9.  The amounts invested by the Defendants over time through Arcapita ultimately resulted in Arcapita owing to each Defendant a substantial sum.  Comm. BisB SMF ¶¶ 23, 79; BisB Resp. to Comm. SMF ¶¶ 23, 79; Comm. Tadhamon SMF ¶ 16; Tadhamon Capital, B.S.C.'s Resp. to the Official Comm. of Unsecured Creditor's Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. ¶ 16 [Adv. Pro. No. 13-01435, ECF No. 78] (the "Tadhamon Resp. to Comm. SMF").

1.  BisB Investments with Arcapita

In April 2002, BisB entered into one such Investment Agreement with Arcapita (the "BisB Agreement"), which resulted in BisB ultimately investing a total of approximately $9.8 million with Arcapita.  Comm. BisB SMF ¶¶ 3, 10.  Under the BisB Agreement, BisB and Arcapita engaged in two investment transactions in December 2011, each of which were rolled over multiple times.  Comm. BisB SMF ¶¶ 7-9, 13-22, 25-26.  One of these investments was for

BHD (Bahraini Dinars) 1.8 million[4] and the other for $5 million.[5]  Comm. BisB SMF ¶ 7.  The

two investments were set to mature on March 15 and 16, 2012, respectively, less than a week

prior to the Petition Date.  Comm. BisB SMF ¶¶ 16, 21.  On March 16, 2012, the $5 million

investment was rolled over for a fifth and final time, establishing a new maturity date of March

23, 2012.  Comm. BisB SMF ¶ 22; Khani BisB Decl., Ex. E at BISB_000115.  On March 15,

2012, the other investment of BHD 1.8 million was rolled over for a fifth and final time,

establishing a new maturity date of March 22, 2012.  Comm. BisB SMF ¶¶ 17.  The parties agree

---

[4]     On December 1, 2011, BisB and Arcapita entered into a BHD 1.8 million investment transaction with a maturity date of January 4, 2012, and an established return of BHD 2,040.00.  Comm. BisB SMF ¶ 8.  The investment was rolled over for the first time on January 4, 2012, establishing a new maturity date of February 6, 2012 and a new return of BHD 1,980.00.  Comm. BisB SMF ¶ 13; BisB Resp. to Comm. SMF ¶ 13.  This investment was rolled over for the second time on February 6, 2012, establishing a new maturity date of February 29, 2012, and a new return of BHD 1,380.  Comm. BisB SMF ¶ 14.  The investment was rolled over for a third time on February 29, 2012, establishing a new maturity date of March 8, 2012, and a new return of BHD 400.307.  Comm. BisB SMF ¶ 15.  The investment was rolled over for a fourth time on March 8, 2012, establishing a new maturity date of March 15, 2012, and a new return of BHD 350.346.  Comm. BisB SMF ¶ 16.  The investment was rolled over for the fifth and final time on March 15, 2012, four days before Arcapita filed for bankruptcy.  Comm. BisB SMF ¶ 17.  This final rollover established a new maturity date of March 22, 2012, and a new return of BHD 350.00.  BisB SMF ¶ 17.  Upon three of the rollovers, the agreed-upon return was paid to BisB, and only the principle investment amount was rolled over.  Comm. BisB SMF ¶ 25.  For the other two rollovers, the agreed-upon return was rolled over along with the principle investment amount.  Comm. BisB SMF ¶ 25.

[5]     Also on December 1, 2011, BisB and Arcapita entered into a separate $5 million transaction with a maturity date of January 4, 2012, and an established return of $7,555.56.  Comm. BisB SMF ¶ 9.  This investment was rolled over for the first time on January 4, 2012, establishing a new maturity date of February 6, 2012, and a new return of $7,333.33.  Comm. BisB SF ¶ 18; BisB Resp. to Comm. SMF ¶ 18.  The investment was rolled over for a second time on February 6, 2012, establishing a new maturity date of February 29, 2012, and a new return of $5,111.11.  Comm. BisB SMF ¶ 19.  The investment was rolled over for a third time on February 29, 2012, establishing a new maturity date of March 9, 2012, and a new return of $1,250.00.  Comm. BisB SMF ¶ 20.  The investment was rolled over for a fourth time on March 9, 2012, establishing a new maturity date of March 16, 2012, and a new return of $972.22.  Comm. BisB SMF ¶ 21; Khani BisB Decl., Ex. E at BISB_000154.  The investment was rolled over for a fifth and final time on March 16, 2012, just days before Arcapita's bankruptcy filing, establishing a new maturity date of March 23, 2012, and a new return of $972.22.  Comm. BisB SMF ¶ 22; Khani BisB Decl., Ex. E at BISB_000115.  Upon each of these rollovers, the agreed-upon return was paid to BisB, and only the principle amount of the investment was rolled over.  Comm. BisB SMF ¶ 26.

        There is an inconsistency between the Committee's pleadings and its statement of material facts with respect to certain of the rollover dates for the $5 million transaction.  In its statement of material facts, the Committee asserts that the fourth rollover took place on March 8, 2012 and the fifth rollover took place on March 14, 2012.  *See* Comm. BisB SMF ¶¶ 21, 22.  But the Committee's briefs list these rollovers as taking place on March 9, 2012 and March 16, 2012, respectively.  *See* Comm. BisB SJM at 6 (chart and text); Comm. BisB Resp. at 21.  The applicable transaction documents list the purchase dates for these rollovers as March 9 and 16, 2012, but the documents themselves are dated March 8, 2012 and March 14, 2012.  *See* Khani BisB Decl., Ex. E at BISB_000154, BISB_000115.  But as these differences are not material to the outcome of this Decision, the Court will refer to these rollovers for purposes of consistency as occurring on March 9, 2012 and March 16, 2012, respectively.

that the total of the two investments is approximately $9.8 million.  Comm. BisB SMF ¶ 10.[6]  In

summary, BisB had the following investments on deposit with Arcapita:

| INITIAL TRANSACTION DATE: | MATURITY DATE: | AMOUNT INVESTED: | TRANSACTION ROLL OVER DATES: |
|---|---|---|---|
| December 1, 2011 | January 4, 2012 | BHD 1,800,000 (Bahraini Dinars) | 1/4/12 - 2/6/12 2/6/12 - 2/29/12 2/29/12 - 3/8/12 3/8/12 - 3/15/12 3/15/12 - 3/22/12 |
| December 1, 2011 | January 4, 2012 | $5,000,000 | 1/4/12 - 2/6/12 2/6/12 - 2/29/12 2/29/12 - 3/9/12 3/9/12 - 3/16/12 3/16/12 - 3/23/12 |

2.  <u>Tadhamon Investments with Arcapita</u>

Tadhamon and Arcapita also entered into two Investment Agreements, one in September

2009 and the other in November 2011 (together, the "Tadhamon Agreements"), with Tadhamon

ultimately investing a total of over $18 million with Arcapita.  Comm. Tadhamon SMF ¶¶ 5, 6,

17; Tadhamon Resp. to Comm. SMF ¶ 5.  Between November 2011 and January 2012,

Tadhamon and Arcapita engaged in four investment transactions under the Tadhamon

Agreements,[7] certain of which were rolled over by agreement of the parties before or upon the

---

[6]      The Committee asserts that these investments ultimately gave rise to approximately $9.8 million plus agreed-upon returns of BHD 350.346 and $972.22 due from Arcapita to BisB as of the Petition Date.  Comm. BisB SMF ¶ 23; *but see infra* n.63.

[7]      On August 8, 2011, Tadhamon and Arcapita entered into a $99,750 investment contract with a maturity date of August 3, 2012, and a return of $5,562.45.  Comm. Tadhamon SMF ¶ 10.  On November 17, 2011, Tadhamon and Arcapita entered into a $12 million investment contract with a maturity date of May 17, 2012. Comm. Tadhamon SMF ¶ 13.  On January 9, 2012, Tadhamon and Arcapita entered into two contracts: a $2 million investment contract with a maturity date of April 9, 2012, and a return of $22,750.00; and a $4 million investment contract with a maturity date of April 9, 2012, and a return of $45,500.00.  Comm. Tadhamon SMF ¶¶ 11-12.

maturity date of the investment.  Comm. Tadhamon SMF ¶ 9.[8]  Thus, as of the March 19, 2012

Petition Date, Tadhamon had the following four investments on deposit with Arcapita:

| TRANSACTION DATE: | MATURITY DATE: | AMOUNT INVESTED: | EXPECTED RETURN: |
|---|---|---|---|
| August 8, 2011 | August 3, 2012 | $99,750 | $5,562.45 |
| November 17, 2011 | May 17, 2012 | $12,000,000 | $485,333.33 |
| January 9, 2012 | April 9, 2012 | $2,000,000 | $22,750.00 |
| January 9, 2012 | April 9, 2012 | $4,000,000 | $45,500.00 |

## B.  Investments Made by Arcapita Through the Defendants

In addition to investments by the Defendants with Arcapita, Arcapita made investments

with the Defendants.  Specifically, Arcapita entered into similar master investment agreements

with each of the Defendants, under which the parties engaged in several investment transactions.

In these transactions, Arcapita appointed the applicable Defendant as its agent for the investment

of Arcapita's funds for the purchase of Shari'a-compliant investments from a third party and the

sale of those same investments to the Defendants on a deferred payment basis, on an agreed-

upon maturity date.  Comm. BisB SMF ¶ 27; Comm. Tadhamon SMF ¶¶ 22-23.  Under the

structure of the investment transactions, Arcapita would transfer funds to the Defendants, which

were then used to make certain investment purchases in Arcapita's name.  Comm. BisB SMF ¶

30; Comm. Tadhamon SMF ¶ 24.  The Defendants would then repurchase the investments from

Arcapita on a deferred payment basis for an amount equal to the original investment plus an

agreed-upon return.  Comm. BisB SMF ¶¶ 30, 32; Comm. Tadhamon SMF ¶ 25.

---

[8]      The Committee asserts that as a result of the transactions made under the Tadhamon Agreements, Arcapita
owed Tadhamon the amount of $18,658,895.78 as of the Petition Date.  Comm. Tadhamon SMF ¶ 21; *but see infra*
n.63.

The type of transactions involved were different for each Defendant. The investments that Arcapita made with BisB were so-called murabaha transactions, which involve Shari'a-compliant investments in fungible commodities. Comm. BisB SMF ¶ 27; *see* Thomas BisB Report at 8.[9] The investments with Tadhamon were wakala transactions. Tadhamon Resp. to Comm. SMF ¶ 47. In a wakala transaction, "instead of offering to sell a commodity, the placing institution offers to make an investment based on an expected return stated by the receiving institution." Thomas Tadhamon Report at 15-16. For wakala transactions, Tadhamon typically invests its clients funds in Shari'a-compliant investment products such as debt instruments, murabaha and wakala placements, and bridge financing products. Tadhamon Capital's Statement of Undisputed Facts in Supp. of its Cross-Mtn. for Summ. J. ¶ 25 [Adv. Pro. No. 13-01435, ECF No. 75] (the "Tadhamon SMF").

Another distinction between the two types of transactions involves the obligation to repurchase the investment. Murabaha transactions involve an obligation to repurchase and an agreed repurchase amount. Tadhamon Resp. to Comm. SMF ¶¶ 25, 33; *see also* Thomas BisB Report at 10 ("The benefit of murabaha is that it discloses the cost price of goods and commodities to the buyer. This creates a transparent analogy to principal (the cost price) and interest (the profit added to the cost price). As a result, one may infer an interest rate and credit margin from most murabaha transactions."). But wakala transactions instead provide for an expected (but not guaranteed) investment return that is paid on a specified date. *See* Tadhamon Resp. to Comm. SMF ¶¶ 25, 33; *see also* Thomas Tadhamon Report at 15, 33 (stating that "[t]he wakala placement according to AAOIFI is a risk bearing instrument" and that an investor risks

---

[9]      Certain murabaha transactions also involve the purchase and sale of goods. *See* Thomas BisB Report at 7. But the more common type of murabaha involve commodities, and these were the type used in Arcapita's transactions with Tadhamon. *See id.* at 8-9.

the "loss of capital due to losses by the pool" and "the risk of a lower than expected return on capital due [to] under performance in the pool").

Tadhamon's wakala transactions technically did not involve an obligation to repurchase or agreed repurchase amount.  Tadhamon Resp. to Comm. SMF ¶¶ 25, 33.  But while Tadhamon does not guarantee a return on wakala investments, it typically pays the agreed profit rate "99 percent of the time," with excess profit retained by Tadhamon.  Tadhamon Resp. to Comm. SMF ¶ 52 (quoting Khani Tadhamon Decl., Ex. A at 70:24-71:24 (Dep. Tr. of Ahmed Hatam Sultan, Feb. 8, 2018)).  This is the case even if the underlying investment does not generate the expected return.  Khani Tadhamon Decl., Ex. A at 71:12-21 (Dep. Tr. of Ahmed Hatam Sultan, Feb. 8, 2018).

1.  Arcapita's Investments with BisB

On July 10, 2003, BisB and Arcapita entered into an Investment Agreement (the "2003 Investment Agreement"), under which BisB and Arcapita executed three murabaha commodity investment transactions on March 13, 14 and 15, 2012, respectively (each a "BisB Placement," and collectively, the "BisB Placements").  Comm. BisB SMF ¶¶ 27, 34.[10]  Each BisB Placement was in the amount of $10 million, for a total of $30 million transferred by Arcapita to BisB.  Comm. BisB SMF ¶ 35.  BisB subsequently paid Arcapita the proceeds of the $20 million placed

---

[10]     On each day of March 13, 14, and 15, 2012, BisB sent Arcapita an "Investment Offer" corresponding to each BisB Placement.  Comm. BisB SMF ¶ 36.  Arcapita sent BisB an Investment Acceptance pertaining to each Investment Offer for the BisB Placements, the parties exchanged the corresponding Agent's Confirmations and Purchase Offers, and the corresponding purchase acceptances, pertaining to each BisB Placement, and the three BisB Placements were effected on March 13, 14, and 15, 2012, respectively, according to the procedure established in the 2003 Investment Agreement.  Comm. BisB SMF ¶ 37.

The March 13, 2012 BisB Placement was in the amount of $10 million with a maturity date of March 27, 2012 and an agreed-upon return of 0.55 percent per annum.  Comm. BisB SMF ¶ 47.  The March 14, 2012 BisB Placement was in the amount of $10 million with a maturity date of March 29, 2012 and an agreed-upon return of 0.55 percent per annum.  Comm. BisB SMF ¶ 50.  The March 15, 2012 BisB Placement was in the amount of $10 million with a maturity date of March 26, 2012 and an agreed-upon return of 0.6 percent per annum.  Comm BisB SMF ¶ 52.

with BisB on March 13 and 15, 2012, but retained the March 14, 2012 Placement; the

Committee asserts that a total of $10,002.291.66 is currently outstanding, but BisB alleges this

amount can be retained as a valid setoff under Bahraini law.  Comm. BisB SMF ¶¶ 39, 40; BisB

Resp. to Comm. SMF ¶¶ 39, 40.  A summary of these transactions is as follows:

| INVESTMENT DATE: | MATURITY DATE: | INVESTMENT AMOUNT: | RATE OF RETURN: | COMMENTS: |
|---|---|---|---|---|
| March 13, 2012 | March 27, 2012 | $10,000,000 | 0.55% per annum | Paid on maturity |
| March 14, 2012 | March 29, 2012 | $10,000,000 | 0.55% per annum | Setoff asserted |
| March 15, 2012 | March 26, 2012 | $10,000,000 | 0.60% per annum | Paid on maturity |

   2.  Arcapita's Investments with Tadhamon

       On March 15, 2012, Tadhamon and Arcapita entered into a "Master Wakala Agreement

for Investment" (the "Master Wakala Agreement").  Comm. Tadhamon SMF ¶ 22.  That same

day, Arcapita and Tadhamon entered into two investment transactions pursuant to the Master

Wakala Agreement (the "Tadhamon Placements").  Comm. Tadhamon SMF ¶ 31.[11]  Each

Tadhamon Placement called for Arcapita to invest $10 million with Tadhamon.  Comm.

Tadhamon SMF ¶ 31.[12]  Subsequent to the Petition Date of March 19, 2012, Tadhamon sent

Arcapita an offer to reinvest, or "rollover" the principal amounts of the Tadhamon Placements,

which were set to expire on March 30 and April 16, 2012.  Comm. Tadhamon SMF ¶ 75.

Arcapita agreed and contracts rolling over the Tadhamon Placements were executed on March

28 and April 15, 2012 (the "Tadhamon Rollover Contracts"), with new maturity dates of April

30, 2012 and May 16, 2012, respectively.  Comm. Tadhamon SMF ¶¶ 76-77, 82, 84.  These

---

[11]     On March 15, 2012, Tadhamon sent Arcapita  a "Wakil Offer" corresponding to each of the Tadhamon
Placements, in accordance with the Master Wakala Agreement.  Comm. Tadhamon SMF ¶ 32.  On that same day,
Arcapita returned to Tadhamon a "Muwakkil Acceptance" corresponding to each "Wakil Offer," in accordance with
the Master Wakala Agreement.  Comm. Tadhamon SMF ¶ 34.

[12]     One of the Tadhamon Placements entered into on March 15, 2012 was for $10 million with a maturity date
of March 30, 2012 and a 1.25 percent per annum rate of return.  Comm. Tadhamon SMF ¶ 41.  The other was for
$10 million with a maturity date of April 16, 2012 and a 2.00 percent per annum rate of return.  Comm. Tadhamon
SMF ¶ 42.

rollovers constituted new investments that were made pursuant to new contracts.  Comm.

Tadhamon SMF ¶ 79.[13]   A summary of these placement and rollover contracts is as follows:

| INVESTMENT DATE: | MATRITY DATE: | INVESTMENT AMOUNT: | EXPECTED RATE OF RETURN: | COMMENTS: |
|---|---|---|---|---|
| 3/15/2012 | 3/30/2012 | $10,000,000 | 1.25% per annum | |
| 3/30/2012 | 4/30/2012 | $10,000,000 | 1.5% per annum | Rollover of the 3/15/12 – 3/30/12 Placement |
| 3/15/2012 | 4/16/2012 | $10,000,000 | 1.25% per annum | |
| 4/16/2012 | 5/16/2012 | $10,000,000 | 1.5% per annum | Rollover of the 3/15/12 – 4/16/12 Placement |

## C. Defendants' Purported Setoffs

Arcapita filed for Chapter 11 protection on March 19, 2012.  Comm. BisB SMF ¶ 67;

Comm. Tadhamon SMF ¶ 69.  The March 14, 2012 Placement between BisB and Arcapita

subsequently matured on March 29, 2012; by its terms it provided for payment to Arcapita of

$10,002,291.66 in proceeds by BisB (the "BisB Maturity Proceeds").  Comm. BisB SMF ¶ 77.

Likewise, the rollover contracts for the Tadhamon Placements between Tadhamon and Arcapita

matured on April 30, 2012 and May 16, 2012, the terms of which provided for payment of

$10,012,916.67 and $10,012,500.00, respectively, to Arcapita by Tadhamon (the "Tadhamon

Rollover Proceeds" and, together with the BisB Maturity Proceeds, the "Transaction Proceeds").

Comm. Tadhamon SMF ¶¶ 83, 85, 95, 96.

After the bankruptcy filing, Arcapita made attempts to recover the Transaction Proceeds

from both BisB and Tadhamon.  These attempts included a letter sent to each of the Defendants

---

[13]        The $10 million rollover contract executed on March 28, 2012 had a new investment date of March 30, 2012, a new maturity date of April 30, 2012, and a new expected rate of return of 1.5 percent per annum.  Comm. Tadhamon SMF ¶ 82.  The amount due to Arcapita on April 30, 2012 under that contract totaled $10,012,916.67.  Comm. Tadhamon SMF ¶ 83.  The $10 million rollover contract executed on April 15, 2012 had a new investment date of April 16, 2012, a new maturity date of May 16, 2012, and a new expected rate of return of 1.5 percent per annum.  Comm. Tadhamon SMF ¶ 84.  The amount due to Arcapita on May 16, 2012 under this contract amounted to $10,012,500.00.  Comm. Tadhamon SMF ¶ 85.

on April 30, 2012 by Arcapita's bankruptcy counsel at Gibson, Dunn & Crutcher LLP.  Comm. BisB SMF ¶ 78; Comm. Tadhamon SMF ¶ 101.  The letters discussed the automatic stay imposed under Section 362 of the Bankruptcy Code by Arcapita's bankruptcy filing and demanded payment of the Transaction Proceeds as property of Arcapita's bankruptcy estate pursuant to Section 542 of the Bankruptcy Code.  Comm. BisB SMF ¶ 78; Comm. Tadhamon SMF ¶ 101.

On June 25, 2012 and June 28, 2012, K&L Gates LLP sent responsive letters on behalf of Tadhamon and BisB, respectively, which asserted that each of the Defendants had exercised a purported right to a setoff of the debts owing between themselves and Arcapita under Bahraini law.  Comm. BisB SMF ¶ 80, 81, 84; Comm. Tadhamon SMF ¶¶ 104, 107.  Thus, the Defendants asserted a setoff of the Transaction Proceeds that were owed by the Defendants to Arcapita against the amounts that were due from Arcapita to the Defendants under their respective Investment Agreements.  Comm. BisB SMF ¶ 80, 81, 84; Comm. Tadhamon SMF ¶¶ 104, 107.[14]  Despite occurring after the Petition Date, the Defendants neither sought nor obtained approval from this Court to exercise a setoff of any kind.  Comm. BisB SMF ¶ 97; Comm. Tadhamon SMF ¶ 135.

The Central Bank of Bahrain (the "CBB") subsequently issued a formal direction to each of the then-CEOs of BisB and Tadhamon, which provided, among other things, that the Defendants either: (i) immediately return the Transaction Proceeds to Arcapita, or (ii) seek permission from the Bankruptcy Court in accordance with the Bankruptcy Code to withhold the funds, and return the funds if such permission is not granted.  Comm. BisB SMF ¶¶ 90, 92;

---

[14]    The Committee asserts that by exercising the setoffs, the Defendants recovered in full on the debts due to them under the Investment Agreements.  Comm. BisB SMF ¶ 89; Comm. Tadhamon SMF ¶ 119; *but see infra* n.63.

Comm. Tadhamon SMF ¶¶ 126, 127.  The CBB is the sole regulator of Bahrain's financial sector

and is in charge of the licensing, regulation and supervision of parties carrying out regulated

financial services in Bahrain.  Comm. BisB SMF ¶ 91; Comm. Tadhamon SMF ¶ 125.

The CBB provided its formal direction to BisB through a letter to BisB's then-CEO,

dated July 4, 2012 (the "BisB Formal Direction") and to Tadhamon in a letter to Tadhamon's

then-CEO, dated July 15, 2012 (the "Tadhamon Formal Direction," and together with the BisB

Formal Direction, the "Formal Directions").  Comm. BisB SMF ¶ 90; Comm. Tadhamon SMF ¶

126.  The BisB Formal Direction states that the CBB:

> hereby directs your Bank to exercise one of the following options: (i) that your
> Bank complies with the request to release the funds and returns the funds
> immediately to Arcapita Bank B.S.C. (c), or (ii) that your Bank seeks permission
> from the US Bankruptcy Court (in accordance with the US Bankruptcy Code),
> prior to affecting any set-off, and if such permission is not granted, that your Bank
> returns the funds that it holds for the account of Arcapita Bank B.S.C. (c)
> immediately.

Khani BisB Decl., Ex. Q at BISB_001525.  Similarly, the Tadhamon Formal Direction states that

the CBB:

> hereby directs your Company to exercise one of the two following options:
>
> (i) that your Company complies with the request to release the funds and returns
> the funds immediately to Arcapita Bank B.S.C. (c), or
>
> (ii) that your Company seeks permission from the US Bankruptcy Court (in
> accordance with the US Bankruptcy Code) to withhold the funds.  In the event
> that such permission is not granted, that your Company returns the funds that it
> holds for the account of Arcapita Bank B.S.C. (c) immediately.

Khani Tadhamon Decl., Ex. V at TAD_007809.  There is no evidence that the CBB ever

withdrew or amended the Formal Directions.  *See, e.g.,* Comm. Tadhamon SMF ¶ 134.

The Committee subsequently filed these adversary proceedings against the Defendants to

seek damages for breach of contract and violation of the automatic stay, turnover of the

Transaction Proceeds, claims disallowance, and with respect to BisB, the avoidance of a

preferential transfer. *See* Compl. ¶ 1 [Adv. Pro. No. 13-01434, ECF No. 1]; Compl. ¶ 1 [Adv.

Pro. No. 13-01435, ECF No. 1].

In support of its request for summary judgment, the Committee argues that under

Bahraini law, the Defendants have breached the terms of their respective contracts with Arcapita

by withholding the Transaction Proceeds from Arcapita beyond the maturity dates of those

agreements.[15]   The Committee seeks turnover of the balance of the Transaction Proceeds under

Section 542(b) of the Bankruptcy Code, as these debts owed to Arcapita are matured and

constitute property of the estate.   The Committee also argues that the Defendants' failure to

return the balance of the Transaction Proceeds constitutes a willful violation of the automatic

stay.[16]   The Committee further seeks disallowance of any claims the Defendants have against

Arcapita under Section 502(d) of the Bankruptcy Code, due to the Defendants' liability to the

estate under the turnover provisions of Section 542.   With respect to BisB, the Committee

alternatively argues that Arcapita's transfer of funds to BisB for the March 14 Placement was an

avoidable preferential transfer under Section 547(b) of the Bankruptcy Code.

In their cross-motions for summary judgment, the Defendants initially argue that this

Court lacks personal jurisdiction over them.   As for the requested return of the Transaction

Proceeds, the Defendants assert that they properly exercised their rights to the setoffs under

Bahraini law and that their actions in retaining the funds are further safeguarded by the safe

---

[15]   The Committee seeks $10,002.291.66 from BisB and $18,613,366.04 from Tadhamon as damages for breach of contract, plus other appropriate damages, costs and interest, including prejudgment interest at the rate of 9%.   *See* Official Comm. of Unsecured Creditors' Mem. of Law in Supp. of its Mot. for Summ. J. at 18, 35-36 [Adv. Pro. No. 13-01434, ECF No. 72] (the "Committee BisB SJM"); Official Comm. of Unsecured Creditors' Mem. of Law in Supp. of its Mot. for Summ. J. at 19, 37 [Adv. Pro. No. 13-01435, ECF No. 69] (the "Comm. Tadhamon SJM").

[16]   The Committee requests that the Court declare the Defendants' purported setoffs *void ab initio* and further award damages and attorneys' fees due to willful violation of the automatic stay.   *See* Comm. BisB SJM at 32-33; Comm. Tadhamon SJM at 33-35.

harbor provisions of the Bankruptcy Code. In its opposition to the Defendants' cross-motions, the Committee notes that the question of personal jurisdiction has already been decided in these cases. The Committee also argues that the purported setoff by Tadhamon fails to satisfy the requirements of Section 553(a) because the debts between the parties lacked mutuality. Additionally, the Committee contends that the Defendants' purported setoffs are in violation of Bahraini law by virtue of the CBB's Formal Directions and the debts at issue were created to assert setoff rights in violation of Section 553(a)(3)(C) of the Bankruptcy Code. Last but not least, the Committee contends that none of the asserted safe harbors of the Bankruptcy Code protect these transactions.

After a brief discussion of personal jurisdiction, this Decision will address the various issues regarding setoff, including mutuality, whether the setoff violated Bahraini law, and whether the setoffs were done with the improper purpose of asserting setoff rights. The Decision will then address the safe harbors asserted by the Defendants before concluding with a brief discussion of the elements of the Committee's substantive claims.

## DISCUSSION

### A. **Summary Judgment**

Federal Rule of Civil Procedure 56, made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, governs the granting of summary judgment. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [movant] is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56). If the "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

"A fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007). But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "The Court may also grant some but not all of the relief requested in a summary judgment motion if it finds disputed issues of fact as to some of the issues presented." *In re Residential Capital, LLC*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015) (citing Fed. R. Civ. P. 56(g)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [the movant's] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). The showing necessary to satisfy this initial burden depends on which side bears the burden of proof on a particular issue at trial. *See Read Prop. Grp. LLC v. Hamilton Ins. Co.*, 2018 WL 1582291, at *5 (E.D.N.Y. Mar. 30, 2018). When the movant has the burden of proof at trial, its own submissions in support of the motion must entitle it to judgment as a matter of law. *See Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). When the burden of proof falls on the nonmoving party, it is generally sufficient for the movant to point to a lack of evidence on an essential element of the nonmovant's claim. *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). To avoid summary judgment, the nonmoving party must then come forward with evidence sufficient to raise a genuine issue of fact for trial. *See id*.

"In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita*, 475 U.S. at 587). But "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation[,]" *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001), and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"When cross motions for summary judgment are made, the standard is the same as that for individual motions." *United Indus. Corp. v. IFTE plc*, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id.* "Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

## B. <u>Personal Jurisdiction</u>

The Defendants first assert that they are entitled to summary judgment based on a lack of personal jurisdiction. But this argument can be easily rejected. Personal jurisdiction was previously litigated in these cases. On appeal from a decision of this Court, the District Court for the Southern District of New York held that the Defendants' use of New York correspondent bank accounts to receive funds from Arcapita met the threshold of minimum contacts necessary

to assert personal jurisdiction over the Defendants. *See Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahrain Islamic Bank (In re Arcapita Bank B.S.C.(c))*, 549 B.R. 56, 67-71 (S.D.N.Y. 2016), *rev'g Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahrain Islamic Bank (In re Arcapita Bank B.S.C.(c))*, 529 B.R. 57 (Bankr. S.D.N.Y. 2015).

The District Court's decision on personal jurisdiction is currently law of the case, given the Defendants' lack of an appeal from the District Court's decision. *See* Mot. to Alter or Amend Orders Denying Mot. to Dismiss Pursuant to Bankruptcy Rule 9023 and Local Bankr. Rule 9023-1 at 5 n.10 [Adv. Pro. No. 13-01434, ECF No. 58; Adv. Pro. No. 13-01435, ECF No. 54] ("As to personal jurisdiction over the Defendants, they did not seek an interlocutory appeal of the District Court Decision and acknowledge that it is currently the law of the case."). While the Defendants note that they reserved their right to appeal the issue, such appeal will ultimately be addressed by the Court of Appeals for the Second Circuit, not this Court.

Relying on additional evidence as to their contacts with the United States, the Defendants now argue that such evidence can be considered on summary judgment when it comes to light after a ruling on a Fed. R. Civ. P. 12(b) motion. *See Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637 (S.D.N.Y. 2015). But *Bank Leumi* involved a court reconsidering its own previous ruling on the issue of personal jurisdiction. In the circumstances here, the Court is bound by the decision of the District Court. *See Kerman v. City of New York*, 374 F.3d 93, 110 (2d Cir. 2004) ("Where issues have been explicitly or implicitly decided on appeal, . . . the law-of-the-case doctrine obliges the district court on remand to follow the decision of the court of appeals . . . .") (citations and quotations omitted).

Even if this Court were permitted to revisit the issue of personal jurisdiction, the

Defendants have not shown that their new evidence compels a different conclusion. The

Defendants now put forward evidence that reiterates their lack of contacts with the United States,

as well as evidence that the Defendants and Arcapita engaged in dollar denominated investment

placements with one another that were cleared through U.S. correspondent bank accounts. *See*

Bahrain Islamic Bank's Statement of Undisputed Facts in Supp. of its Cross-Mtn. for Summ. J.

¶¶ 6-12, 17-23 [Adv. Pro. No. 13-01434, ECF No. 77] (the "BisB SMF"); Tadhamon SMF ¶¶

37-44, 49-53. The new facts relate to the Defendants' overall lack of contacts with the United

States, or the details about how the correspondent accounts were used. But this "new" evidence

is fully consistent with the evidence already presented by the Defendants on the issue of personal

jurisdiction. *See In re Arcapita*, 549 B.R. at 60-62 (detailing facts regarding location of

Defendants and their use of correspondent accounts). None of this new evidence refutes the facts

upon which the District Court relied, which was the use of the correspondent bank accounts for

the transactions at issue in this case. *See id*. at 68-70. It is simply more of the same.

**C.     Setoff**

Rather than debate the merits of the Committee's underlying claims, the Defendants

argue that their retention of the Transaction Proceeds is appropriate because they exercised a

valid right of setoff under Bahraini law. "Although the Bankruptcy Code does not itself establish

a right of setoff, [S]ection 553 of the Bankruptcy Code recognizes and preserves any right to

setoff that exists under applicable non-bankruptcy law, to the extent that the conditions of

[S]ection 553 have been satisfied." *In re Lehman Bros. Holdings*, 404 B.R. 752, 757 (Bankr.

S.D.N.Y. 2009) (citations omitted).[17]  Section 553(a) provides, in relevant part:

---

[17]     *See also Felton v. Noor Staffing Grp., LLC (In re Corp. Res. Servs. Inc.)*, 564 B.R. 196, 205 (Bankr.
S.D.N.Y. 2017) ("[T]he right to apply setoff in bankruptcy most certainly depends on bankruptcy law—[S]ection

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . .

11 U.S.C. § 553(a).  The prerequisites for a valid setoff under Section 553(a) of the Bankruptcy Code include that "(1) the amount owed by the debtor must be a prepetition debt; (2) the debtor's claim against the creditor must also be prepetition; and (3) the debtor's claim against the creditor and the debt owed the creditor must be mutual."  *In re Lehman*, 404 B.R. at 757 (citations and quotations omitted).  Moreover, Section 553(a)(3)(C) permits setoff only if the debt was not incurred by the creditor "for the purpose of obtaining a right of setoff against the debtor."  11 U.S.C. § 553(a)(3)(C).  "A creditor bears the burden of proving a right of setoff. . . ."  *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Grp.)*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997).  But whether to allow setoff is within the sound discretion of the Court, *In re Lehman*, 404 B.R. at 757, and the court may "invoke equity to bend the rules, if required, to avert injustice."  *In re Bennett Funding*, 212 B.R. at 212 (quotations omitted).  Thus, even if "the technical requirements of setoff are satisfied, the bankruptcy judge must [also] scrutinize the right of setoff in light of the Bankruptcy Code's goals and objectives.  These goals include . . . equitable treatment of all creditors."  *Id.* (citations and quotations omitted).

---

553 preserves the right to setoff available under applicable nonbankruptcy law, but [S]ection 553 adds three conditions in subsections 553(a)(1), (2) and (3) to applying setoff in bankruptcy."); *In re Delta Air Lines, Inc.*, 341 B.R. 439, 445 (Bankr. S.D.N.Y. 2006) (noting that "11 U.S.C. § 553 limits the use of setoff rights already available under [nonbankruptcy] law . . . .)" (citation and quotation omitted); *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, 439 B.R. 811, 823 (Bankr. S.D.N.Y. 2010) (noting that "Section 553 of the Bankruptcy Code does not provide for an independent right of setoff, but rather incorporates any pre-existing setoff right that may exist under [nonbankruptcy] law so long as such setoff complies with the prerequisites set forth in section 553(a)"); *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009) ("[S]etoff is appropriate in bankruptcy only when a creditor both enjoys an independent right of setoff under applicable non-bankruptcy law, and meets the further Code-imposed requirements and limitations set forth in [S]ection 553.") (citing *Dollar Bank, FSB v. Tarbuck (In re Tarbuck)*, 318 B.R. 78, 81 (Bankr. W.D. Pa. 2004)).

1. <u>Mutuality as to Tadhamon</u>

The Committee asserts that Tadhamon's attempted setoff is unenforceable because there is no mutuality of obligations between the parties. More specifically, the Committee argues that Tadhamon cannot establish mutuality of its postpetition debts under the Tadhamon Rollover Contracts against Arcapita's prepetition debts under the Tadhamon Agreements and related transactions. "[I]n accordance with the doctrine of mutuality, pre-petition claims may not set-off against post-petition claims . . . . The rationale . . . is that a pre-petition debtor and a debtor-in-possession are separate and distinct entities." *Burley v. Am. Gas & Oil Inv'rs (In re Heafitz)*, 85 B.R. 274, 278 (Bankr. S.D.N.Y. 1988) (citations omitted). "[I]n the context of bankruptcy, postpetition debts may not provide the basis for setoff because mutuality ceases upon the filing of the bankruptcy estate." *In re Lehman*, 404 B.R. at 760 (citations and quotations omitted). The creditor bears the burden to establish that the setoff was mutual. *See id.* at 758 (citations omitted). Furthermore, "mutuality is strictly construed against the party seeking setoff." *In re Bennett Funding*, 212 B.R. at 212.

Tadhamon asserts that the mutuality requirement under Section 553 of the Bankruptcy Code is somehow preempted by the safe harbor provisions of the Bankruptcy Code. Specifically, Tadhamon argues that the plain language of the safe harbor provisions in combination with the language of Section 553 overcome the mutuality requirement. Tadhamon first observes that the safe harbor provisions—including Sections 362(b)(6), (17) and (27), 362(o), 561(a) and (d)—contain language stating that they are not limited by any other provisions of the Bankruptcy Code. Additionally, Tadhamon notes that the language of Section 553(a) is qualified by its opening phrase, which states: "*Except as otherwise provided in this section* and in sections 362 and 363 of this title . . . ." 11 U.S.C. § 553(a) (emphasis added).

Tadhamon asserts that other provisions of Section 553—specifically Section 553(a)(2)(B)(ii),

553(a)(3)(C) and 553(b)(1)—fall under the "[e]xcept as otherwise provided language" because

these subsections carve out the safe harbor provisions from the restrictions of Section 553.[18]

But the Court disagrees.  The Court is persuaded by the treatment of this question in *In re

Lehman Bros. Holdings Inc.*, 433 B.R. 101 (Bankr. S.D.N.Y. 2010).  In *Lehman*, Swedbank AG

sought to set off prepetition debt owed by the debtors to Swedbank under certain ISDA Master

Agreements against funds that the debtor had transferred after the petition date into its general

deposit account at Swedbank.  *See id.* at 104-06.  Swedbank argued that it was entitled to

exercise its contractual setoff right under the ISDA agreements against the postpetition funds

held in the deposit account—despite a lack of mutuality under Section 553—because the ISDA

agreements were covered by the safe harbor provisions of Sections 560 and 561 of the

Bankruptcy Code, which permit the exercise of "any contractual right" of setoff.  *See id*. at 108.

The *Lehman* court rejected Swedbank's argument.  The court conceded that Sections 560

and 561 provide that "the exercise of any contractual right . . . shall not be stayed, avoided, or

otherwise limited by operation of any provision of this title."  *Id.* at 108 (emphasis omitted).  But

the *Lehman* court went on to observe that these safe harbor provisions plainly did not address the

mutuality requirement under Section 553(a).  *See id.* at 109.  Instead, the language of the sections

merely permitted the exercise of a contractual setoff right notwithstanding other provisions of the

Bankruptcy Code that could operate as a stay, avoid or otherwise limit the setoff right.  *See id.*

---

[18]    Sections 553(a)(2)(B)(ii), 553(a)(3)(C) and 553(b)(1), which detail enumerated exceptions to the setoff right under Section 553, each contain a carveout to the exceptions that cite to the safe harbor provisions.  For instance, Sections 553(a)(2)(B)(ii) and 553(a)(3)(C) state: "except for a setoff of a kind described in [S]ection 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561 . . . ."  11 U.S.C. §§ 553(a)(2)(B)(ii), 553(a)(3)(C).  Similarly, the carveout in Section 553(b)(1) states: "Except with respect to a setoff of a kind described in [S]ection 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, 561, 365(h), 546(h), or 365(i)(2) of this title . . . ."  11 U.SC. § 553(b)(1).

Importantly, the court emphasized that such a setoff right must actually exist in the first place.
*See id*.  As the safe harbor provisions are silent with respect to the mutuality requirement of
Section 553(a), the court declined to read such an exception into the statute.  *See id.* [19]

As to Swedbank's argument that the safe harbor provisions implicitly overrode the
mutuality requirement of Section 553(a), the *Lehman* court disagreed.  The court relied on the
fundamental nature of mutuality as to setoff, observing that "[f]or purposes of any right to setoff
permitted under [S]ection 553, mutuality is baked into the very definition of setoff . . . . To
require that the offsetting balances are mutual does not stay, avoid, or limit the right to offset
because the right only exists in bankruptcy when there is mutuality."  *Id*. at 109-110.[20]

Notwithstanding the *Lehman* decision, Tadhamon here relies on legislative history,
specifically Congress' enactment of the Financial Netting Improvements Act of 2006 ("FNIA"),
which deleted the phrase "mutual debt" from the prior text of the safe harbor provisions.  *See*
Report of Committee on Financial Services on the Financial Netting Improvements Act of 2006,
H.R. Rep. No. 109-648, at 21-23 (2006) (new text of Sections 362(b)(6), (7), (17) and (27) of the
Bankruptcy Code omitting the phrase "mutual debt and claim").  But in *Lehman*, Swedbank

---

[19]      In addition to Sections 560 and 561 of the Bankruptcy Code, Tadhamon argues that the safe harbor
provisions of Sections 362(b)(6), 362(b)(17), 555 and 556 are also not limited by Section 553's mutuality
requirement, relying on the language "any contractual right" contained in each of these provisions and language
stating that these provisions are not limited by any other provisions of the Bankruptcy Code.  *See* Mem. of
Tadhamon Capital B.S.C.(c) in Supp. of its Cross-Mtn. for Summ. J. and Opp. to Comm. Mot. for Summ. J. at 5, 46
[Adv. Pro. No. 13-01435, ECF No. 77] (the "Tadhamon SJM").  This is the same argument put forward in *Lehman*
by Swedbank with respect to Sections 560 and 561 and the Court finds the reasoning of *Lehman* to be equally
applicable to each of these safe harbor provisions cited by Tadhamon.

[20]      Tadhamon also cites Section 363(c)(1) of the Bankruptcy Code, which permits ordinary course business
transactions of a debtor-in-possession.  Tadhamon argues that the prefatory language of Section 553(a)—"[e]xcept
as otherwise provided in this [S]ection and in [S]ections 362 and 363 . . ."—nullifies the mutuality requirement of
Section 553 with respect to Section 363(c)(1).  *See* Tadhamon SJM at 4-5, 47.  But when read with the remainder of
Section 553(a), the prefatory "except" language does not actually expand the circumstances where nonbankruptcy
setoff rights are recognized under the Bankruptcy Code, but rather serves to limit the broad preservation of non-
bankruptcy setoff rights of Section 553(a) by making applicable certain qualifying conditions.  And as more fully
discussed below, the Tadhamon Rollover Contracts were not in the ordinary course of business.

pointed to the same Congressional amendments, arguing that "the amendments to FNIA, which replaced the phrase 'mutual debt and claim' in [S]ections 362(b)(6), (b)(17), and (b)(27) with 'any contractual right,' effectively removed the mutuality requirement from the safe-harbored exceptions to the automatic stay." *In re Lehman*, 433 B.R. at 112.  The *Lehman* court disagreed, however, holding that "[t]he legislative history of FNIA reveals that Congress intended merely to make 'technical changes to the netting and financial provisions' of the Bankruptcy Code to 'update the language to reflect current market and regulatory practices.'  These technical amendments cannot be read as authority for so fundamental a change in creditor rights." *Id*. (quoting Report of Committee on Financial Services on the Financial Netting Improvements Act of 2006, H.R. Rep. No. 109–648, at 1 (2006)).

Tadhamon argues that the *Lehman* case is distinguishable because Swedbank there sought to set off a debt that was created postpetition against prepetition swap debt.  Tadhamon asserts that both of the debts in its relationship with Arcapita were created prepetition and matured postpetition and thus mutuality is not an obstacle to its setoff.  Tadhamon specifically highlights that the parties agreed to roll over the wakala debts postpetition before their first maturity dates and that Tadhamon did not exercise its setoff rights until all the debts had matured.

But Tadhamon's position rests on an incorrect premise.  The debts at issue here are not both prepetition.  "For setoff purposes under [Section] 553, a claim—even a contingent one—arises when all transactions necessary for liability occur." *Feltman v. Noor Staffing Grp., LLC (In re Corp. Res. Serv., Inc.)*, 564 B.R. 196, 207 (Bankr. S.D.N.Y. 2017) (citations and quotations omitted).  "The character of a claim is not transformed from pre-petition to postpetition simply because it is contingent, unliquidated, or unmatured when the debtor's

petition is filed." *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036 (5th Cir. 1987) (citations and quotations omitted). "Setoff 'is permitted when, at the time the bankruptcy petition is filed, the *debt is absolutely owing* but is not presently due, or when a *definite liability has accrued* but is not yet liquidated.'" *In re Corp. Res.*, 564 B.R. at 207 (quoting *In re Young*, 144 B.R. 45, 46-47 (Bankr. N.D. Tex. 1992) (emphasis in original)).

Applying these principles here, the debts owed by Arcapita to Tadhamon were prepetition. They arose under the Tadhamon Agreements entered into in September 2009 and November 2011 and the investment transactions in August 2011, November 2011 and January 2012. *See* Tadhamon Resp. to Comm. SMF ¶¶ 20-21; Tadhamon SMF ¶¶ 5-6, Comm. Tadhamon SMF ¶¶ 10-13, 69. But the debts owed to Arcapita by Tadhamon are postpetition. While the Master Wakala Agreement and the original Tadhamon Placements were entered into just prior to the Petition Date in March 2012, *see* Comm. Tadhamon SMF ¶¶ 22, 31, the Tadhamon Rollover Contracts were entered into on March 28 and April 15, 2012, subsequent to the Petition Date. *See* Tadhamon Resp. to Comm. SMF ¶ 77; Comm. Tadhamon SMF ¶ 76-77. Indeed, Tadhamon admits—as it must—that these contracts were "post-petition business transaction[s]." Tadhamon Resp. to Comm. SMF ¶ 77; *see also* Comm. Tadhamon SMF ¶ 76-77.[21] Because the debt owed by Arcapita arose prepetition but the debt owed to Arcapita arose postpetition, mutuality is lacking. *See, e.g.*, *In re Shoppers Paradise, Inc.*, 8 B.R. 271, 278 (Bankr. S.D.N.Y. 1980) ("[A] postpetition obligation . . . may not be set off against a prepetition obligation of the debtor, since there is a lack of mutuality of obligation."); *Genuity Solutions,*

---

[21]     As if to remove any doubt, Tadhamon also admits that the Tadhamon Rollover Contracts were "new investments" that were made pursuant to "new contracts." Tadhamon Resp. to Comm. SMF ¶ 79; *cf.* Tadhamon Resp. to Comm. SMF ¶ 80 (admitting that the Tadhamon Rollover Contracts contained new terms and replaced the Tadhamon Placements, though Tadhamon asserts that the placements and the new Tadhamon Rollover Contracts, continued to be governed by the Master Wakala Agreement).

*Inc. v. Metro Transp. Auth.* (*In re Genuity Solutions, Inc.*), 2007 Bankr. LEXIS 2133, at *14

(Bankr. S.D.N.Y. June 20, 2007) ("[P]re-petition claims may only be set off against pre-petition

claims, and post-petition claims may only be set off against post-petition claims."); *see also In re*

*Lehman*, 404 B.R. at 760 ("[P]ostpetition debts may not provide the basis for setoff . . . .").

    2.  Validity of the Setoffs Under Bahraini Law

The parties also dispute whether the claimed setoffs are permitted under applicable

nonbankruptcy law, here the law of Bahrain. The Defendants acknowledge that the applicable

contracts with Arcapita do not expressly provide for setoff. *See* Mem. of Bahrain Islamic Bank

in Supp. of its Cross-Mtn. for Summ. J. and Opp. to Comm. Mot. for Summ. J. at 41 [Adv. Pro.

No. 13-01434, ECF No. 79] (the "BisB SJM"); Tadhamon SJM at 45. But as explained in the

report of their expert Zeenat A. Al Mansoori,[22] the Defendants assert an extra-contractual right

to setoff under Bahraini law. *See id.*; *see also* Mansoori BisB Report ¶¶ 28-29; Mansoori

Tadhamon Report ¶¶ 30-31.[23] Specifically, the Defendants rely on Article 353 of the Bahraini

Civil Code, which provides that:

> [a] debtor has a right to a set-off of that which he owes to his creditor against that
> which such creditor owes to him, even when the causes giving rise to the two
> debts are different, provided that they are both for a sum of money or fungibles of
> a like nature and quality, that they are not in dispute and that they are due and
> may be sued for.

---

[22]     When the Court considers the declarations of foreign law experts, it "is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed." *In re B.C.I. Fins. Pty Ltd. (In Liquidation)*, 583 B.R. 288, 300 (Bankr. S.D.N.Y. 2018) (quoting *Norwest Fin., Inc. v. Fernandez*, 86 F. Supp. 2d 212, 227 (S.D.N.Y. 2000)); *see also Faggionato v. Lerner*, 500 F. Supp. 2d 237, 244-48 (S.D.N.Y. 2007) (accepting the conclusions of one of two dueling French law experts because it is the "'persuasive force of the opinions' expressed that is conclusive under Rule 44.1") (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998)).

[23]     Ms. Mansoori notes that setoff is a statutory right under the laws of Bahrain independent of the contracts. *See* Mansoori BisB Report ¶¶ 28-29; Mansoori Tadhamon Report ¶¶ 30-31.

Honeywell BisB Decl. in Further Supp., Ex. 6 (Art. 353(a) of Bhr. Civil Code); *see also* Mansoori BisB Report ¶ 36; Mansoori Tadhamon Report ¶ 38.

But the Committee disagrees. *See generally* Raees BisB Report ¶ 4.2; Raees Tadhamon Report ¶ 4.2. It contends that the Defendants' setoffs are invalid under Bahraini law because they were superseded by the Formal Directions that were issued to each Defendant by the CBB as to these specific transactions. *See* Official Comm. of Unsecured Creditors' Reply in Supp. of Mot. for Summ. J. and in Opp. to Bahrain Islamic Bank's Cross-Mot. for Summ. J. at 11-12 [Adv. Pro. No. 13-01434, ECF No. 83] (the "Committee BisB Reply"); Official Comm. of Unsecured Creditors' Reply in Supp. of Mot. for Summ. J. and Opp. to Tadhamon's Cross-Mot. for Summ. J. at 18-19 [Adv. Pro. No. 13-01435, ECF No. 81] (the "Committee Tadhamon Reply"). The Formal Directions issued separately to both BisB and Tadhamon provided, among other things, that the Defendants either: (i) immediately return the Transaction Proceeds to Arcapita, or (ii) seek permission from the Court in accordance with the Bankruptcy Code to withhold the funds, and return the funds if such permission is not granted. Comm. BisB SMF ¶ 92; Comm. Tadhamon SMF ¶ 127. The Committee asserts that the Formal Directions override any right to setoff that the Defendants may have under the Bahraini Civil Code. By withholding the Maturity Proceeds without first obtaining permission of this Court, the Committee argues the Defendants are in violation of the Formal Directions and thus Bahraini law. *See* Comm. BisB Reply at 11; Comm. Tadhamon Reply at 18-19.

Based on the undisputed facts, the Court agrees. As the Committee's expert Nezar Raees persuasively explains, Bahraini law provides that the provisions of the Civil Code—which is classified as a form of general law in Bahrain—do not supersede any Bahraini special law dealing with a specific issue. *See* Raees BisB Report ¶¶ 4.2.1, 4.2.5; Raees Tadhamon Report at

¶¶ 4.2.1, 4.2.5. Specifically, Article 3 of the Decree enacting the Bahraini Civil Code states that

"[t]he provisions of the attached code shall not prejudice the provisions set forth in any special

legislation." Raees BisB Report ¶ 4.2.1 (quoting Art. 3 of Bhr. Civil Code Decree); Raees

Tadhamon Report ¶ 4.2.1 (quoting Art. 3 of Bhr. Civil Code Decree). This is a point with which

the Defendants' expert agrees. *See* Mansoori BisB Report ¶ 35 ("The provisions of the Civil

Code relating to statutory set-off constitute the provisions applicable to any statutory set-off,

*subject to any special provisions with respect thereto under any other applicable law*.")

(emphasis added); Mansoori Tadhamon Report ¶ 37 (same). The precedence of special law over

the provisions of general law has also been established by the Court of Cassation in Bahrain,[24]

which has stated:

> It is established that the existence of a special law stops resorting to the provisions
> of a general law except for matters not covered by a special law. A special law
> cannot be undermined by a general law as such undermining contradicts the
> purpose for which the special law was enacted.

Raees BisB Report ¶ 4.2.5 (quoting Court of Cassation Appeal No. 422 for the Year 2008, Legal

Principle No. 150 (June 15, 2009)); Raees Tadhamon Report ¶ 4.2.5 (same). As Mr. Raees

further notes, the Central Bank of Bahrain and Financial Institutions Law (the "CBB Law"),

enacted in 2006 qualifies as Bahraini special legislation "that supervises and regulates financial

institutions operating in Bahrain." Raees BisB Report ¶ 4.2.2; Raees Tadhamon Report ¶ 4.2.2.

As such, "the provisions of the CBB Law will always prevail over the provisions of the Civil

Code." *Id*.; *see also* Raees BisB Report ¶ 4.2.3 (stating that the CBB Law's precedence over the

Bahraini Civil Code as to financial institutions is confirmed by Article 1 of the Decree enacting

the CBB Law); Raees Tadhamon Report ¶ 4.2.3 (same).

---

[24] The Court of Cassation is the supreme court of appeal in Bahrain and serves as the final court of appeal for
all civil, commercial, and criminal matters. *See* Raees BisB Report ¶ 4.2.5; Raees Tadhamon Report ¶ 4.2.5. Its
judgments are considered legal principles that are set for all courts of law in Bahrain. *See id.*

The CBB serves as the regulator of financial institutions that are licensed to provide financial services in Bahrain. Raees BisB Report ¶ 4.2.4; Raees Tadhamon Report ¶ 4.2.4; *see also* Mansoori BisB Report ¶ 67 (noting that Article 3 of the CBB Law provides that the CBB's statutory objectives include "set[ting] and implement[ing] the monetary, credit and other financial sector policies for the Kingdom.") (quoting Art. 3(1) of CBB Law); Mansoori Tadhamon Report ¶ 71 (same). This authority is explicitly vested to it by the CBB Law, which provides that "[t]he Central Bank shall assume the following duties and powers: . . . (4) regulate, develop and license the Services stated in Article 39 of this law, and *exercise regulatory control over institutions that provide such services*." Raees BisB Report ¶ 4.2.4 (quoting Art. 4(4) of CBB Law) (emphasis added); Raees Tadhamon Report ¶ 4.2.4 (same); *see also* Mansoori BisB Report ¶ 68 (noting that Article 39(b) of the CBB Law provides that "[t]he Central Bank shall issue regulations specifying the Regulated Services and organizing the provisions of these services. The Central Bank shall supervise and control any licensees providing such services.") (quoting Art. 39(b) of CBB Law); Mansoori Tadhamon Report ¶ 72 (same). Under CBB Law, "Regulated Services shall mean the financial services provided by the financial institutions, including those governed by Islamic Sharia principles." Mansoori BisB Report ¶ 68 (quoting Art. 39(a) of CBB Law; Mansoori Tadhamon Report ¶ 72 (same).

One tool used by the CBB in its regulation of Bahraini financial institutions is the issuance of Directions. Raees BisB Report ¶ 4.2.6; Raees Tadhamon Report ¶ 4.2.6. Article 38 of the CBB Law authorizes the CBB Governor to issue any type of Direction to ensure the proper implementation of the CBB Law, its regulations and the fulfillment of CBB objectives. Raees BisB Report ¶ 4.2.6; Raees Tadhamon Report ¶ 4.2.6; *see also* Mansoori BisB Report ¶ 69; Mansoori Tadhamon Report ¶ 73. The issuing of Directions is contemplated by the CBB

Rulebook,[25] which states that "[t]he CBB Law provides for two formal rulemaking instruments: Regulations (made pursuant to Article 37) and Directives (made pursuant to Article 38)."[26] Raees BisB Report ¶ 4.2.7.1 (quoting Rule UG-1.1.1 of Volume 2 of the CBB Rulebook); Raees Tadhamon Report ¶ 4.2.7.1 (same).

A financial institution that receives a Direction from the CBB issued under Article 38 of the CBB Law is obligated to comply with the Direction. Raees BisB Report ¶ 4.2.6; Raees Tadhamon Report ¶ 4.2.6. Specifically, Article 38 of the CBB Law provides that "[o]nce circulated to the intended addresses, the directives become binding." Raees BisB Report ¶ 4.2.6 (quoting Art. 38(c) of CBB Law); Raees Tadhamon Report ¶ 4.2.6 (same). This is confirmed by the CBB Rulebook, which states that:

> Directives are made pursuant to Article 38 of the CBB Law. These instruments do not have general application in the Kingdom, but are rather addressed to specific licensees (or categories of licensees), approved persons or registered persons. *Directives are binding on those to whom they are addressed*.

Raees BisB Report ¶ 4.2.7.2 (quoting Rule UG-1.1.7 of Volume 2 of the CBB Rulebook) (emphasis added); Raees Tadhamon Report ¶ 4.2.7.2 (quoting Rule UG-1.1.6 of Volume 4 of the CBB Rulebook); *see also* Mansoori Tadhamon Report ¶ 75.

Upon issuance of a Direction, the recipient

> will normally be given 30 days from the Direction's date of issuance in which to make objections to the CBB concerning the actions required. This must be done in writing, and addressed to the issuer of the original notification. Should an

---

[25]    The CBB Rulebook is issued by the CBB pursuant to the CBB Law. *See* Raees BisB Report ¶¶ 4.2.7, 4.2.7.1; Raees Tadhamon Report ¶¶ 4.2.7, 4.2.7.1. Of special significance to this case are Volume 2 Chapters UG-1 and EN-3 of the CBB Rulebook, which are applicable to Islamic Banks, and Volume 4 Chapters UG-1 and EN-4 relating to Directions for investment firms. *See id.*

[26]    The terms "directions" and "directives" are seemingly used interchangeably—without explanation or distinction between the two—by the parties, the experts, the CBB Rulebook and the CBB Law. *See, e.g.,* Tadhamon SJM at 28-29 (using the phrase "direction"); Tadhamon Reply at 9 (using the phrase "directive"); Mansoori Tadhamon Report at 22, 25, 28 (using both "directive" and "direction"). No party has argued that the use of these different terms should lead to a different result in these cases. The Court has cited the statutes verbatim, but has followed the naming convention used most often in the parties pleadings and the expert reports, which is the term "direction."

> objection be made, the CBB will make a final determination, within 30 days of
> the date of the objection, as specified in Articles 125(c) and 126 of CBB Law.

Raees BisB Report ¶ 4.2.7.8 (quoting Rule EN-3.2.2 of Volume 2 of the CBB Rulebook); *see also* Raees Tadhamon Report ¶ 4.2.7.8 (quoting Rule EN-4.3.2 of Volume 4 of the CBB Rulebook).

The CBB issues Directions under the supervisory powers granted to it by the CBB Law, and "[t]hese powers are broad in nature, and effectively allow the CBB to issue whatever Directions it reasonably believes are required to achieve its statutory objectives."  Raees BisB Report ¶ 4.2.7.3 (quoting Rule EN-3.1.1 of Volume 2 of CBB Rulebook); *see also* Raees Tadhamon Report ¶ 4.2.7.3 (quoting Rule EN 4.1.1 of Volume 4 of the CBB Rulebook); Mansoori BisB Report ¶ 70; Mansoori Tadhamon Report ¶ 74.  Indeed,

> [t]he types of Directions that the CBB may issue in practice vary and will depend
> on the individual circumstances of a case.  Generally, however, Directions require
> a licensee or individual to undertake specific actions in order to address or
> mitigate certain perceived risks.  They may also include restrictions on a
> licensee's activities until those risks have been addressed. . . .

Raees BisB Report ¶ 4.2.7.4 (quoting Rule EN-3.1.2 of Volume 2 of CBB Rulebook); *see also* Raees Tadhamon Report ¶ 4.2.7.4 (quoting Rule EN 4.2.1 of Volume 4 of the CBB Rulebook).

The CBB is aware that the power it exercises with respect to Directions overrides the role of a licensee's Board and management with respect to particular issues.  *See* Raees BisB Report ¶ 4.2.7.5 ("The CBB is conscious of the powerful nature of a Direction and, in the case of a licensee, the fact that it subordinates the role of its Board and management on a specific issue.") (quoting Rule EN-3.1.3 of Volume 2 of the CBB Rulebook); Raees Tadhamon Report ¶ 4.2.7.5

(same) (quoting Rule EN-4.2.2 of Volume 4 of CBB Rulebook).[27]  The CBB takes the following

factors into account when deciding whether to issue a Direction:

> (a) the seriousness of the actual or potential contravention, in relation to the requirement(s) concerned and the risks posed to the licensee's customers, market participants and other stakeholders; (b) in the case of an actual contravention, its duration and/or frequency of the contravention; the extent to which it reflects more widespread weaknesses in controls and/or management; and the extent to which it was attributable to deliberate or reckless behaviour; and (c) the extent to which the CBB's supervisory objectives would be better served by issuance of a Direction as opposed to another type of regulatory action.

Raees BisB Report ¶ 4.2.7.6 (quoting Rule EN-3.1.4 of Volume 2 of the CBB Rulebook); *see*

*also* Raees Tadhamon Report ¶ 4.2.7.6 (quoting Rule EN-4.2.3 of Volume 4 of the CBB

Rulebook); Mansoori BisB Report ¶ 70; Mansoori Tadhamon Report ¶ 76.  Proposals to issue

Directions are carefully considered by the CBB, using the above-referenced criteria.  *See* Raees

BisB Report ¶ 4.2.7.7 (quoting Rule EN-3.2.1 of Volume 2 of the CBB Rulebook); Raees

Tadhamon Report ¶ 4.2.7.7 (quoting Rule EN-4.3.1 of Volume 4 of the CBB Rulebook).  The

Directions require the approval of an Executive Director of the CBB or a more senior official,

and must include the statement that they are issued as a formal Direction as defined by the CBB

Rulebook.  *See* Raees BisB Report ¶ 4.2.7.7 (quoting Rule EN-3.2.1 of Volume 2 of the CBB

Rulebook); Raees Tadhamon Report ¶ 4.2.7.7 (quoting Rule EN-4.3.1 of Volume 4 of the CBB

Rulebook).

Given all these features of Bahraini law, Mr. Raees persuasively concludes that the

Formal Directions issued by the CBB to the Defendants were compulsory orders under Article

38 of the CBB Law that the Defendants must follow.  Raees BisB Report ¶ 4.1.1.1; Raees

---

[27]    Because of this, "[t]he CBB will carefully consider the need for a Direction, and whether alternative measures may not achieve the same end.  Where feasible, the CBB will try to achieve the desired outcome through persuasion, rather than recourse to a Direction."  *See* Raees BisB Report ¶ 4.2.7.5 (quoting Rule EN-3.1.3 of Volume 2 of the CBB Rulebook); Raees Tadhamon Report ¶ 4.2.7.5 (quoting Rule EN-4.2.2 of Volume 4 of CBB Rulebook).

Tadhamon Report ¶ 4.1.1.1.  The Formal Directions here are clear and unequivocal that the Defendants must take one of two courses of action: either return the Maturity Proceeds to Arcapita or obtain this Court's permission to withhold the Maturity Proceeds.  *See* Raees BisB Report ¶ 4.2.9; Raees Tadhamon Report ¶ 4.2.9; BisB Formal Direction at BISB_001525; Tadhamon Formal Direction at TAD_007809.  The Court further concludes that the CBB Law constitutes special law applicable to the CBB and that such CBB Law prevails over the provisions of the Bahraini Civil Code.  As these Formal Directions issued by the CBB bind their recipients as provided under Article 38(c) of the CBB Law and applicable Rules of the CBB Rulebook, the Defendants are not entitled to a statutory setoff under the Bahraini Civil Code because such setoffs are flatly contrary to the CBB's Formal Directions here.  *See* Raees BisB Report ¶ 4.2.12; Raees Tadhamon Report ¶ 4.2.12.[28]

The Defendants do not dispute any of the key facts on this issue, even if they disagree with the ultimate conclusion.  Nothing in Ms. Mansoori's expert report conflicts with—and indeed several of her observations support—Mr. Raees' explanation about the powers of the CBB and the authority of its Directions.  Instead, Ms. Mansoori makes a much narrower argument.  She asserts that the Formal Directions did not invalidate the setoffs here because the Defendants acted prior to the issuance of the Formal Directions.[29]  *See* Mansoori BisB Report ¶

---

[28]      In the alternative, Mr. Raees opines that the Defendants' actions violate Article 355(a) of the Bahraini Civil Code, which precludes a statutory setoff "where one of the two obligations consists of a thing of which the owner has been unjustly deprived[,]" as well as Article 28(d) of the Bahraini Civil Code, which provides that a party may be barred from asserting a statutory setoff if exercising such right is found by a court of law to have the effect of causing serious and unknown damage to third parties.  *See* Raees BisB Report at ¶¶ 4.1, 4.3; Raees Tadhamon Report at ¶¶ 4.1, 4.3, 4.4.  Given the Court's ruling in this Decision, the Court need not reach these this alternative argument.

[29]      More specifically, Ms. Mansoori asserts that at the time of the Formal Directions, the setoffs had already been created under Bahraini law.  *See* Mansoori BisB Report ¶¶ 71, 76; Mansoori Tadhamon Report ¶¶ 77, 82.  Thus, Ms. Mansoori argues that a statutory setoff under Bahraini law is deemed to have taken place from the date its conditions are fulfilled and not from the date that the party maintains the setoff; she also maintains that the alleged setoffs at issue were not contingent on the agreement, consent or notification of Arcapita or court approval.  *See* Mansoori BisB Report ¶ 25; Mansoori Tadhamon Report ¶ 26.  Given this, Ms. Mansoori argues that the conditions

66; Mansoori Tadhamon Report ¶ 70.  But Ms. Mansoori's argument is unpersuasive.  It is not

supported by any provision of Bahraini law or other fact.  Indeed, there is nothing in the Bahraini

law cited by Ms. Mansoori that suggests such a temporal limitation on the CBB's authority.  The

Court is also not convinced by her suggestion as to what the CBB could have done rather than

what it did.  She appears to suggest that the CBB should have instead issued a warning notice

pursuant to Article 125 of the CBB Law, rather than issue the Formal Direction.[30]  Ms. Mansoori

notes that the party receiving such notice would have the right to submit a written objection

within the time period specified in the notice and that the CBB would have to discuss such

objection and issue an appropriate resolution.  Mansoori BisB Report ¶¶ 73-74; Mansoori

---

of statutory setoff were satisfied as of June 28, 2012 in the case of BisB and June 25, 2012 in the case of Tadhamon.
*See* Mansoori BisB Report ¶ 26; Mansoori Tadhamon Report. ¶ 27; *see also* Hr'g Tr. 137:20-23 (Nov. 13, 2018)
("[i]t's probably safe to say based on the evidence we have that our firm's letters can serve as the marker as the
latest possible date for which set off was asserted.").

But the Committee disputes this, arguing that the setoffs were not complete because there was no effort by
the Defendants to return the remaining balances in the accounts to Arcapita.  *See*  Hr'g Tr. 169:2-15, 186:18-187:2
(Nov. 13, 2018).  Tadhamon did not return the balance to Arcapita until December 12, 2012. *See* Khani Tadhamon
Decl., Ex. R at TAD_000415 to TAD_000416 (letter dated December 12, 2012 from Waleed Abdulla Rashdan,
then-CEO of Tadhamon, informing Atif Abdulmalik, then-CEO of Arcapita, that Tadhamon had transferred to
Arcapita the excess amount of $1,412.050.63 owed to Arcapita after the purported setoff, and attaching
corresponding SWIFT Transfer Request).  Counsel to BisB confirmed at the hearing on these motions that BisB had
yet to return the remaining balance. *See* Hr'g Tr. 206:12-207:11 (Nov. 13, 2018); Khani BisB Decl., Ex. P at
ARCAPITA_0000033 (letter dated July 4, 2012 from Mohammed Ebrahim Mohammed, BisB's then-CEO, to Atif
Abdulmalik, Arcapita's then-CEO, explaining BisB's purported setoff under Bahraini civil law and stating that
balance of $194,516.03 will be returned "[u]pon satisfactory confirmation of our set-off. . . .").

[30]      Article 125 provides:

Prior to imposing any penalties or administrative proceedings upon the Licensee, the Central Bank
must deliver to him a written notice containing the following:

a)   The violations committed by the Licensee with respect to the provisions of this law, the
     resolutions and bylaws issued in enforcing thereof, or of the terms and conditions of the
     License, accompanied by the evidence and proves that convinced the Central Bank that such
     violation had occurred.

b)   The penalty or administrative proceedings intended to be imposed upon the Licensee.

c)   The grace period to be allowed for challenging the intended penalty or administrative
     proceedings, which should not be less than thirty days as from the date of serving the notice.

Mansoori BisB Report ¶ 72 (quoting Art. 125 of CBB Law); Mansoori Tadhamon Report ¶ 81 (same).

Tadhamon Report ¶¶ 93-94.  Ms. Mansoori also states that other measures available to the CBB

included "Administrative Proceedings," the "Suspension of the Licensee from Providing the

Service," and the "Amendment and Revocation of License."  Mansoori BisB Report ¶ 75;

Mansoori Tadhamon Report ¶ 95.  But none of this conjecture matters.[31]  The CBB did issue its

Formal Directions, which told the Defendants that they must return the setoff funds and/or seek

this Court's permission for the setoff.  And neither Defendant complied.

To the extent that Ms. Mansoori is presenting an equitable argument in favor of setoff,

there are good reasons to reject it here.  *See In re Bennett Funding*, 212 B.R. at 212 ("Once the

technical requirements of setoff are satisfied, the bankruptcy judge must scrutinize the right of

setoff in light of the Bankruptcy Code's goals and objectives.  These goals include . . . equitable

treatment of all creditors.  In addition, the right of setoff is within the bankruptcy court's

discretion, and it may invoke equity to bend the rules, if required, to avert injustice.") (citations

and quotations omitted).  The Defendants were aware of the CBB's intention to issue the Formal

Directions before the setoffs took place and had ample opportunity to inform the CBB of their

legal position before the Formal Directions were issued.  In fact, the CBB requested Tadhamon's

legal opinion about setoff, which Tadhamon provided.  *See* Khani Tadhamon Decl., Ex. T at

TAD_006965 (email exchange between Khalid Hamad of CBB and Waleed Abdulla Rashdan of

Tadhamon, dated June 25, 2012, discussing issuance of Formal Direction and Tadhamon

providing legal opinion on the subject).  Even knowing that the CBB intended to issue the

Formal Directions, Tadhamon purported to exercise its setoff the same day it provided its legal

opinion to the CBB—June 25, 2012—with BisB following three days later on June 28, 2012.

---

[31]     Ms. Mansoori herself acknowledges that "[i]n the CBB's view, it is generally neither practical nor effective
to prescribe in detail the exact regulatory response for each and every potential contravention . . . . Moreover,
individual circumstances are unlikely to be identical in all cases, and may warrant different responses."  Mansoori
Tadhamon Report ¶ 78 (quoting Rule EN-B2.2 of the CBB Rulebook).

*See* Comm. BisB SMF ¶ 80; Comm. Tadhamon SMF ¶ 104; *see* Khani Tadhamon Decl., Ex. A at 105:21-106:12 (Dep. Tr. of Ahmed Hatam Sultan, Feb. 8, 2018) (on the day the setoff was asserted, Tadhamon's then-CEO was aware that the CBB intended to issue a Direction to return the funds).[32]

Moreover, both Defendants requested that the CBB withdraw the Formal Directions, asserting that they had already exercised setoff under Bahraini law. The Defendants have met with the CBB regarding this request. Khani BisB Decl., Ex. R at BISB_001529 (letter dated July 16, 2012 from Mohammed Ebrahim Mohammed, Chief Executive Officer of BisB to Khalid Hamad, Executive Director-Banking Supervision at the CBB, noting meeting between BisB and CBB regarding Arcapita at CBB's offices on July 10, 2012). But there is no evidence that the CBB granted the Defendants' request to withdraw the Formal Directions. *See* Comm. Tadhamon SMF ¶ 134; Hr'g Tr. 23:2-3 (Nov. 13, 2018) (counsel to the Committee noting that Formal Directions have not been withdrawn by the CBB).

The Court also rejects the Defendants' invitation for this Court to second guess the wisdom of the CBB's actions as unwise or poor policy. That is not the role of this Court. *Cf. Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895) ("'Comity' . . . is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."); *Jota v. Texaco Inc.*, 157 F.3d 153, 159-

---

[32]         *See also* Khani Tadhamon Decl., Ex. S at TAD_006471 (email exchange between Tadhamon employees Ahmed Hatam Sultan, Executive Director of Treasury and Capital Markets at the time, and Junaid Jafar, taking place July 18, 2012, regarding Tadhamon's plans for responding and reacting to a Formal Direction, with Sultan stating "*TCM with RMD and OPS had a meeting to look at the worst case scenario, which is complying with the formal direction from the CBB, hence returning $20MM to Arcapita*. . . . This is the worst case scenario which looks very likely as the CBB is putting pressure and interfering between FI's with no grounds but I guess the question would be whether TC wants to go against the CBB or not which in my view is not recommended[,]" and Jafar replying, "I agree, we push the issue till we can and then return the funds[.] Uncle Sam doesn't let you off that easily and can get the world to do what it wants.") (emphasis added).

60 (2d Cir. 1998) ("Under the principles of comity, United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States.") (citations and quotations omitted); *Basic v. Fitzroy Eng'g*, 949 F. Supp. 1333, 1341 (N.D. Ill. 1996) ("Therefore, for reasons of comity, and ever mindful of 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts . . . may hinder the conduct of foreign affairs,' the court finds that the instant action would serve only to interfere with New Zealand's sovereign right to decide cases brought to its own judicial forum.") (quoting *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990)); *In re Oi S.A.*, 587 B.R. 253, 273 (Bankr. S.D.N.Y. 2018) ("It is simply not this Court's role to second guess the wisdom of the [foreign] courts or overrule their decisions, which would be fundamentally inconsistent with comity."). The CBB made clear in the Formal Directions that it had considered both the risks to the Defendants and the Bahraini financial sector as a whole. *See* BisB Formal Direction at BISB_001525; Tadhamon Formal Direction at TAD_007809.[33]

### 3. Whether Defendants' Debts Were Incurred to Obtain Setoff

The parties also disagree about whether the Defendants' alleged setoffs are invalid under Section 553(a)(3)(C) of the Bankruptcy Code. This section provides that a setoff is disallowed when a creditor has incurred a debt "for the purpose of obtaining a right of setoff against the

---

[33]    In their request to the CBB that it reconsider the Formal Directions, the Defendants argued that "[t]o unwind the set-off now and pursue an remedy in the US Bankruptcy Court would result in severe prejudice to our legal position" and that to require the Defendants "to seek formal permission from the Bankruptcy Court in this situation is tantamount to ignoring the sovereignty of the legal system in Bahrain and also to give direct force of law to an order of a Court which is not intended to have such binding effect under the Bahraini legal framework." *See* Khani Tadhamon Decl., Ex. W at TAD_007811 to TAD_007813 (letter dated July 22, 2012, from Waleed Abdulla Rashdan, Tadhamon's then CEO, to the CBB requesting that the CBB "reconsider this Direction" and "withdraw its Direction"); Khani BisB Decl., Ex. S at BISB_001531 to BISB_001533 (undated letter from Mohammed Ebrahim Mohammed, Chief Executive Officer of BisB to Khalid Hamad, Executive Director-Banking Supervision at the CBB, asking that CBB "reconsider this Direction" and seeking "withdrawal of the CBB's direction").

debtor. . . ." 11 U.S.C. § 553(a)(3)(C).  The Committee contends that the Defendants improperly

obtained the investment funds from Arcapita for the purpose of obtaining a right of setoff against

the debts that Arcapita owed to the Defendants.

The exception in Section 553(a)(3)(C) prevents the rewarding of "creditors who persuade

a debtor to engage in conduct which has the effect of impermissibly improving the creditor's

position among the other creditors." *In re Dillard Ford, Inc.*, 940 F.2d 1507, 1513 (11th Cir.

1991).  "Specifically, courts are concerned with the intentional build-up of funds on deposit

thereby affirmatively and purposely preferring one creditor over another." *Official Comm. of*

*Unsecured Creditors v. Mfrs. & Traders Tr. Co. (In re Bennett Funding Grp.)*, 212 B.R. 206,

217 (B.A.P. 2d Cir. 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998)) (holding that the debtor did not

make deposits solely to prefer the bank over other creditors where the debtor's average balance

remained steady over the course of a year, therefore indicating a lack of intentional build-up of

funds).  "Generally, courts are wary about any possible deliberate manipulation of the amounts

deposited either by the debtor or the creditor." *Id.* at 216-17 (citing *In re Bohlen Enterprises.,*

*Ltd.*, 78 B.R. 556 (Bankr. N.D. Iowa 1987), *aff'd*, 91 B.R. 486 (N.D. Iowa 1987), *rev'd on other*

*grounds*, 859 F.2d 561 (8th Cir. 1988); *In re Allbrand Appliance & Television Co.*, 16 B.R. 10,

14 (Bankr. S.D.N.Y. 1980)); *see also In re Kroh Bros. Dev. Co.*, 86 B.R. 186, 191-92 (Bankr.

W.D. Mo. 1988) ("If either the depositor or the bank intends that a deposit may not be withdrawn

but must be used to satisfy the bank's claim, the deposit constitutes a voidable preference when

other elements of that statute are met."); *Velde v. Border State Bank (In re HovdeBray Enters.)*,

483 B.R. 187, 194 (B.A.P. 8th Cir. 2012) ("The set-off exception does not apply where a deposit

is accepted by a bank with an intent to apply it on a preexisting claim against the depositor.  If

the deposit was made with the purpose of effecting payment to the bank [Section] 553(a)(3)(C) is

met and setoff is not allowed.").[34]

The debtor bears the burden of proving that a debt was incurred for the purpose of

obtaining setoff rights. *See Clean Burn Fuels, LLC v. Purdue BioEnergy, LLC (In re Clean Burn*

*Fuels, LLC)*, 492 B.R. 445, 467 (Bankr. M.D. N.C. 2013). Simply put, the facts must show that

there was an intent to manipulate the balance. *See id.* The Eleventh Circuit provides this

guidance:

> Although the conduct may occur in many forms, the archetypal situation is the
> case where a debtor has a preexisting obligation to the creditor, and, in the months
> prior to debtor's filing for bankruptcy, the debtor pays back the creditor by
> "loaning" him money. Later the parties notice the two debts and engage in setoff,
> canceling both of them. In this archetypal situation, the creditor obtains the debt
> only to engage in setoff, thus this "loan" is disfavored by the setoff rules.

*In re Dillard Ford*, 940 F.2d at 1513. In determining whether a debt was incurred to obtain a

right to setoff, courts will examine "whether the debt was incurred in good faith and in the

regular course of business." *In re Clean Burn Fuels,* 492 B.R. at 468. "If the bank can show that

it accepted the deposit in good faith, that the deposit was made in the due course of the bank's

business of accepting deposits, and that the deposit was subject to withdrawal at will by the

debtor, the prohibition of [S]ection 553(a)(3) may not apply." 5 Collier on Bankruptcy P

553.03[5][b][i] (16th 2020) (citing *In re PRS Prods., Inc.*, 574 F.2d 414, 417-18 (8th Cir.

1978); *Dutton v. Fort Monmouth Fed'l Credit Union (In re Dutton)*, 15 B.R. 318, 321 (Bankr.

D.N.J. 1981); *In re Kittrell*, 115 B.R. 873, 881-82 (Bankr. M.D.N.C. 1990)); *see also DuVoisin*

*v. Foster (In re S. Indus. Banking Corp.)*, 809 F.2d 329, 332 (6th Cir. 1987) (holding that debt

---

[34] One commentator has gone even further, opining that "[t]he objective is to prevent setoff when the debtor
was affirmatively and purposely preferring a creditor by depositing funds. It need not necessarily be in response to a
demand by the creditor, although creditor demand may occur." 5 Collier on Bankruptcy P 553.03[5][b][i] n.223
(16th 2020).

was incurred for the purpose of obtaining setoff where timing of loan was questionable, creditor

had sophistication in banking, and creditor admitted that "it was his intention upon maturity of

the promissory note and the investment certificates to apply the proceeds of such investment

certificates to the amount then payable."); *In re Automatic Voting Mach. Corp.*, 26 B.R. 970, 973

(Bankr. W.D.N.Y. 1983) (holding that debt was not incurred for the purpose of obtaining setoff

where deposit was made in the ordinary course of the debtor's business and was made in an

unrestricted checking account maintained as an operating account for the debtor's business).  A

creditor's awareness of the debtor's financial difficulties may also contribute to the conclusion

that a creditor incurred the debt for the purpose of setoff.  *See Union Cartage Co. v. Dollar*

*Savings & Trust Co. (In re Union Cartage Co.)*, 38 B.R. 134, 138-40 (Bankr. N.D. Ohio 1984)

(noting that the facts of the case showed that the creditor knew the debtor was in severe financial

difficulty).[35]

Applying all these principles here, the Court concludes that the undisputed facts

demonstrate that the debts incurred by the Defendants were for the purposes of obtaining a setoff

right against the Debtor.  While the Court recognizes that issues of intent are often unsuitable for

summary judgment, no fact finder could reasonably reach any other conclusion here given the

record, particularly the detailed evidence of the parties' thinking in contemporaneous emails and

telephone conversations.

a.    The BisB Debt

As a threshold matter, the investments made by Arcapita with BisB were outside of the

regular course of business for the parties.  While Arcapita had made placements with BisB in the

---

[35]    Bad faith is not a requirement.  "While the statute appears to be most directly aimed at deceptive conduct,
bad faith is not a requirement for its application, and the section applies even if the creditor acted innocently merely
to obtain security for its obligation.  If the debtor thereafter files for bankruptcy relief before the setoff is taken, the
setoff will not be valid under section 553."  5 Collier on Bankruptcy P 553.03[5][b][i] (16th 2020).

past, prior to the BisB Placements, Arcapita had made no placements with BisB in 2012 and just

one in March 2011, which was then rolled over several times. *See* Khani BisB Decl., Ex. C at

BISB_001281-85. The timing of the placements was also questionable, with the placements

occurring on March 13 through March 15, 2012, just days prior to the Petition Date on March 19,

2012. *See* Khani BisB Decl., Ex. F at BISB_000078-80; Khani BisB Decl., Ex. G at

ARCAPITA_0000024-29; Khani BisB Decl., Ex. H at ARCAPITA_009617-26. The amount

was also noteworthy. While the BisB Placements amounted to $30 million in total, BisB

retained the March 14, 2012 Placement of $10 million as part of its purported setoff, which was

just over the $9.8 million owed by Arcapita to BisB. *See* Khani BisB Decl., Ex. G at

ARCAPITA_0000024; Khani BisB Decl., Ex. D at BISB_000159; Khani BisB Decl., Ex. E at

BISB_000154. It was also uncommon for the parties to maintain placements of this

magnitude—$30 million—with one another at any one time. *See*  Khani BisB Decl., Ex. C.

        BisB claims it was unaware of Arcapita's imminent bankruptcy filing. But BisB was

generally aware of Arcapita's financial difficulties in the months prior to the Petition Date. For

instance, on January 10, 2012, an Arcapita employee sent an email attaching an investment pitch

presentation to Nader Al Bastaki, who was BisB's then Senior Manager in Treasury and

Investment. *See* Khani BisB Decl., Ex. M at BISB_000865-66. Mr. Al Bastaki forwarded the

presentation to various other BisB employees, with the accompanying message:

> I just got this from Arcapita. Bridge investment contingent on obtaining
> financing or converting to shares of the fund. Pays 7.5% for 3 months. *Outright*
> *decline is my response* based on execution issues, risky exit avenue, *and the*
> *general situation with Arcapita*. Please let me have your thoughts.

Khani BisB Decl., Ex. M at BISB_000865 (emphasis added). BisB's Mohammed Fikree

responded, "How can we entertain?  [H]aving recommended 100% provision on Arcapita."

Khani BisB Decl., Ex. M at BISB_000865. Mr. Al Bastaki answered that Arcapita "are just

trying their luck.  It seems that the fund company is desperate."  Khani BisB Decl., Ex. M at

BISB_000865.  Additionally, on March 12, 2012, an Arcapita representative called and spoke[36]

with a BisB representative identified only as "Omer," who was substituting for Sameer Qaedi,

BisB's then Senior Manager in Treasury.  Khani BisB Decl., Ex. K at BISB_001433.  The

Arcapita representative told Omer that Arcapita "need[ed] more money" from BisB, but Omer

responded: "You are unable to repay your loans, so how we can increase it to you!"  Khani BisB

Decl., Ex. K at BISB_001433.  On March 13, 2012, Mr. Qaedi spoke with an Arcapita

representative by phone, during which conversation Mr. Qaedi asked why Arcapita did not return

BisB's money under the BisB contracts.  *See* Khani BisB Decl., Ex. K at BISB_001434.  When

the Arcapita representative asked Mr. Qaedi for a renewal of BisB's investments with Arcapita,

Mr. Qaedi responded, "No.  You have to pay," and stated that Arcapita was no longer "bringing

good business of large deals."  *See* Khani BisB Decl., Ex. K at BISB_001434-35.

Representatives of Arcapita and BisB also engaged in telephone discussions in the days

just before the bankruptcy filing that make it clear the parties were trying to find a way for BisB

to be fully protected.  In the week prior to the Petition Date, BisB repeatedly refused to renew its

investments made through Arcapita under the BisB Agreement, which were set to expire on

March 15 and 16, 2012, and through which Arcapita owed BisB approximately $10 million.  *See*

Khani BisB Decl., Ex. K at BisB_001433-38.  Then, on March 13, 2012, in a telephone

conversation between an Arcapita representative and Sameer Qaedi, BisB's then Senior Manager

in Treasury, Arcapita expressed an intent to place a large amount of funds, at which point BisB's

reluctance changes:

---

[36]     BisB recorded calls between itself and Arcapita relating to transactions under the 2003 Investment
Agreement.  *See* Comm. BisB SMF ¶¶ 41-43.  Similarly, as authorized under the Master Wakala Agreement,
Tadhamon tape recorded telephone conversations between itself and Arcapita relating to potential investment
transactions under the Master Wakala Agreement.  Khani Tadhamon Decl., Ex. G at TAD_000406.

| (Tel. # 17218936): | Hi.  Why you didn't call me. |
| (Ext.6182): | I have been on leave.  But, why you didn't return our money? |
| (Tel.# 17218936): | But you want us to renew these loans. |
| (Ext.6182): | No.  You have to pay. |
| (Tel.# 17218936): | Give us only five days.  Do you want us to repay both loans? |
| (Ext.6182): | Yes both. |
| (Tel. # 17218936): | *Believe me Sameer.  I will conclude with you a good deal within this week.  It might be over 5 million, so please renew them.* |
| (Ext.6182): | *Now you are not bringing good business of large deals.  We are not benefiting so much from your deals, since we are giving you back-to-back market rates.* |
| (Tel. # 17218936): | *I will conclude with you some large deals within this week.* |
| (Ext.6182): | I will take 20bps on them. |
| (Tel. # 17218936): | I will give you less than 20bps.  But you are requested to renew our loans. |
| (Ext.6182): | I can't renew.  This is not in my hand.  Renewal is done by other people. |
| (Tel.# 17218936): | *I will conclude with you a good deal within this week.*[37] |

---

[37]    BisB argues that the term "deals" relates to currency sales by BisB to Arcapita and not to the murabaha placements by Arcapita, stating that "the parties' calls during most of the pre-petition period dealt almost exclusively with such sales." BisB Reply at 4.  But BisB also acknowledges that the parties also used the term "deals" to refer to murabaha placements.  *See* BisB Reply at 3 ("In the entire record of their pre- and post-petition calls, the parties regularly used the term "deals" to refer to such currency sales *or* BisB's murabaha placements with Arcapita.  They usually referred to Arcapita's murabaha placements with BisB as a "deposit," twice as "deals.").

    BisB also notes that Arcapita made $12.7 million in multiple piecemeal currency purchases from BisB in the period from March 13-15 and suggests that the statement in question refers to one of these currency purchases.  *See* BisB Reply at 4-5 & n.19.  But the currency sales cited by BisB appear to be routine ongoing transactions, nothing out of the ordinary between the parties.  *See* BisB Reply at 4 ("BisB sought such sales as part of its ongoing business with Arcapita . . .") & n. 12-13 ("describing BisB's ordinary course sales of BHD to Arcapita. . .").  By contrast, the immediate discussion at issue between BisB and Arcapita relates to a rollover of BisB's murabaha investment and refers to a singular "deal" in "a large amount," something that was seemingly out of the ordinary

| (Ext.6182): | How much? |
|---|---|
| (Tel.# 17218936): | A large amount. |
| (Ext.6182): | *We are looking for a good deal; something that exceeds 10 million.*[38] |
| (Tel. # 17218936): | *But try to renew our loans.* |

Khani BisB Decl., Ex. K at BISB_001434-36 (emphasis added).

Arcapita then made a $10 million placement with BisB on March 13, 2012, with a maturity date of March 27, 2012 and an agreed upon rate of return of 0.55 percent per annum. *See* Khani BisB Decl., Ex. F at BISB_000078–80.  On March 14, 2012, an Arcapita representative stated to Mr. Qaedi: "[i]f I say that I'm going to pay you your money, would you be pleased or otherwise.  We want to renew both deals of Dollars and Bahraini Dinar."  Khani BisB Decl., Ex. K at BISB_001440.  BisB agreed to the rollovers of the BisB investments, but Mr. Qaedi dictated it would be "only for one week."  Khani BisB Decl., Ex. K at BISB_001441. That same day, March 14, 2012, Arcapita made another $10 million placement with BisB, with a maturity date of March 29, 2012 and a rate of return of 0.55 percent per annum.  *See* Khani BisB Decl., Ex. G at ARCAPITA_0000024–29.  Finally, on March 15, 2012, Arcapita made one last placement of $10 million with BisB, with a maturity date of March 26, 2012 and a 0.60 percent per annum rate of return.  *See* Khani BisB Decl., Ex. H at ARCAPITA_009617–26.  Thus, between March 13 and 15, 2012, Arcapita advanced to BisB the three separate payments that resulted in a total buildup of $30 million of Arcapita funds on deposit with BisB immediately

---

between the parties.  In any event, to the extent that the discussions did relate to currency purchases, then they would reflect BisB's concern about protection of all its investments with Arcapita from the bankruptcy process.

[38]   This amount was incidentally just over the $9.8 million that Arcapita owed to BisB.

prior to Arcapita's bankruptcy.  *See* Khani BisB Decl., Ex. F at BISB_000078–80; Khani BisB

Decl., Ex. G at ARCAPITA_0000024–29; Khani BisB Decl., Ex. H at ARCAPITA_009617–26.

Subsequent to Arcapita's bankruptcy filing, the parties had further discussions about how

to deal with the funds during the bankruptcy, again appearing to choreograph the withholding of

funds by BisB.  On March 19, 2012, the same day that BisB filed for bankruptcy, an Arcapita

representative telephoned Mr. Qaedi at BisB and stated:

> Please note that we are unable as per Central Bank of Bahrain (CBB) instructions to
> repay Murabaha deals concluded with you. You have also Murabaha deals with us . .
> . *See, both obligation balances between our banks are nearly the same.*  See, your
> balances with us is nearly USD 10 million . . . . We will withdraw only USD 20
> million from our placement balance and keep USD 10 million with you.

Khani BisB Decl., Ex. K at BISB_001463 (emphasis added).  Mr. Qaedi responded, "No.  I can't

decide on this matter.  Let me go back to the management and then I will feedback you.  *But you

have to pay*."  Khani BisB Decl., Ex. K at BISB_001463 (emphasis added).  The conversation

continued, with the Arcapita representative responding by suggesting the amounts Arcapita

would withdraw:

| | |
|---|---|
| (Tel.# 917218936): | *We will withdraw only USD20 million from our placement balance and keep USD10 million with you.* |
| (Ext.6182): | How you are allowed for withdrawal and not allowed for repayment of your loans! |
| (Tel. # 917218936): | This is our money, and we can withdraw. |
| (Ext.6182): | *Make settlement first or at least make netting to the two balances (between loans and deposits).* |
| (Tel.# 917218936): | We [sic] Can't we rollover your loans? |
| (Ext.6182): | You can't. |
| (Ext.6182): | This means that we can't undertake foreign exchange (FX) deals with you, unless you pay first. |

|  | I can't give you a price for FX.  But for net value okay.  Because the situation is different now. |
|---|---|
| (Tel.# 917218936): | This is the first time we default! |
| (Ext.6182): | Now the situation is different.  You have my mobile number.  Call me later. |

Khani BisB Decl., Ex. K at BISB_001464 (emphasis added).  In another call that took place on

March 25, 2012, an Arcapita representative explained to a BisB representative how the

bankruptcy filing complicated the situation:

| (Tel.# 917218936): | See, we can't pay now because we have a court order that prohibits release of any money.  Moreover, we can't enter into any Murabaha deal because no one is willing to deal with us and also we are prevented from booking deals.  *So, please you are requested to refund us with USD20 Million on the maturity date and keep the remaining balance of USD10 million, just for comfort.  This remaining balance of USD10 million is more than enough to cover our obligations to you.* (i.e. BHD1.8 Million+USD5 Million). |
|---|---|
| (Ext.6182): | Is this your management decision? |
| (Tel.# 917218936): | Yes.  They told me not to pay even a pence. |
| (Ext.6182): | If your balances are frozen, how you are going to receive money. |
| (Tel.# 917218936): | I can receive, but can't pay. |
| (Ext.6182): | I have a management decision so as not to pay you any money. |
| (Tel. # 917218936): | So, why shall we pay you!  Since you are unwilling to pay us. |
| (Ext.6182): | I'm telling you at least to renew your defaulted deals with us, since your bank is bankrupt, and unable to undertake deals or pay money. |

| (Tel. # 917218936): | But you are saying that you will not return us our money, so how do you want us to repay?  I didn't ask you to renew, but just to keep them suspending as outstanding amounts. |
| (Ext.6182): | Are you really unable to purchase commodities? |
| (Tel.# 917218936): | Yes. |
| (Tel.# 917218936): | Please try to pay us USD20 million and keep the remaining USD10 Million with you. |

Khani BisB Decl., Ex. K at BISB_001481 to BISB_001482 (emphasis added).  These conversations set forth what BisB ultimately did, repaying the $20 million in deposits under two placements made by Arcapita, but keeping a $10 million placement by purporting to exercise a setoff against the prepetition debt owed by Arcapita to BisB.  *See* Khani BisB Decl., Ex. I (BisB electronic invoices relating to the March 13, 14 and 15, 2012 placements); Ex. O (letter, dated June 28, 2012, from BisB's counsel to Arcapita's counsel).  This fits the archetypal situation described by the Eleventh Circuit.  *See In re Dillard Ford*, 940 F.2d at 1513 (describing "archetypal situation" as "the case where a debtor has a preexisting obligation to the creditor, and, in the months prior to debtor's filing for bankruptcy, the debtor pays back the creditor by 'loaning' him money.  Later the parties notice the two debts and engage in setoff, cancelling both of them.").

BisB tries to minimize the significance of these exchanges.  For example, it argues that the comments between Arcapita and BisB personnel were mere "banter" and notes that there was never any correspondence directly linking the placements and the rollovers.  *See* BisB Reply at 2 n.6, 3 and n.8.  But when all of the facts of the case are viewed in context, they clearly belie BisB's characterizations.  Moreover, BisB's position would impose an evidentiary hurdle that is not found in the case law on Section 553(a)(3)(C) and that would be almost impossible to meet

in real life.  BisB cites to no cases under Section 553(a)(3)(C) requiring the kind of explicit

linkage it urges.  Such a position flies in the face of common sense as direct and circumstantial

evidence are both used to evaluate other inquiries under the Bankruptcy Code.  *See, e.g., Sharp*

*Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005)

("Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader

is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly

associated with fraudulent transfers that their presence gives rise to an inference of intent.").

Indeed, the Court views these facts in the continuum of what transpired after the transfers, with

the CBB explicitly stating that BisB must return the funds or seek the permission of this Court

and BisB steadfastly refusing to do so.  This full context further confirms the extraordinary

nature of the transactions here were outside of the regular course of business.

     b.  The Tadhamon Debt

As with BisB, the evidence clearly demonstrates that the investments made by Arcapita

with Tadhamon were not in the parties' regular course of business.  Investments had previously

flowed from Tadhamon to Arcapita, but Arcapita had never before placed funds with Tadhamon

prior to the Tadhamon Placements.  *See* Khani Tadhamon Decl., Ex. B at 34:24–35:9; 36:19–24;

48:4–23 (Dep. Tr. of Maisarah Yaseen (Feb. 8, 2018)).  The timing of the transactions

themselves was also out of the ordinary, with the Tadhamon Placements having been negotiated,

structured and executed all in the course of one day—March 15, 2012[39]—that was only one

---

[39]     The Committee takes the position that the operative agreements for the Committee's claims are the
Tadhamon Rollover Contracts that govern Tadhamon's current debt, as opposed to the Tadhamon Placements,
which were executed on March 15, 2012 and were rolled over upon maturity.  *See* Comm. Tadhamon SJM at 27
n.20.  The Committee asserts that even though the Tadhamon Placements and Tadhamon Rollover Contracts are
contractually distinct, Tadhamon's intentions in entering into both the Tadhamon Placements and the Tadhamon
Rollovers Contracts are linked, and the circumstances surrounding the creation of the Tadhamon Placements is
relevant to understanding Tadhamon's reasoning for entering into the Tadhamon Rollover Contracts.  *See id.*

business day prior to the Petition Date.[40]  *See* Khani Tadhamon Decl., Ex. A at 76:24-78:5 (Dep.

Tr. of Ahmed Hatam Sultan (Feb. 8, 2018)).  Both of the Tadhamon Placements also took place

on the same day that the Master Wakala Agreement was executed, which had never happened in

any of the prior investments that had flowed from Tadhamon to Arcapita.  *See* Khani Tadhamon

Decl., Ex. G at TAD_000402-10; Khani Tadhamon Decl., Ex. H at TAD_000071-72; Khani

Tadhamon Decl., Ex. E at TAD_001590-97.  And as with BisB, the ultimate issuance of the

Formal Directions by the CBB only reinforces the finding that the transactions between

Tadhamon and Arcapita were not in the regular course of business.

The $20 million total of the Tadhamon Placements also is noteworthy.  Not only had

Tadhamon never made an investment in Arcapita of this scale during the parties' prior

relationship, but the total dollar amount of the Tadhamon Placements conveniently just exceeded

the $18.7 million that was owed by Arcapita to Tadhamon.  *See* Khani Tadhamon Decl., Ex. F at

TAD_006433-37; Khani Tadhamon Decl., Ex. H at TAD_000071; Khani Tadhamon Decl., Ex. E

at TAD_001590-97 (investments from Tadhamon to Arcapita generally ranging from hundreds

of thousands of dollars to low millions, with one outlier deposit of $12 million).  Arcapita's

extraordinary decision to place such large amounts outside of its control on the eve of its

bankruptcy filing seems to make little financial sense, as the return on these investments was

comparatively minimal.  *See* Khani Tadhamon Decl., Ex. H at TAD_000071-72 (rates of return

of 1.25% and 2.00%, for expected profits of $5,208.33 and $17,777.78, respectively); *see also*

Tadhamon SMF ¶¶ 158, 166 (profits of $5,208.33 and $17,777.78).

---

[40]    March 15, 2012 fell on a Thursday, which is the final day of the work week in Bahrain.  *See* Comm.
Tadhamon SMF ¶ 37.  Arcapita filed its bankruptcy case in New York on the following Monday, March 19, 2012.
*See id.*

As with BisB, Tadhamon asserts that it was unaware of Arcapita's imminent bankruptcy filing. But its employees had repeatedly raised concerns that Arcapita was experiencing financial stress. In January 2011, an email chain between Tadhamon employees regarding deposit limits on Arcapita discusses a default in 2009 by Arcapita that required Tadhamon to "roll over USD 10M with Arcapita because they were not able to deliver the payment due to liquidity issues." *See* Khani Tadhamon Decl., Ex. K at TAD_004619. In October 2011, Maisarah Yaseen, Tadhamon's Senior Associate in Treasury and Wealth Management at that time, emailed the Tadhamon risk management department and stated that Arcapita was "[a]pparently . . . having shortage of liquidities." Khani Decl., Ex. U at TAD_005135. The email noted Tadhamon's exposure to Arcapita and asked for the "risk views on their short term liquidity position." *Id*. In February 2012, Mr. Yaseen of Tadhamon reached out to Arcapita to discuss the impending maturity in March 2012 of Arcapita's $1.1 billion loan facility with various lenders; he inquired about Arcapita's discussions with its lenders and the "impact on the creditability of Arcapita." Khani Tadhamon Decl., Ex. J at ARCAPITA_0006303; *see also* Khani Tadhamon Decl., Ex. B at 102:16-103:22 (Dep. Tr. of Maisarah Yaseen, current Director of Treasury and Wealth Management of Tadhamon (Feb. 8, 2018)) (discussing awareness of $1.1 billion of Arcapita debt obligations through news in the market and desire to "understand if— what is going on with Arcapita and if everything is fine with them."); Khani Tadhamon Decl., Ex. A at 60:7-15 (Dep. Tr. of Ahmed Hatam Sultan, current CEO of Tadhamon (Feb. 8, 2018)) (stating that he was concerned in February that Arcapita had a $1.1 billion maturity and that by the first maturity of Tadhamon's debt with Arcapita, Tadhamon was hoping to have "a clearer picture of their ability to repay.").

But far more relevant and damning are the communications between Arcapita and Tadhamon about the specific transactions between the parties and the related question of how to handle Arcapita's bankruptcy filing.  On March 18, 2012, a Tadhamon representative asked an Arcapita representative to renew the Tadhamon Rollover Contracts, stating that "it will give [Tadhamon] more comfort if we could make renewable to avoid the shortage during the liquidity of the structured deposit[,]" a seeming reference to Tadhamon's $12 million investment with Arcapita that was set to mature on May 17, 2012.  Khani Tadhamon Decl., Ex. Z at TAD_007835.  The Arcapita representative responded, "listen, we are going to work together sure . . . we will not leave you out of the loop.  *You people accept to work with us when we've been in a weak situation. . . . You support us, and we want basically pay you back*."  Khani Tadhamon Decl., Ex. Z at TAD_007835 (emphasis added).  As this exchange was one day before the bankruptcy was filed, this is powerful evidence.  But there is more.

One day after the bankruptcy was filed, Arcapita sent a letter to Tadhamon's then-CEO informing Tadhamon of the bankruptcy filing.  Khani Tadhamon Decl., Ex. L at TAD_000397 (email dated March 20, 2012 attaching Chapter 11 letter).  The letter noted that, given the Chapter 11 filing, Tadhamon's "funds with Arcapita will be frozen for the duration of the process as we work with all creditors to reach agreement."  Khani Tadhamon Decl., Ex. L at TAD_000397 (email dated March 20, 2012 attaching Chapter 11 letter).  Arcapita subsequently requested that Tadhamon transfer the proceeds due under the Tadhamon Placements upon their maturity dates of March 30 and April 16, 2012.  *See* Khani Tadhamon Decl., Ex. B at 52:6-16, 45:6-10 (Dep. Tr. of Maisarah Yaseen, dated Feb. 8, 2018).  But on March 28 and April 15, 2012, Tadhamon sent Arcapita offers to roll over the principal amounts of the Tadhamon Placements.  *See* Comm. Tadhamon SMF ¶ 75.  Arcapita agreed to roll over this placement soon

after Tadhamon's request, thereby keeping its original $10 million investments from the

Tadhamon Placements on deposit with Tadhamon and reinvesting those amounts into new

transactions. *See* Comm. Tadhamon SMF ¶¶ 76-78.

It appears that the parties explicitly structured their transactions so that Tadhamon would

get a full return on its money, as opposed to receiving the lower return received by Arcapita's

other unsecured creditors. In a telephone discussion that took place between Maisarah Yaseen of

Tadhamon and Mahmood Al-Kooheji of Arcapita on April 9, 2012, the two sides acknowledged

the realities of the bankruptcy process:

| | |
|---|---|
| Yaseen: | Mean, you will not pay the client, the court, the court said you hold everything, but you can keep investing, I mean; |
| Al-Kooheji: | I understand your point, eventually yes, but today you have the court, what are they saying? They are saying, of course we are in a debate with them, they are saying the depositors are being treated exactly like the debtor on the bank's portfolio, today the bank's portfolio, the debtor [...] there was a freeze on them we are not paying them even the financing cost. |
| Yaseen: | Okay; |
| Al-Kooheji: | They are getting zero from us, you know? [...] They are basically, putting you in the same pool, if we put you in the same pool, eventually we cannot mistreat others, got my point! |
| Yaseen: | Understood, understood; |
| Al-Kooheji: | *We don't pay them and pay you, or at least accounting wise, we accounted, account for you, and we don't account for them, the court will not approve, and will not allow us*, eventually we are in chapter 11 that's it, whatever the position was, done....we cannot move on it, that's it, you cannot.... that was the position [...] *so it is hard to, for example to say it is a renewal and already the cash is not in our position, and they will not allow us*, they will tell us by which right you said renewal. |
| Yaseen | Okay what about the late payment? |

| | |
|---|---|
| Al-Kooheji: | You charge, do anything, I mean, today, you can take your action as it is, today you did the credit....you claimed this credit from the court against Arcapita do you understand? |
| Yaseen: | M'mm [means yes]; |
| Al-Kooheji: | You did filed [sic] a case against Arcapita in the American courts? |
| Yaseen: | M'mmm [following] |
| Al-Kooheji: | *Okay! you do your normal process, clear?*  Then later on at the end everything will be determined.  Now, so far, we are handless....we cannot do anything....there is nothing in our hands. |

Khani Tadhamon Decl., Ex. Z at TAD_007849 (emphasis added).  In a subsequent phone call, they discuss an email from Mr. Yaseen related to a rollover of the March 15, 2012 Placement, which was set to mature on April 16, 2012.  The call further confirms the parties' intent to carve out their relationship from how other creditors would be treated in a U.S. bankruptcy process:

| | |
|---|---|
| Al-Kooheji: | listen [ ... ] the language makes it firmer; |
| Yaseen: | The what? |
| Al-Kooheji: | The language of your message |
| Yaseen: | Umm; [following] |
| Al-Kooheji: | You are saying, we will reinvest as per the agreement; |
| Yaseen: | U'mmm [following]; |
| Al-Kooheji: | *re-write it, as is you are telling us*, we will not, I mean in a way we are re-investing, regardless, did you got my point? |
| Yaseen: | Say it again; |
| Al-Kooheji: | I mean the message is saying the Murabaha, you want to re invest for one month [ .... ] right [ ... ] ! |
| Yaseen: | U'mm [following] |
| Al-Kooheji: | Let's do it as per as our sign agreement. |

> Please note that we will reinvest if, *I meant to say re-write it, as you are telling me that you are re-investing, and not to indicate that you are asking me for approval;*

Yaseen:    *As if, I am already invested;*

Al-Kooheji:    Yes, yes as if you are doing it regardless, you got my point?

Yaseen:    Fine, ok;

Al-Kooheji:    Did you got my point?

Yaseen:    [interrupted]

Al-Kooheji:    *Do you know why I need this?*
*We need this to let you understand, that we want it because, if the court asked us to transfer it, we will say [ ... ] [interrupted]*

Yaseen:    *Already invested;*

Al-Kooheji:    The bank, the bank, would not agree to transfer it;

Yaseen:    Ok, let to be for 3 month, or 4 month (interrupted);

Khani Tadhamon Decl., Ex. Z at TAD_007855 (emphasis added).[41]

The same parties talked again on April 30, 2012, which was the maturity date of the March 28, 2012 Rollover Contract. During this conversation, Mr. Yaseen and Mr. Al-Kooheji specifically planned to avoid the interference of the American bankruptcy Court by having Tadhamon refuse to return the placement proceeds and instead execute a unilateral rollover, with Al-Kooheji going so far as to essentially draft an email for Yaseen to send back to him:

Al-Kooheji:    *The email you I sent before,* sent yesterday

Yaseen:    Yes;

---

[41]    The Defendants argue with respect to the April 12th call that standard offer and acceptance documentation was ultimately utilized in the transaction. *See* Tadhamon Reply at 3 n.11. But that is beside the point. It does not change the fact that the parties were seeking to structure their financial relationship in a way to avoid the purview of this Court.

Al-Koheji:        *Ok, take it and put it as a response to me*, did you know what I mean?  meaning keep it as a response. *basically, we are not transferring, the 10 million, we'll transfer you the profit, fine, but we'll not transfer you the 10 million*; did you got my point?

Yaseen:          A'a 'a'a [sound wondering];

Al-Koheji:        *Waleed, Waleed* [Rashdan, Tadhamon's then-CEO], *and Hisham* [Al-Raee, Arcapita's present Chief Operating Officer] *agreed*;

Yaseen:          Now, today, or?

Al-Koheji:        No, no they agreed on Thursday;

Yaseen:          Talk to me, so I can understand, so I don't do anything unless I understand;

Al-Koheji:        No, no *Waleed met Hisham, they sat together*, [ ... ] as I told you, I will repeat it for you again, between us, please keep discreet, to avoid [ ... ] don't discuss it with Waleed, unless he talks to you, then tell him you know, *Waleed knows it supposed to a discreet*;

Yaseen:          Ok, tell me;

Al-Koheji:        Anyway, Aaa, [continuing] unless Waleed told you, then you can discuss it with him as if you know; the issue is that, *you have to take us step by step, because today we have lawyers, and there are people behind us, understand?*

Yaseen:          You say, you are asking me for this? [wondering]

Al-Koheji:        *We, legally will ask you for the money, and you guys are rejecting. Fine when you reject, we ... even Hisham told Waleed there is a letter will be issued by the Lawyer; Harsh*;

Yaseen:          for?

Al-Koheji:        That you, we have to transfer the cash, meaningless;

Yaseen:          Ok;

| Al-Kooheji: | Between us, what is the letter about?  Hisham prepared Waleed for it, did you get my point?  He said there is a letter containing ... etc. |
|---|---|
| Al-Kooheji: | what would be our reply to such letter? |
| Yaseen: | just keep it will remain in the papers ... like ... who cares ... you know! [ha] |
| Yaseen: | Is it containing legal [interrupted]; |
| Al-Kooheji: | No, no legal contents, it is not a legal implication, there are no legal implications, if it had legal implications, then, they would say to transfer it, got it? |
| Yaseen: | Umm [following]; |
| Al-Kooheji: | *They know Hisham and Waleed know about it, but let's do the process [ ... ] as they agreed, fine, I will send you the email, and you respond back unless you want to talk to Waleed;* |
| Yaseen: | *No, no, ok, no worries, your same email I will resend it to you again;* |
| Al-Kooheji: | Send it only to me, remove the word that says we discussed, as we will not transfer the cash, and such things, remove it, let me see the email once again, they email was cleared to me I sent it to yesterday, yes, yes, we are doing it regardless, right? |
| Yaseen: | Yes; |
| Al-Kooheji: | Fine, send it to me, we don't.  but the profit will be send it to you; |
| Al-Kooheji: | Ok, with Allah's will; |
| Yaseen: | Fine, will do it this way; |
| Yaseen: | Ok; |

Khani Tadhamon Decl., Ex. Z at TAD_007860-61 (emphasis added).  The references to Mr.

Hisham and Mr. Waleed, senior level members of each bank, demonstrate that this was not

58

merely idle chitchat among employees who had no authority.  Given these conversations, it is not

surprising that Ahmed Hatam Sultan, Tadhamon's CEO, testified that subsequent to Arcapita's

bankruptcy filing, Tadhamon took "comfort" from the fact that they were holding $20 million of

Arcapita's funds as a result of the Placements.  Khani Tadhamon Decl., Ex. A at 83:15-21 (Dep.

Tr. of Ahmed Hatam Sultan (Feb. 8, 2018)).

These conversations are also not surprising given the close relationship of the parties.

Mr. Sultan testified with respect to the Bahraini banking industry in general that it "is so small

and everybody knows each other. . . . In Bahrain, people really rely on the word of mouth rather

than the risk word.  Because it's a small community and bankers help each other."  Khani

Tadhamon Decl., Ex. A at 30:22-31:4, 61:17-19 (Dep. Tr. of Ahmed Hatam Sultan (Feb. 8,

2018)).  Indeed, Mr. Sultan and Mr. Al-Kooheji of Arcapita are friends outside of work, with

Sultan noting that he knew Al-Kooheji "as a family."  Khani Tadhamon Decl., Ex. A at 58:25-

59:4 (Dep. Tr. of Ahmed Hatam Sultan (Feb. 8, 2018)).[42]

### c.   The Defendants' Arguments

The Defendants characterize the Committee as straining to create a factual inference of

collusion based on speculation and conclusory allegations, arguing that the Committee is

required to produce hard evidence of collusion and any factual inference from the record must be

rational.  *See, e.g., Anderson News, L.L.C. v. Am. Media, Inc.,* 899 F.3d 87, 101 (2d Cir. 2018)

("We are attentive to the legal principle that the weight [to] be assigned to competing permissible

inferences remains within the province of the fact-finder at a trial.  But some assessing of the

evidence is necessary in order to determine rationally what inferences are reasonable and

---

[42]      After working at Arcapita, Mr. Al-Kooheji ultimately joined Tadhamon's Investor Relations Department in
December 2012, remaining employed there until August of 2014.  *See* Official Committee of Unsecured Creditors'
Supplemental Statement of Undisputed Fact in Support of its Motion for Summary Judgment ¶ 1 [Adv. Pro. No. 13-
01435, ECF No. 89].

therefore permissible.") (citations and quotations omitted). The Defendants contend that the more likely explanation of these events is that Arcapita was investing its excess prepetition cash as a cash management strategy.

But the Court disagrees. The unusual nature of the transactions, in combination with the conversations between the parties, demonstrates that the debt in these circumstances was incurred for the purpose of protecting these creditors from what would otherwise await them in a bankruptcy as unsecured creditors. *See, e.g., DuVoisin v. Foster (In re S. Indus. Banking Corp.)*, 809 F.2d 329, 332 (6th Cir. 1987) (noting that Section 553(a)(3)(C) requires a subjective inquiry into whether the purpose of the creditor's loan was to obtain a setoff and improve the creditor's position and finding that it was not clearly erroneous to infer from facts to determine that intent was to setoff the debt); *In re Union Cartage Co.*, 38 B.R. at 139-40 (Bankr. N.D. Ohio 1984) (rejecting "self-serving" statement of the creditor as "hardly persuasive" and examining facts to find that "it can be inferred that the deposits were made for the purpose of giving [the creditor] a right to setoff."). Indeed, given the Defendants subsequent failure to comply with the CBB's Formal Directions, a fact finder could not reach any other conclusion.[43]

The Defendants also argue that Arcapita's demands for repayment after the bankruptcy filing are inconsistent with the implication that Arcapita and the Defendants may have colluded

---

[43]   Citing to correspondence between Arcapita and the CBB, the Defendants point out that Arcapita made at least $35 million in prepetition placements with BisB, Tadhamon and "other banks". *See* Tadhamon Reply at 2 n.7 (citing Honeywell Tadhamon Decl., Ex. 85 at ARCAPITA_0005393 (describing placements "before the Chapter 11 petition" with BisB, Tadhamon Capital, and Al Baraka Islamic Bank ("Al Baraka")); BisB Reply at 3 n.7 (citing Honeywell BisB Decl., Ex. 57 at ARCAPITA_0005393 (same)). But that does not change the result here. The vast majority of the $35 million number that the Defendants cite is attributable to the $30 million in placements with the Defendants, with only $5 million attributable to one other bank, Al Baraka. The Defendants also cite to Arcapita's accounting records with respect to other banks, but the utility of these records is limited, as the Defendants provide no detailed information on these transactions and the Court therefore cannot reach any conclusions with regard to them. *See* Honeywell Tadhamon Decl., Ex. 91 (Arcapita accounting records from April 3-Dec. 27, 2012, listing various "Placements with Banks", including BisB, Tadhamon, Al Baraka, "BMI Bank" and "GMI"); Supp. Honeywell BisB Decl., Ex. 1 (same).

with respect to the setoffs. *See, e.g.,* Khani BisB Decl., Ex. N (Letter of Gibson, Dunn &

Crutcher LLP, dated April 30, 2012, to BisB demanding payment of BisB Maturity Proceeds);

Khani Tadhamon Decl., Ex. P (Letter of Gibson, Dunn & Crutcher LL, dated April 30, 2012, to

Tadhamon demanding payment of Tadhamon Rollover Proceeds).  But these demands were by

the Debtors' U.S. bankruptcy counsel, professionals who were well aware of a debtor's fiduciary

obligations to all creditors.  Such communications do not absolve a creditor and debtor who

collude to obtain preferential treatment for a favored creditor.

Relying on its experts, the Defendants further suggest that the placements made by

Arcapita were "short-term cash investments" that were simply "a standard practice among

Bahraini banks for liquidity management" and "on which [Arcapita] expected immediate

profits."  BisB SJM at 3-4; *see also* Thomas Tadhamon Report at 28 ("Even a struggling

Arcapita would need to place excess funds as the firm was still generating cash flow."); Thomas

BisB Report at 26 (same).  But as the Committee's expert—Harris Irfan—points out, it would

seem "inconceivable" for management of an Islamic bank to "allow such placements to be made

knowing not only the deteriorating credit position of my institution, but also very likely knowing

that my institution was due to file for bankruptcy in one business day."  Irfan Tadhamon Report

at 11-12; Irfan BisB Report at 11.  Not surprisingly then, the Committee's expert further opined

that the placements

> would not be considered "standard market practice for struggling firms."  On the
> contrary, the executive committee and the credit committee of any institution in
> such a position would take appropriate measures to ensure there could be no
> possibility of deemed impropriety.  These placements would certainly not have
> been made in the ordinary course of business.

Irfan Tadhamon Report at 12; *see* Irfan BisB Report at 11.  The Committee expert highlighted

the timing of the placements within days of Arcapita's bankruptcy filing as being "particularly

unusual." Irfan Tadhamon Report at 12; Irfan BisB Report at 11.  With respect to the Tadhamon,

replacements, Mr. Irfan found the negotiation and entry into the Master Wakala Agreement, and

then the execution of two transactions thereunder, all within the course of one day to be

"extraordinary," with the entry into a master wakala agreement between institutions that have not

had a wakil/muwakkil interbank relationship typically taking several weeks or months of

negotiations.  Irfan Tadhamon Report at 12.[44]

Mr. Irfan further states that "[e]ven if it were not customary . . . for institutions to seek

bankruptcy protection in the US, the market was fully aware of credit difficulties at Arcapita for

several months prior to the Petition Date."  Irfan Tadhamon Report at 15; Irfan BisB Report at

12.[45]  This seems to be a sentiment shared even by Tadhamon's expert, who states:

> When Arcapita's syndicated commodity murabaha was due for refinancing in the
> spring of 2012, however, the investor climate had not fully recovered.  The firm
> still had a substantial mismatch between maturing and short term funding and
> long term assets.  That Arcapita was in a difficult situation was known.

---

[44]    The Defendants object to certain of the statements contained in Mr. Irfan's rebuttal report as going beyond
the scope of Mr. Thomas' report.  The Defendants specifically cite to Mr. Irfan's opinions relating to the "supposed
'close collaboration' between Arcapita and [the Defendants], based on his interpretation of the same phone records
interpreted by the Committee[,]" "a lack of evidence that BisB obtained approvals from its Shari'a committee[,]"
and "the quality of Tadhamon's internal controls for managing credit risk, monitoring legal documents, and
obtaining approvals from its Shari'a committee."  Tadhamon Reply at 5; BisB Reply at 7.  But Tadhamon also
admits that Mr. Thomas touches on issues relating to "the market practices for Islamic banks struggling with
liquidity issues and the general knowledge of Arcapita's money market practices prior to its Chapter 11 filing."
Tadhamon Reply at 5 n.23; BisB Reply at 7 n.30.  For this reason, the Court believes it appropriate to consider Mr.
Irfan's opinions on what would constitute ordinary course of business practices for Arcapita with respect to its
investments in the Defendants.  In any event, the Court would reach the same conclusion without relying on these
statements.

[45]    Mr. Irfan further notes

> how tight knit the Islamic banking market is, and how incestuous the community, many of who
> may find themselves one day working at the institutions with whom they may be currently
> negotiating a transaction. . . . Such relationships and business practices in Bahrain and other Gulf
> states inevitably mean that the Islamic banking market is acutely aware of movements of staff
> between banks, rumours of individuals interviewing outside their firms, rumours of financial
> transactions that are not going well, and rumours of pieces of banks or their assets under
> management that are being sold off.  Immediately prior to the Petition Date, I would expect many
> senior Bahraini bankers to be expecting a major credit event to be about to take place at Arcapita,
> even if they had failed to consider the possibility of Arcapita seeking protection under the US
> Bankruptcy Code.

Irfan Tadhamon Report at 18; *see* Irfan BisB Report at 13-14.

Thomas Tadhamon Report at 27; Thomas BisB Report at 25.  Given the close-knit nature of the

Bahraini banking community many senior bankers at Bahraini banks would have been expecting

a major credit event at Arcapita.  *See* Irfan Tadhamon Report at 18; *see* Irfan BisB Report at 13-

14.

### D.  **Safe Harbors**

The Defendants invoke a variety of so-called "safe harbors" in the Bankruptcy Code as a

basis to protect these transactions from challenge.  The safe harbors were designed

> as a means of minimizing the displacement caused in the commodities and
> securities markets in the event of a major bankruptcy affecting those industries . .
> . . If a firm is required to repay amounts received in settled securities transactions,
> it could have insufficient capital or liquidity to meet its current securities trading
> obligations, placing other market participants and the securities markets
> themselves at risk.

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011)

(citations and quotations omitted).  The Defendants have the burden of establishing that the

transactions are covered by the safe harbors.  *See Fairfield Sentry Ltd. v. Theodoor GGC*

*Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 507 (Bankr. S.D.N.Y. 2018)  ("The

[S]ection 546(e) safe harbor is an affirmative defense as to which the Defendants bear the burden

of proof.") (citing cases); *Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium*

*Capital, LLC*, 437 B.R. 798, 812 (Bankr. D.S.C. 2010) (same); *Hayes v. Morgan Stanley DW*

*Inc. (In re Stewart Fin. Co.)*, 367 B.R. 909, 920-21 (Bankr. M.D. Ga. 2007) (same); *see also In*

*re Best Payphones, Inc.*, 2016 Bankr. LEXIS 130, at *32 (Bankr. S.D.N.Y. Jan. 13, 2016) ("The

party asserting an exception to the automatic stay bears the burden of proving that the exception

applies."); *In re Residential Res. Mortg. Inv. Corp.*, 98 B.R. 2 (Bankr. D. Az. 1989) (placing

burden of proof for meeting various elements of Section 555 on the creditor); *cf. Tronox Inc. v.*

*Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 339 (Bankr. S.D.N.Y. 2013) ("[Section]

546(e) is a classic affirmative defense: even if the plaintiff successfully proves the elements of a

case in chief under any of the enumerated avoidance provisions, [Section] 546(e) intervenes to

shield the transfer from avoidance . . . . ").[46]

For purposes of summary judgment, the Defendants can prevail if the undisputed facts

establish the existence of a statutory safe harbor.  *See Official Comm. of Unsecured Creditors of*

*Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 453

B.R. 201, 211 (Bankr. S.D.N.Y. 2011) (noting that "[i]t is appropriate to resolve a dispute over

the legal application of a safe harbor provision in the context of a dispositive motion such as a

motion for summary judgment"); *Degirolamo v. McIntosh Oil, Co. (In re Laurel Valley Oil Co.)*,

2013 Bankr. LEXIS 896, at *17 (Bankr. N.D. Ohio Mar. 6, 2013) (granting summary judgment

where the defendant met its burden of proof under Section 546(e)); *U.S. Bank N.A. v. Plains*

*Mktg. Can. LP (In re Renew Energy LLC)*, 463 B.R. 475, 482 (Bankr. W.D. Wis. 2011) (same).

On the other hand, the Plaintiff is entitled to summary judgment as to the safe harbors if no

reasonable fact finder could find in favor of Defendants when viewing the undisputed facts in a

light most favorable to the Defendants.  *Cf. Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199,

204 (2d Cir. 2009) ("[T]he nonmoving party must come forward with admissible evidence

sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.").[47]

---

[46]        Many of these cases address the burden of proof with respect to Section 546(e), and there are few cases as
to the burden of proof for the other statutory safe harbors.  But there is little reason why the burden would differ
under the other safe harbor sections invoked by the Defendants.  As noted in *Tronox*, "[a]n affirmative defense does
not merely negate an element of a plaintiff's *prima facie* case; instead, it intervenes to defeat the claim even if
plaintiff proves every element of its case."  *In re Tronox*, 503 B.R. at 339 (citing *United States v. Continental Ill.*
*Natl Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1253 (2d Cir. 1989)).  "It is well-established that a defendant . . .
bears the burden of proving its affirmative defense." *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001).

[47]        Notably, both parties seek a ruling on summary judgement as to the safe harbors based on the undisputed
facts of this case.  At oral argument, counsel to the Committee noted that "[a] trial in this matter is going to be the
same evidence presented to you in no different a form than us standing up here and possibly playing videos for you
because they don't have qualified witnesses to testify to these facts.  And we don't have witnesses.  We're relying

1.  <u>The Safe Harbor for Securities Contracts</u>

The Defendants argue that their setoffs are protected by Sections 362(b)(6), 546(e), 555, and 561(a) of the Bankruptcy Code because the transactions here qualify as "securities contracts."  More specifically, the Defendants argue that these murabaha and wakala agreements—and the related investments contracts under these agreements—are contracts for the purchase or sale of a "security" or "any other agreement or transaction that is similar to an agreement or transaction referred to in" Section 741(7) of the Bankruptcy Code.  11 U.S.C. §§ 741(7)(A)(i), (vii).  The Defendants argue that the agreements here are "securities" under the residual clause of Section 101(49) of the Bankruptcy Code.  *See* 11 U.S.C. § 101(49)(A)(xiv) (defining a "security" as including "any claim or interest commonly known as a security").  But the Court disagrees.

Looking to the economic substance of the Murabaha agreements here, they provide that the party receiving the money under each agreement owes to its counterparty a debt in the amount of the investment principal plus an agreed-upon return, due on a specified maturity date. *See* BisB Agreement, Khani BisB Decl., Ex. B at BISB_000002 - BISB_000003 ("The rate of return (profit) advised by the Agent to Bahrain Islamic Bank shall be a net rate."); 2003 Investment Agreement, Khani BisB Decl., Ex. B at BisB)000010 - BISB_000011 ("[T]he rate of return (profit) advised by the Agent to FIIB shall be a net rate."); 2009 Investment Agreement, Khani Tadhamon Decl., Ex. C at TAD_000424 – TAD_000425 ("The rate of return (profit) advised by the Agent to the Principal shall be a net rate."); 2011 Investment Agreement, Khani

---

on the documentary record.  And so, a trial here looks the same." Hr'g Tr. 70:14-19 (Nov. 13, 2018).  While the experts may disagree on whether certain of the transactions constitute securities for purposes of the safe harbors—as discussed below—this is a difference of opinion, not of fact.  And as previously noted, when the Court considers the declarations of foreign law experts, it "is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed."  *In re B.C.I. Fins. Pty Ltd.*, 583 B.R. at 300 (internal citation omitted).

Tadhamon Decl., Ex. D at TAD_001143 - TAD_001151 (discussing calculation of profit).  The

same is essentially true in practice for the wakala transactions here.[48]  *See* Master Wakala

Agreement, Khani Tadhamon Decl., Ex. G at TAD_000404 (defining the "Muwakkil Profit" as

"[t]he profit due to the Muwakkil calculated in accordance with the Wakil Offer.");  BisB Resp.

to Comm. SMF at ¶¶ 4, 27; 30;[49] Tadhamon Resp. to Comm. SMF at ¶¶ 7, 25, 33.[50]  Thus, the

---

[48]     Tadhamon disputes the Committee's characterization of the Master Wakala Agreement and related transactions, noting that the wakala transactions did not involve an obligation to repurchase or agreed repurchase amount.  Tadhamon Resp. to Comm. SMF ¶¶ 25, 33.  But Tadhamon concedes that, while it does not guarantee a return on wakala investments, it typically pays the agreed profit rate "99 percent of the time," even if the underlying investment does not generate the expected return.  Tadhamon Resp. to Comm. SMF ¶ 52 (quoting Khani Tadhamon Decl., Ex. A at 70:24-71:24 ((Dep. Tr. of Ahmed Hatam Sultan, Feb. 8, 2018); Khani Tadhamon Decl., Ex. A at 71:12-21 ((Dep. Tr. of Ahmed Hatam Sultan, Feb. 8, 2018).

[49]     Under the BisB Agreement,

> BisB and Arcapita entered into investment transactions whereby BisB would deposit funds with Arcapita, Arcapita would invest those funds in specified commodity purchases on BisB's behalf, and Arcapita would immediately repurchase those same commodities from BisB on a cost-plus basis (i.e., BisB's initial investment amount plus agreed-upon profit) to be paid by Arcapita to BisB on an agreed-upon maturity date.

BisB Resp. to Comm. SMF ¶ 4 (citing Khani BisB Decl., Ex. B. at BISB_000002 (compilation of BisB-Arcapita agreements)).  The 2003 Investment Agreement provided the following procedures for BisB and Arcapita entering into individual investment transactions under the BisB Agreement:

> (i) BisB (the "Agent") sends an "Investment Offer" to Arcapita (the "Bank") specifying the amount Arcapita would invest, the dates by which Arcapita would transfer those amounts to BisB, the commodity BisB was to purchase with the investment funds on behalf of Arcapita, the profit to be generated by the investments, and the maturity date (or "Deferred Payment Date") upon which BisB would be required to repurchase the commodities from Arcapita; (ii) Arcapita sends BisB an "Investment Acceptance" accepting BisB's offer; (iii) Arcapita sends BisB the specified amount of investment funds on the Purchase Date; (iv) upon receiving the investment funds, BisB immediately purchases the agreed-upon commodities and send Arcapita an "Agent's Confirmation and Purchase Offer," in which it offers to buy the same commodities for immediate delivery on a deferred payment basis; (v) Arcapita accepts BisB's offer by sending BisB a "Purchase Acceptance"; and (vi) on the "Deferred Payment Date," BisB sends Arcapita payment for the purchased commodities.

BisB Resp. to Comm. SMF ¶ 3027 (quoting Khani BisB Decl., Ex. B. at BISB_000010 (compilation of BisB-Arcapita agreements).

[50]     Under the Tadhamon Agreements:

> Tadhamon would deposit funds with Arcapita, and Arcapita would invest those funds in certain Shari'a-compliant commodity investments on Tadhamon's behalf. Under the Tadhamon Agreements, Arcapita would thereafter repurchase the same commodities from Tadhamon for the original investment amount plus an agreed-upon return, to be paid by Arcapita to Tadhamon on a specified maturity date.

agreements are like loans as they explicitly provide for a creditor to recoup its investment with a specific rate of return.  *See* Irfan BisB Report at 6-7; Irfan Tadhamon Report at 6-7, 9; *see also* Khani BisB Decl., Exs. F, G, H (BisB Placement documentation setting rate of return of 0.55%, 0.55% and 0.6% for respective transactions); Khani Tadhamon Decl., Exs. H, M (Tadhamon Placement documentation setting expected profit of 1.25% and 2.0% for respective transactions).

Indeed, Arcapita and BisB themselves consistently referred to the prepetition debts owed by Arcapita to BisB as "loans."  *See, e.g.*, Khani BisB Decl., Ex. K at BISB_001433 (BisB treasury department telling Arcapita's treasury department "[y]ou are unable to repay your loans"); BISB_001434-BISB_001436 (Arcapita's treasury department repeatedly asking BisB's to "renew our loans"); BISB_001438 (BisB's treasury department telling Arcapita to "[p]ay first your overdue loans"); *see also* Irfan BisB Report at 6-7 (explaining how the murabaha as deployed equate to conventional interest-bearing loans or deposits transactions); Irfan Tadhamon Report at 7 (the wakala here have been deployed as "a bespoke bilateral loan-like arrangement").  Mr. Hassan Amin Jarrar—the CEO of BisB—has even described a murabaha as in effect a

---

Tadhamon Resp. to Comm. SMF ¶ 7 (citing Khani Tadhamon Decl., Ex. C at TAD_000423 (Investment Agreement, dated September 24, 2009); Khani Tadhamon Decl., Ex. D at TAD_001143 (Master Murabaha Agreement, dated Nov. 14, 2011)).  As for the Master Wakala Agreement:

> Tadhamon was obligated under the MWA to repurchase the investments from Arcapita on a deferred payment basis for an amount equal to the original investment plus an agreed-upon return . . . and to transfer such amount to an account designated by Arcapita on an agreed-upon maturity date.

Tadhamon Resp. to Comm. SMF ¶ 25 (citing Khani Tadhamon Decl., Ex. G at TAD_000405 (MWA)).  According to the Committee,

> Each "Wakil Offer" specified the amount Arcapita would invest with Tadhamon, the date by which Arcapita would transfer the investment amount to Tadhamon, the expected return on the investment, and the maturity date on which Tadhamon was required to pay Arcapita the Maturity Proceeds of the investment.

Tadhamon Resp. to Comm. SMF ¶ 33 (citing Khani Tadhamon Decl., Ex. H at TAD_0000071 (email chain attaching documentation of the Placements).

synthetic loan.  Khani BisB Decl., Ex. A at 38:23-39:3; 39:23-40:2 (Dep. of Hassan Amin Jarrar, dated January 25, 2018); *see Old Colony Tr. Co. v. City of Omaha*, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").[51]

The agreements do not bear the hallmarks of debt securities such as bonds, debentures, notes, or other instruments that are considered securities under Section 101(49) of the Bankruptcy Code.  The agreements here are not publicly tradeable as deployed (and have not been traded at all); they are not fungible; they are never listed on an exchange; and they are not liquid (i.e., readily convertible into cash).  *See* Irfan BisB Report at 6; Irfan Tadhamon Report at 6.  They are instead deposits or "loan-like" instruments that provide for the repayment of the principal investment along with a determined interest-like return.  *See* Irfan BisB Report at 6-7, Irfan Tadhamon Report at 6-9.

It is true that murabaha can be used as a building block in combination with other Islamic contracts to create more sophisticated financial instruments that might be considered securities by market participants, such as profit rate swaps, or commodity and currency hedging instruments.  *See* Irfan BisB Report at 7; Irfan Tadhamon Report at 7.  But while the commodity murabaha may be utilized in combination with other financial instruments to replicate the effect of certain securities, the murabaha themselves do not have the characteristics of securities.  *See*

---

[51]    *See also* 5 Margaret N. Kniffin, Corbin on Contracts § 24.16 (Joseph M. Perillo ed., rev. ed. 1998) ("In the process of interpreting a contract, the court can receive great assistance from the interpreting statements made by the parties themselves or from their conduct in rendering or in receiving performance under it.  The practical interpretation of a contract may thus be evidenced by the parties' acts or by their words."); 11 Williston on Contracts § 32:14 ("Once it is determined in a particular jurisdiction that the underlying requirements have been met so as to permit evidence of the parties' conduct, their own interpretation may be shown by acts of the parties as well as precise words.").

Irfan BisB Report at 7-8; Irfan Tadhamon Report at 7-9. This is a particularly easy conclusion to reach in this case where the murabaha contracts were used in one of the simplest applications—a commodity murabaha—that creates the effect of a credit financing arrangement between two parties, and not as a liquid, fungible, tradable instrument. *See* Irfan BisB Report at 7; Irfan Tadhamon Report at 7. Similarly, the wakala may be structured as a security in the form of an Islamic bond that may be issued and traded on the secondary capital markets. *See* Irfan Tadhamon Report at 7. But as deployed here, they were not issued in a bond-like format, and instead were used to replicate a term deposit in a bilateral loan-like arrangement between the banks. *See* Irfan Tadhamon Report at 7.

The Court's conclusion here is consistent with the Second Circuit's decision in *In re Lehman Brothers Holdings Inc.*, 855 F.3d 459, 474-475 (2d. Cir. 2017) ("*LBHI*"). In *LBHI*, the Second Circuit provided guidance for evaluating whether a financial transaction falls within the scope of a security under the residual clause of Section 101(49)(A)(xiv), the same provision invoked by the Defendants here. The Second Circuit found that certain restricted stock units ("RSUs") were securities under Section 101(49)(A)(xiv) because they bore "many of the hallmark characteristics" of securities specifically enumerated in Section 101(49)(A). *Id.* at 474. The *LBHI* court observed that, "of *most significance*, [the RSU holders] had the same risk and benefit expectations as shareholders because the value of their RSUs was tied to the value of Lehman Brothers' common stock." *Id.* (emphasis added). The RSU holders therefore had "'greater financial expectations than [a] creditor' inasmuch as 'a creditor can only recoup her investment,' whereas "an RSU holder 'expect[ed] to participate in firm profits.'" *Id.* (quoting *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 257 (2d Cir. 2006)). In reaching its conclusion, the Court also looked to other courts that had similarly defined

"securities" under Section 510(b) in terms of "an interest tied to a firm's overall success." *Id.*

(collecting cases). Other cases approach the issue the same way as the court in *LBHI*. *See KIT*

*Digital, Inc. v. Invigor Grp. Ltd. (In re KIT Digital, Inc.),* 497 B.R. 170, 183 (Bankr. S.D.N.Y.

2013) (holding that a debtor's obligation to pay stock was a security under Section 510(b) of the

Bankruptcy Code since "by agreeing to accept stock instead of cash[,] . . . [the claimant]

subjected itself to the greater risk that the price of the stock it would then receive might go

down" while at the same time it "would get the benefits if the price of the stock went up"); *In re*

*Club Ventures Inv. LLC*, 2012 WL 6139082, at *5 (Bankr. S.D.N.Y. Dec. 11, 2012) (holding that

a creditor's membership units were securities and were subject to Section 510(b), because they

"would have given [the claimant] certain rights to share in the [d]ebtor's profits[] and . . . the risk

and reward expectations of an equity holder"); *Aristeia Capital, L.L.C. v. Calpine Corp. (In re*

*Calpine Corp.),* 2007 WL 4326738, at *13 (Bankr. S.D.N.Y. Nov. 21, 2007) ("The value of the

[convertible notes] var[ies] with the value of the common stock of [the debtor], and therefore

resemble[s] an equity interest to which Section 510(b) is applicable.").

Unlike the RSUs in *LBHI*, the murabaha and wakala here did not grant to the Defendants

or Arcapita voting rights or other control over each other or any other entity, nor did they provide

for the payment of dividends. *See id*. And "of most significance," neither the Defendants nor

Arcapita assumed "the same risk and benefit expectations as shareholders" as a result of their

investments. *Id.* Their interests were confined to a single cash payment of U.S. dollars on a

future date. The only risk the investing party assumed was the risk of non-payment by its

counterparty; its only expectation was timely payment of a fixed amount. *See* Hr'g Tr. 87:10-15

(Nov. 13, 2018) (in responding to question from the Court as to what a remedy would look like

in a hypothetical breach of contract situation, Committee counsel responding that, "There's a

dollar amount of money that has to be delivered because the commodity is delivered at the same

moment to the ultimate person who gets the money at the end of the day.  And they hedge that

risk off.  That's what their expert says.  That's what our expert says.  There's no risk on the

commodity.  And so, the commodity becomes irrelevant. . . . [I]f there's a suit . . . about the

nonpayment, its not you need to send me my 1000 ounces of palladium.  The suit is you need to

pay me my money plus my profit.")[52]

        In arguing that these transactions qualify as securities, Defendants rely upon the risk

faced by the party that buys the commodity and ultimately has to dispose of it.  *See* Hr'g Tr.

107:14-111:13 (Nov. 13, 2018).  In the case of the murabaha transaction being challenged here,

for example, Arcapita gave funds to BisB and was to receive back its principle and an agreed

upon rate of return; BisB was the party who had title to the underlying commodities at the end of

the day.  In Defendants' view, it is this exposure to risk by BisB that makes these transactions

securities.  *Id*. at 113:6-9.[53]  But the Defendants' argument doesn't hold up on this record.  In

fact, there is nothing in the record about what the receiving banks did here with the commodities.

*Id*. at 111:25-112:1 (Defendants' counsel stating, "We do not have anything in the record as to

what these banks did.").  Rather, the Court merely has statements about what the party receiving

the commodities in these types of transaction might do.  *Id*. at 111:25-112:18 (noting that

Defendants' expert Mr. Thomas describes what banks usually do).  Thus, Defendants have no

evidence of any risk undertaken here for these transactions, which by itself makes it impossible

---

[52]        If one were to focus less on the overall import of the transactions and more on their technical terms, the murabaha agreements here would not qualify as securities.  Under Section 101(49)(B)(vii) of the Bankruptcy Code, the definition of "security" specifically excludes a "debt or evidence of indebtedness for goods sold and delivered or services rendered."  11 U.S.C. § 101(49)(B)(vii).  Consistent with that exclusion, the murabaha transactions provide for the purchase of commodities and then repurchase of those same commodities for immediate delivery on a deferred payment basis.  *See* BisB Resp. to Comm. SMF ¶¶ 27, 30; Tadhamon Resp. to Comm. SMF ¶¶ 6.

[53]        *See also* Thomas BisB Report at 20 (discussing  theoretical risk to commodity broker if verbal order is not executed); Thomas Tadhamon Report at 22 (same).

for them to satisfy their burden as to this safe harbor.

In fact, the evidence in the record makes clear that the long-term ownership risk claimed by Defendants is not a necessary part of these transactions and, in fact, rarely occurs. As conceded by the Defendants' expert, Abdulkader Thomas, "the placing (selling) bank rarely has more than transitory, seconds or minutes, ownership or possession of the goods or commodities." Thomas BisB Report at 10; Thomas Tadhamon Report at 10. As he explained:

> [C]ommodity murabaha money market can not work if the volatility is realized by the banks and almost all trades are organized to remove market risk . . . . Market volatility is often managed by the common pairs of supplying and buying brokers circulating the same commodity as the basis for sequential trades.

Thomas BisB Report. at 12-13 & n.28; Thomas Tadhamon Report at 12-13 & n.26.[54] The receiving bank can sell the commodity "right off" and get the cash. Hr'g Tr. 112:6-8; Thomas BisB Report at 8 ("In a commodity murabaha, the creditor institution buys a fungible commodity and sells it on deferred terms to the debtor institution. The debtor institution on-sells the commodity to obtain cash."); Thomas Tadhamon Report at 8 (same); Thomas BisB Report at 9-13, 32  (noting that "receiving financial institution, as the owner of the commodity . . . on sells the commodity to an off-taking broker, on a spot basis", discussing role of an off-taking broker, and noting with respect to the deals between BisB and Arcapita that "[t]he commodity murabaha transaction were typically organized with London based brokers sourcing the commodities or assisting with the off-take."); Thomas Tadhamon Report at 9-13 (noting that "receiving financial institution, as the owner of the commodity . . . on sells the commodity to an off-taking broker, on a spot basis", discussing role of an off-taking broker); *see also* Hr'g Tr. 173:12-20 (Committee

---

[54]    Mr. Thomas did testify that "[a] small number of Islamic banks actually seek exposure to market risk. They do this to assure the validity of the murabaha process, and not to profit from market movements." Thomas BisB Report at 12 n.28; *see also* Thomas Tadhamon Report at 12 n.26. There is no evidence, however, that the transactions here fall into this admittedly small set of circumstances.

counsel stating that "both experts opined that the way these are done in the marketplace

eliminates the risk.  And what I understand to happen and this is consistent with what Mr.

Thomas says is that they then sell it on to one of the brokers who's using that same commodity

in another trade, so that the – neither bank involved in the transaction, the selling or the receiving

bank doesn't have the commodities for any length of time, they're immediately delivered

commodities.").

The Defendants' expert concedes that the commodity murabaha system is structured to

avoid risk, noting that, "[m]ost money market Commodity Murabaha are organized in order to

remove the risk of commodity volatility.  This may be achieved in one of two ways.  Either the

Buying and Selling brokers coordinate or one of the banks acts as an agent in one capacity or the

other."  Thomas BisB Report at 10; Thomas Tadhamon Report at 10.  Thus, "market volatility is

often managed by the common pairs of supplying and buying brokers circulating the same

commodity as the basis for sequential trades with other market players."  Thomas BisB Report at

13; *see also* Thomas Tadhamon Report at 12 n.26.

The Committee's expert sees the murabahas here as akin to an interbank deposit, as there

is ordinarily no risk as to the commodity because the transfer of the commodities was immediate.

*See* Irfan BisB Report at 8 ("[T]he commodity murabaha when used as an interbank placement

device as in this case ensures immediate[] delivery of title of the underlying commodities, and

does not expose either party to price movement in the underlying commodity: in other words, it

neither hedges nor speculates on the price of that commodity. . . .").

As to the wakala transactions, the Defendants rely upon the fact that the return to be

received by the party placing the funds is only expected and not guaranteed.  *See* Thomas

Tadhamon Report at 15-16, 33 (contrasting a money market wakala with a commodity Murabaha

and noting with respect to wakala that "instead of offering to sell a commodity, the placing institution offers to make an investment based on an expected return stated by the receiving institution"; stating that "[t]he wakala placement according to AAOIFI is a risk bearing instrument" and that an investor risks the "loss of capital due to losses by the pool" and "a lower than expected return on capital due [to] under performance in the pool").   But it is undisputed that the expected return is paid to the depositor in 99% of cases.  *See* Khani Tadhamon Decl., Ex. A at  70:24-71:24 ((Dep. Tr. of Ahmed Hatam Sultan, Feb. 8, 2018) (testifying that in context of wakala transaction, depositor is paid the negotiated return "99 per cent of the time", even in circumstances where the return is not generated as expected); *see also* Irfan Tadhamon Report at 6-7 ("In my experience in the industry, I have not personally encountered a wakala interbank placement where the expected return has not been paid out.").

In fact, the Defendants' expert had not personally encountered a circumstance where the expected return was not paid; he had simply heard of one such circumstance.  *See* Thomas Tadhamon Report at 16 n.37 ("Until now, losses are not known to have happened in the wider market as the investment pools are high quality money market transactions.  But in the *TID v. BLOM* case, BLOM was obliged to forego their expected profit.").  This is true despite the extensive expertise of Defendants' expert with these kinds of financial instruments.  *See* Thomas Tadhamon Decl. at 1 ("A focus of my career for the past 30 years has been the implementation, interpretation, and application of Islamic financial principles governing transactions and financial instruments of the type that are the subject of this Report.").  In any event, the risk of non-performance exists in all contracts, including contracts that are not securities contracts such as loans.  *See LBHI*, 855 F.3d at 474 (focusing on the risk of ownership and noting that RSU holders had the "same risk and benefit expectations as shareholders because the value of their

RSUs was tied to the value of Lehman Brothers' common stock.  Each RSU holder therefore had

greater financial expectations than [a] creditor inasmuch as a creditor can only recoup her

investment, whereas an RSU holder expect[ed] to participate in firm profits.") (citations and

quotations omitted).

Last but not least, the Defendants contend that the agreements constitute securities under

the safe harbors because they maintain that these agreements are considered securities in the

Bahraini and Islamic funding markets.  *See, e.g.*, BisB SJM at 32.  The Defendants rely on

language in the residual clause in 11 U.S.C. § 101(49)(A)(xiv) that covers "any other claim or

interest commonly known as a security. . . ."  *Id*.; Tadhamon SJM at 35 (same).  But the

Defendants' position is inconsistent with the Second Circuit's approach in *LBHI*, which found

the residual clause to cover financial instruments similar to those already listed in the statute but

that were not listed or did not yet exist.  *See LBHI*, 855 F.3d at 474 (looking to similarities with

securities listed in Section 101(49)(A)).  In examining whether the RSUs resembled the other

securities enumerated in the statute, the Second Circuit specifically cited to *ejusdem generis*, a

canon of construction which denotes that "general terms that follow specific ones are interpreted

to embrace only objects of the same kind or class as the specific ones."  *Id*. (quoting *United

States v. Amato*, 540 F.3d 153, 160 (2d Cir.  2008)).[55]  Given this guidance, the Court concludes

---

[55]     In their reply briefs, the Defendants cite to the "family resemblance" test articulated in *Reves v. Ernst & Young*, 494 U.S. 56, 63-67 (1990), as the "best available guide" for determining which securities should be considered under the residual clause of Section 101(49)(A)(xiv).  *See* BisB Reply at 12-15; Tadhamon Reply at 11-14.  But the Defendants' argument on the *Reves* test is made for the first time in their reply, and the Committee did not have the opportunity to respond to the argument.  *See United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003) ("We will not consider an argument raised for the first time in a reply brief."); *In re Motors Liquidation Co.*, 538 B.R. 656, 665 n.4 (S.D.N.Y. Aug. 27, 2015) ("[I]ssues raised for the first time in a reply brief are generally deemed waived.") (quoting *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010)).  In any event, the Court finds that *Reves* is an analogy that does not fit these circumstances as it was applied in a different situation involving regulation of U.S. securities.  The Defendants themselves admit that the regulatory purpose of the Bankruptcy Code and U.S. securities laws are different; "the former [is] to collect property of the debtor's estate and distribute it to creditors, and the latter [is] to discourage fraud in the securities markets."  BisB Reply at 13;

that the residual clause is not intended to expand the definition of a security in the way that the

Defendants urge.

The Defendants also cite no authority—and the Court is aware of none—for the

proposition that the definition of "security" under the United States Bankruptcy Code should be

controlled by the views commonly held in a foreign country. The Defendants' approach would

raise concerns about the consistency of any definition of a "security" that is subject to the

differing understanding of individual foreign countries and may be flatly inconsistent with the

definition of a security under U.S. law. Such an approach seems certain to stretch the definition

of "security" beyond recognition and throw consistency to the wind.[56]

Given the entire record here, the Court is persuaded that the views of the Committee's

expert are consistent with the language of the agreements and the undisputed facts. *See* Irfan

BisB Report at 3 ("The financial arrangements between Arcapita [] and BisB consisted of

deposit-like instruments based on the murabaha contractual structure, and in no way fulfill the

common usage or market practice that would cause them to be considered securities."); Irfan

Tadhamon Report at 3 ("The financial arrangements between Arcapita [] and Tadhamon

consisted of deposit-like instruments based on the wakala and murabaha contractual structures,

---

Tadhamon Reply at 12. And even to the extent that *Reves* may be somewhat analogous, the Court finds the *LBHI* decision to be directly on point and controlling authority on the issue before this Court.

[56]    For what it is worth, the Committee's expert does not concede that these transactions are considered securities in Bahrain or the Islamic finance market. He explains that the "uses and nature" of the commodity murabaha lack the characteristics necessary to be considered securities by securities traders in the Islamic funding market and concludes that these agreements are loan-like instruments. *See* Irfan BisB Report at 6-7 (observing that the agreements operate as credit financing arrangements between two parties, and not as liquid, fungible, tradable instruments); Irfan Tadhamon Report at 6-7 (same). While the Defendants' expert relies upon the CBB's broad definition of a security, the Committee's expert rightly points out flaws with this analysis. *See* Irfan BisB Report at 9 ("[I]t is worth noting that BisB misinterprets the CBB's definition of 'securities', as set out in Volume 2, Part B, of the CBB Rulebook, since they interpret clause (j) which includes "Islamic securities, being those financial instruments that are Shari'a compliant' as referring to *all* Islamic financial instruments. That is clearly not the intent of CBB. Instead, it is obvious that securities will include Islamic financial instruments only where they already have the characteristics of securities . . . . ") (emphasis in original); Irfan Tadhamon Report at 9 (stating the same with respect to Tadhamon).

and in no way fulfil the common usage or market practice that would cause them to be

considered securities.").[57]

    2.  <u>The Safe Harbor for Forward Contracts</u>

    The Defendants also argue that the murabaha agreements at issue are protected as

forward contracts under the safe harbor provisions of the Bankruptcy Code.  Section 101(25) of

the Bankruptcy Code defines a forward contract as "a contract . . . for the purchase, sale, or

transfer of a commodity . . . with a maturity date more than two days after the date the contract is

entered into . . . ."  11 U.S.C. § 101(25)(A).  Courts apply a four-factor test originally set out by

*In re National Gas Distributors LLC*, 556 F.3d 247 (4th Cir. 2009) to determine whether a

contract is a forward contract.  Under the *National Gas* analysis, a contract is considered a

forward contract where:

> 1) substantially all expected costs of performance are attributable to the
> underlying commodity; 2) the contract has a maturity date of more than two days
> after the contract was entered into; 3) the price, quantify, and time elements must
> be fixed at the time of contracting; and 4) the contract has a relationship to the
> financial markets.

*Conti v. Perdue BioEnergy, LLC (In re Clean Burn Fuels, LLC)*, 540 B.R. 195, 204 (Bankr.

M.D.N.C. 2015) (citing *Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs.,*

*LLC*, 556 F.3d 247, 256-57 (4th. Cir. 2009)).  As the agreements at issue fail to meet all of the

*National Gas* requirements, the Court finds that these transactions do not satisfy the safe harbor

---

[57]    The parties have each offered experts on the question of whether these agreements constitute securities under Section 101(49).  *See generally* Thomas BisB and Tadhamon Reports; Irfan BisB and Tadhamon Reports. Not surprisingly, these experts disagree.  Of course, it is the language of the agreements and the import of that language that controls, not the gloss of an expert's opinion.  *See In re B.C.I. Fins. Pty Ltd. (In Liquidation)*, 583 B.R. 288, 300 (Bankr. S.D.N.Y. 2018) ("When considering . . . foreign law expert declarations, it 'is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed.'") (quoting *Norwest Fin., Inc. v. Fernandez*, 86 F. Supp. 2d 212, 227 (S.D.N.Y. 2000); *see also Faggionato v. Lerner*, 500 F. Supp. 2d 237, 244-48 (S.D.N.Y. 2007) (adopting conclusions of one of two dueling foreign law experts and stating that it is the "'persuasive force of the opinions' expressed that is conclusive under Rule 44.1").

for forward contracts.

To begin with, the agreements do not satisfy the fourth factor of the *National Gas* test because there is no "relationship" between the agreements and the broader financial markets. When determining if such a relationship exists, courts examine the "primary purpose" of the agreement at issue. *See, e.g., Clear Peak Energy, Inc. v. Southern Cal. Edison Co. (In re Clear Peak Energy, Inc.)*, 488 B.R. 647, 659-660 (Bankr. D. Ariz. 2013). The fourth factor will be satisfied where the primary purpose of the agreement is "financial and risk-shifting in nature," such as seeking to hedge against fluctuations in the price of a commodity, "as opposed to the primary purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the commodity." *Id*. (quoting *BCP Liquidating LLC v. Bridgeline Gas Mktg. (In re Borden Chems. & Plastics Operating Ltd.)*, 336 B.R. 214, 220 (Bankr. D. Del. 2006)).

For the same reasons already discussed above, the Court finds that the primary purpose of the murabaha agreements is not risk-shifting in nature. In drafting the safe harbor provisions relating to forward contracts, "Congress intended to reach agreements whose purpose was to protect against the uncertainty of price fluctuations[,]" *In re Borden*, 336 B.R. at 221, as opposed to ordinary commodity contracts. But neither Arcapita nor the Defendants entered into these contracts to hedge against price fluctuations in the underlying commodities. Instead, the contracts at issue provided for the immediate delivery of title in the underlying commodities, with the price of the commodities having been fixed at the time the parties entered the contracts. *See* Irfan BisB Report at 8 ("[T]he commodity murabaha when used as an interbank placement device as in this case ensures immediate[] delivery of title of the underlying commodities, and does not expose either party to price movement in the underlying commodity: in other words, it neither hedges nor speculates on the price of that commodity . . . ."); Irfan Tadhamon Report at 8

78

(same).  The investing party therefore held title to the commodities for a transitory intra-day

period at most, with little to no exposure to price fluctuations.  Likewise, after receiving

immediate delivery of title in the commodities, the agent was free to do what it wished with

them.  The contracts did not shift any risk of fluctuations in the commodity price from one party

to the other, as is seen with commodity forwards.  Rather, they operated more like ordinary

commodity contracts.

The agreements also fail the second factor of the *National Gas* test because they specify

maturity dates that are less than two days after the contracting date.  Courts have held the

"maturity date" to be the date of delivery of the underlying commodity.  *See Buchwald v.*

*Williams Energy Mktg. & Trading Co. (In re Magnesium Corp. of Am.)*, 460 B.R. 360, 373

(Bankr. S.D.N.Y. 2011) (determining the maturity date "necessarily calls for an examination of

the time at which the underlying commodity is to be delivered" and where a base contract gave

rise to a series of individual future contracts, "it may be better to analyze the issue in terms of

[each of the delivery dates] as multiple 'maturity date[s].'"); *see e.g., Williams v. Morgan*

*Stanley Capital Group (In re Olympic Natural Gas Co.)*, 294 F.3d 737, 741 (5th Cir. 2002)

(substituting delivery date for maturity date); *In re Borden*, 336 B.R. at 219 (linking the maturity

date to the contract delivery date); *Knauer v. Superior Livestock Auction, Inc. (In re E. Livestock*

*Co.*), 2012 WL 4210347, at *4 (Bankr. S.D. Ind. Apr. 5, 2012) ("The maturity date is the date on

which delivery is made, insofar as that date completes the sellers' obligations under the forward

contract . . . .").

The *Buchwald* case involved a contractual arrangement somewhat similar to that between

Arcapita and the Defendants, with a base contract "giving rise to many individual contracts, by

reason of monthly nominations of desired product, and then with many deliveries—all at the

price fixed at the outset of each month . . . ." 460 B.R. at 373.   The court stated that "[e]ach of those delivery dates would at least seemingly be appropriately regarded as the maturity date" and held that "[w]here a single contract calls for a series of future contracts pursuant to a 'master' agreement . . . it may be better to analyze the issue in terms of multiple 'maturity date[s].'"   *Id*. (citing *Mirant Americas Energy Mktg. v. Kern Oil & Refining Co. (In re Mirant Corp)*, 310 B.R. 548, 565 n.26 (Bankr. N.D. Tex. 2004)).   The *Buchwald* court further noted that "the time at which the price for future performance is fixed" better determines a forward contract's character than the "time a contract is entered into . . . ." 460 B.R. at 374 n.50 (citing *In re Mirant*, 310 B.R. at 565 n.26).

Similar to the base agreement in *Buchwald*, the BisB Agreement gave rise to investment transactions on March 8 and 9, 2012, and the 2003 Investment Agreement gave rise to a transfer under the March 14, 2012 Placement.  *See* Khani BisB Decl., Exs. D-H.  The investment transactions of March 8 and 9, 2012 and the March 14 Placement provided for "immediate delivery" as required by the BisB Agreement and 2003 Investment Agreement.  *See* Khani BisB Decl., Ex. B at BISB_ 000002 (BisB Agreement stating that a "Basic Transaction" involves selling commodities to First Islamic Bank, as principal, "with immediate delivery on deferred payment terms"); BISB_000010 (2003 Investment Agreement  stating that a "Basic Transaction" involves selling commodities to First Islamic Bank, as principal, "with immediate delivery on deferred payment terms").  Thus, the maturity dates of these transactions are the same day as— and not more than two days later than—the dates on which the parties entered into those contracts.

The same analysis applies to the contractual relationship between Arcapita and Tadhamon.  The Tadhamon Agreements gave rise to the four relevant investment transactions

dated August 8, 2011, November 17, 2011, January 9, 2012, and January 9, 2012.  *See* Khani

Tadhamon Decl., Ex. E.  Each of these investment transactions provided for "immediate

delivery" under the Tadhamon Agreements.  *See* Khani Tadhamon Decl., Ex. C at TAD_000425

(2009 Tadhamon Agreement stating that "[i]mmediately after Arcapita [] concludes the purchase

of commodities . . . Arcapita [] . . . will extend an offer to Tadhamon [] to buy the same

commodities for its own account for immediate delivery . . . ."); Khani Tadhamon Decl., Ex. D at

TAD_001143 (2011 Tadhamon Agreement stating that "Seller shall sell certain Commodities . . .

on immediate delivery . . . pursuant to a Purchase Contract").  As with the BisB transactions, the

maturity dates of the Tadhamon investment transactions are the same day as—and not more than

two days later than—the dates on which the parties entered into those contracts.

Relying on *In re Clean Burn Fuels*, 540 B.R. 195 (Bankr. M.D.N.C. 2015), the

Defendants urge that this Court adopt a "flexible definition" of maturity date as "the date on

which the buyer's obligation to pay matures, locking in the benefit or detriment of the contract."

BisB SJM. at 37-38 (citing *Clean Burn*, 540 B.R. at 207); Tadhamon SJM at 41 (same).  But the

rationale for the flexible approach in *Clean Burn* does not apply here.  In the *Clean Burn*

contractual arrangement, the defendant first delivered corn to the debtor's facility where it

remained in storage bins that were leased to the defendant.  *See Clean Burn*, 540 B.R. at 206.

The corn remained in storage until the parties agreed on a futures price, which finalized their

contract.  *See id.*  Thus, delivery took place prior to the parties entering into a contract.  Under

these unique circumstances, the court in *Clean Burn* rejected the definition of "maturity date" as

the date of delivery because it would lead to the "perplexing result" that the contracts "would

necessarily have a maturity date before the contract was finalized."  *Id*.  By contrast, the

agreements between Arcapita and the Defendants were entered into before the commodities were

exchanged:  the BisB Investment Agreements expressly provide for "immediate delivery" of underlying commodities after the parties contract to fix the price of sale.  *See* BisB Resp. to Comm. SMF  ¶¶ 29-30; Khani BisB Decl., Ex. C at BISB_000002, BISB_000010.  Similarly, the Tadhamon Agreements expressly provide for "immediate delivery" of certain commodities *after* the parties enter into a contract fixing the price of sale.  *See* Tadhamon Resp. to Comm. SMF ¶¶ 5-6; Khani Tadhamon Decl., Ex. C at TAD_000425 (2009 Tadhamon Agreement stating that "[i]mmediately after Arcapita [] concludes the purchase of commodities . . . . Arcapita [] . . . will extend an offer to Tadhamon [] to buy the same commodities for its own account for immediate delivery . . . .").  Thus, there is no such risk here of the result that troubled the *Clean Burn* court.

Second, even if this Court adopts the Defendants' proposed definition of maturity date as "the date on which the buyer's obligation to pay matures, locking in the benefit or detriment of the contract," BisB SJM at 37-38; Tadhamon SJM at 41, the maturity date that would make sense here would be the date of delivery.  Under the BisB Investment Agreements, Arcapita and BisB, respectively, were to buy the commodities "for immediate delivery on a deferred payment basis." BisB Resp. to Comm. SMF at ¶¶ 29-30; Khani BisB Decl. Ex. C at BISB_000002, BISB_000010.  Similarly, under the Tadhamon Agreements, Arcapita is to buy the commodities "for its own account for immediate delivery on a deferred payment basis."  Tadhamon Resp. to Comm. SMF ¶¶ 5-6; Khani Tadhamon Decl., Ex. C at TAD_000425 (2009 Tadhamon Agreement stating that "[i]mmediately after Arcapita [] concludes the purchase of commodities . . . . Arcapita [] . . . will extend an offer to Tadhamon [] to buy the same commodities for its own account for immediate delivery . . . .").  Upon the immediate delivery of the commodities, the buyer's obligation to pay matures and the "benefit or detriment of the contract" is locked in. Delivery triggers the agent's obligation to pay the principal and all other obligations are satisfied.

*See McKittrick v. Gavilon, LLC (In re Cascade Grain Products)*, 465 B.R. 570, 576 (Bankr. D.

Or. 2011) (analyzing forward contract using maturity dates that were "the dates on which debtor

received the corn, giving rise to its obligation to pay"); *U.S. Bank v. Plains Mktg. Can. L.P. (In*

*re Renew Energy LLC)*, 463 B.R. 475, 481 (Bankr. W.D. Wis. 2011) (holding contract was not a

forward contract because by the date of delivery, "all obligations . . . were satisfied, except

issuing the invoice and collecting the payment.").

3.   The Safe Harbor for Swap Agreements

Defendants contend that the murabaha agreements with Arcapita are entitled to safe

harbor protection as "swap agreements" under Sections 101(53B)(A)(i)(VII) and

101(53B)(A)(ii) of the Bankruptcy Code.  *See* BisB SJM 38-40; Tadhamon SJM at 42-44.

Section 101(53B)(A)(i)(VII) defines "swap agreements" to include "commodity . . . forward

agreements."  11 U.S.C. § 101(53B)(A)(i)(VII).   The Defendants argue that the agreements

qualify as commodity forward agreements based on the four factor *Natural Gas* test.  *See* BisB

SJM at 38; Tadhamon SJM at 42.   But for the reasons previously discussed, the transactions here

do not satisfy factors (ii) and (iv) of the *Natural Gas* test, since they do not have maturity dates

more than two days after the contracting date and they lack the necessary relationship with the

broader financial markets.

The transactions also do not  constitute "swap agreements" under Section

101(53B)(A)(ii), which provides the following catch-all definition:

> any agreement or transaction that is similar to any other agreement or transaction
> referred to in this paragraph and that
> (I) is of a type that has been, is presently, or in the future becomes, the subject of
> recurrent dealings in the swap or other derivatives markets . . . ; and
> (II) is a forward . . . on one or more . . . commodities . . . .

11 U.S.C. § 101(53B)(A)(ii).  The Defendants cannot establish that these agreements are similar

to any type of swap agreement identified in Section 101(53B). The transactions do not provide

for the "swap" of financial instruments and are therefore not similar to any of the examples

specified in Section 101(53B). *See* Irfan BisB Report at 8 ("Clearly, a murabaha-based interbank

deposit instrument does not cause the swapping of cash flows . . . ."); Irfan Tadhamon Report at

8 (same). Nor does anything in the record demonstrate that the transactions have been, are

presently or will in the future become "the subject of recurrent dealings in the swap or other

derivatives markets." 11 U.S.C. § 101(53B)(A)(ii)(I). While murabaha contracts may be used in

combination with other financial instruments to create the effect of a swap agreement, they are

not themselves swap agreements given their straight-forward use here. *See* Irfan BisB Report at

6-8; Irfan Tadhamon Report at 6-9. Nor is there any evidence that they were traded on

derivatives markets. *Id*. The transactions here also were not "forwards for a commodity"

because, as discussed above, they provide for immediate delivery upon contracting and are

therefore not forward contracts.[58]

E.      **Law Merchant and Normal Business Practice**

        Finally, the Defendants assert that their purported setoffs under Bahraini statute are

"contractual rights" protected under the safe harbor provisions of the Bankruptcy Code. *See*

BisB SJM at 3, 42 (citing to 11 U.S.C. §§ 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 555, 556,

---

[58]    While the Defendants do not appear to argue that the agreements are "master netting agreements," the
Court also finds that the agreements would not be protected as master netting agreements under the safe harbor
provisions in Sections 546(j) or 362(b)(27) of the Bankruptcy Code. The agreements do not meet the definition of a
master netting agreement in Section 101(38A)(A) of the Bankruptcy Code, under which a master netting agreement
must provide for "the exercise of rights . . . under or in connection with" one or more of the five types of contracts
enumerated in Section 561(a) of the Bankruptcy Code, or any security agreement or arrangement or other credit
enhancement related to one or more of such contracts. 11 U.S.C. § 101(38A)(A). None of those enumerated
contracts are present here. The Defendants also concede that the agreements do not expressly provide any right of
setoff as required under Section 101(38A)(A). *See* Tadhamon Resp. to Comm. SMF ¶¶ 27, 36, 86; see also BisB
Resp. to Comm. SMF ¶ 87.

560, and 561); Tadhamon SJM at 3, 46 (same).[59]  For purposes of these sections, "contractual rights" are defined to include:

> a right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Commodity Exchange Act), a multilateral clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act), or in a resolution of the governing board thereof, *and a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.*

11 U.S.C. §§ 555, 556, 559, 560 (emphasis added).  The Defendants contend that their purported setoffs constitute rights under "law merchant' and "normal business practice" in Bahrain and within Islamic finance generally, and therefore qualify as "contractual rights" under the latter part of these rarely invoked safe harbor provisions.  *See* BisB SJM at 3, 42; Tadhamon SJM at 3, 46.

 "The law merchant is a system of law that does not rest exclusively on the institutions and local customs of any particular country, but consists of certain principles of equity and usages of trade which general convenience and a common sense of justice have established to regulate the dealings of merchants and mariners in all the commercial countries of the civilized world."  *Bank of Conway v. Stary*, 51 N.D. 399, 408, 200 N.W. 505, 508 (1924) (discussing development of law merchant throughout history) (citing 3 Kent, Com. 2; *Brooklyn City & N.R. Co. v. National Bank*, 102 U.S. 14, 31 (1880)).

---

[59]    Both Sections 555 and 556 exempt the exercise of contractual rights "to cause the liquidation, termination, or acceleration" of a securities contract or commodity or forward contract, respectively.  11 U.S.C. §§ 555, 556. The Defendants do not assert that they have taken such actions, and fail to explain how these sections exempt their setoffs from the various claims asserted against them by the Committee.

Law merchant has been used for centuries as a "source of legal obligation and thereby a means of self-regulation" among traders and was meant to be binding as a "secondary control over commerce." *See* Raj Bhala, *Self-Regulation in Global Electronic Markets Through Reinvigorated Trade Usages*, 31 Idaho L. Rev. 863, 903 (1995). The standard is difficult to analyze because it is not easy to delineate when a "usage of trade become[s] part of the body of the law merchant." *Id.* (discussing law merchant in the context of the Uniform Commercial Code). While no firm rule applies for law merchant, scholars have characterized the law merchant based on a "common origin and a faithful reflection of the customs of merchants . . . ." *See* Ingrid Michelsen Hillinger, *The Article 2 Merchant Rules: Karl Llewellyn's Attempt to Achieve the Good, the True, the Beautiful in Commercial Law*, 73 Geo L.J 1141, 1150 (1985) (citing *Thayer, Comparative Law and the Law Merchant*, 6 Brook. L. Rev. 139, 141 (1963)).

While the Defendants invoke the law merchant as a safe harbor, they do not cite to any case law holding that the setoff here is commonly recognized under law merchant. They do cite to several cases to support the contention that law merchant has been incorporated into U.S. domestic commercial statutes. But none of these cases support the contention that setoff is a recognized practice of law merchant or discuss the understanding of what constitutes law merchant under the safe harbor provisions of the Bankruptcy Code. *See Mirabile v. Udoh*, 399 N.Y.S.2d 869, 870 (N.Y. Civ. Ct., Kings County 1977) (citing UCC § 1-103 and its incorporation of law merchant in the context of a dispute regarding money orders); *Sweetwater Cattle Co. v. Murphy (In re Leonard)*, 565 B.R. 137, 144 (B.A.P. 8th Cir. 2017) (in the context of a dispute regarding livestock bill of sale laws, stating that law merchant is "now embodied in the UCC"); *Cugnini v. Reynolds Cattle Co.*, 648 P.2d 159, 164 (Colo. Ct. App. 1981) (same); *Pribus v. Bush*, 118 Cal. App. 3d 1003, 1010 (Ct. App. 1981) (noting that law merchant rules on

allonges were incorporated into California statutes); *Alaska Textile Co. v. Chase Manhattan Bank*, 982 F.2d 813, 816 (2d Cir. 1992) (noting that law merchant rules on letters of credit are embodied in the Uniform Customs and Practices for Documentary Credits).

The Defendants instead cite an article that does not discuss or apply law merchant in the context of the U.S. bankruptcy code, but instead examines the concept of law merchant and proposes attributes of a modernized law merchant system. *See* BisB SJM at 42; Tadhamon SJM at 46 (citing Leon E. Trakman, *The Twenty-First-Century Law Merchant*, 48 Am. Bus. L.J. 775 (Winter 2011)). The Defendants note that the Trakman article describes law merchant as "nationalized within domestic legal systems, such as the civil law system, the English common law, and the UCC in the United States." Trakman, 48 Am. Bus. L.J. at 799. In their briefing, the Defendants equate law merchant with the "commercial law" of a given country, but again cite no legal authority for such a position. *See* BisB SJM at 3; Tadhamon SJM at 3. There is no reason why a practice established under the commercial law of Bahrain would automatically constitute "law merchant." Indeed, the Bankruptcy Code provides that a "contractual right" under the safe harbors includes "a right, whether or not evidenced in writing, arising *under common law. . . .* " 11 U.S.C. §§ 555, 556, 559, 560. But Bahrain is a civil law jurisdiction, not a common law jurisdiction,[60] and the Defendants themselves acknowledge that the setoffs in question are statutory in nature.[61] If Congress had intended to include all statutory rights under the civil law

---

[60]    *See, e.g., Standard Chartered Bank v. Ahmad Hamad Al Gosaibi & Bros. Co.*, 957 N.Y.S.2d 602, 605 (Sup. Ct., N.Y. County 2012) ("Standard's Bahrain lawyer notes—and defendants do not deny—that the civil justice system in Bahrain is predominantly a civil law system, rather than a common-law system as in England and the United States."); Faisal Kutty, The Shari'a Factor in International Commercial Arbitration, 28 Loy. L.A. Int'l & Comp. L. Rev 565, 595 (Summer 2006) (noting that Bahrain is among a group of Middle Eastern countries that have adopted the civil law tradition).

[61]    *See* Mansoori BisB Report ¶¶ 23-24 ("As per the provisions of the Bahraini law, judiciary precedent and legal scholarships there are three types of set-off. They are (i) statutory set-off, which occurs by the power of law if its conditions are fulfilled, (ii) voluntary or contractual set-off, which occurs by the parties' mutual consent to the set-off; and (iii) judiciary set-off. . . . BisB maintains that it has exercised a statutory right of set-off in this [d]ispute, this Report discusses only the provisions under the laws with respect to a statutory set-off and its conditions and

of any country within the definition of a safe harbor contractual right, then it would have done

so. But it did not. *See Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 171 (S.D.N.Y. 2012) (the

canon of statutory construction *expressio unius est exclusion alterius* means "the mention of one

thing implies the exclusion of the other. . . . The maxim cautions a court not [to] add elements to

a list of statutory or regulatory requirements.") (citations and quotations omitted). Even

assuming that the law merchant covers the civil law of a jurisdiction, the civil law here has

specifically disavowed these setoffs through the CBB's issuance of the Formal Directions.

The Defendants also rely on their experts to claim that setoff is a standard component of

Shari'a business practice. *See* BisB SJM at 42 (citing Mansoori BisB Report at 17-22; Thomas

BisB Report at 20-23); Tadhamon SJM at 46 (citing Mansoori Tadhamon Report at 17-22;

Thomas Tadhamon Report at 22-25). The argument appears to be that the domestic codification

of setoff in Bahrain and a handful of other countries reflects a long-standing transnational custom

of Shari'a compliant financing and, therefore, the Defendants' setoffs fall under the umbrella of

law merchant.[62] But the Defendants clearly assert that they executed the setoffs pursuant to

Bahraini statute, not according to business practice or market custom. Furthermore, they do not

satisfy the standard they put forth from the Trakman article, which explains that there are ten

"central attributes" of a modernized law merchant, including that it is "transnational in

---

requirements prescribed thereunder and makes no discussion of the other types of set-off."); Mansoori Tadhamon Report ¶¶ 24-25 (same); *see also* BisB SJM at 41 ("The murabaha agreements between BisB and Arcapita do not expressly provide for setoff rights. It is an extra-contractual right provided by Bahraini law. . . ."); Tadhamon SJM at 45 (same); Khani BisB Decl., Ex. O ("Under the circumstances, BisB has taken a set-off under Bahraini law relating to the debts owing between the parties."); Khani Tadhamon Decl., Ex. Q at TAD000595 (same).

[62]    The Court notes that the Committee's expert, Mr. Irfan, disputes the longstanding acceptance of setoff in Islamic finance, stating that the subject of close-out netting has been "prickly and hotly debated by both the bankers and scholarly community." Irfan BisB Report at 16; Irfan Tadhamon Report at 20. Mr. Irfan cites to his experience participating in the industry working group in 2006 to create a Shari'a complaint version of the 2002 ISDA Master Agreement for conventional derivative contracts, though the Defendants challenge the relevance of his observations. *See* Irfan BisB Report at 16; Irfan Tadhamon Report at 20-21; *but see* BisB Reply at 19 n.75; Tadhamon Reply at 18 n.65. In any case, the Court need not resolve this dispute for purposes of its decision on law merchant.

character," expressed "through international commercial codes and conventions," or "endorsed

by transnational institutions—legal economic, and political institutions—by nation-states and by

stratified communities of transnational merchants alike." Trackman, 48 Am. Bus. L.J. at 798-99.

As a threshold matter, the Defendants cannot establish that the setoffs here constitute a

transnational custom when these transactions were viewed as improper by Bahrain's own

regulatory authority. Moreover, the Defendants have not provided evidence that would support

the conclusion that the setoffs here reflect a longstanding or widely accepted custom that is

reflected in international law such that a finder of fact could rule in the Defendants' favor on the

issue. They do cite to the setoff statutes of Qatar and the United Arab Emirates. *See* BisB Reply

at 19 n.74; Tadhamon Reply at 18 n.64. But these two examples hardly amount to a

"transnational body of informal law, created by the industry customs and practices of merchants,

which is endorsed and codified in domestic and international law." Comm. BisB Resp. at 28

(citing Trakman, *supra,* at 798-99); Comm. Tadhamon Resp. at 36 (same).

Furthermore, while "Shari'a does allow for set-off of countervailing debts in certain

circumstances, it has only been relatively recently that the modern Islamic finance market has

applied this broad principle, only in those jurisdictions where set-off is possible, and with

particular reference to murabaha contracts." Irfan BisB Report at 16; Irfan Tadhamon Report at

20. The Defendants themselves admit that setoff was only adopted by the Bahraini Civil Code

and AAOIFI Shari'a Standards in 2001. *See* BisB Reply at 19 n.75; Tadhamon Reply at 18 n.65.

This evidence is scarcely the "longstanding" customs upon which law merchant is based, rather

appearing to be a phenomenon that has recently been codified in the commercial laws of certain

jurisdictions in the twenty-first century. At best then, the Defendants might demonstrate that

setoff is accepted in Islamic finance only under certain circumstances, and in certain countries.

And rather than being a long standing custom among merchants, it appears to still be evolving.

Nor do the setoffs taken in these circumstances constitute normal business practice under

the "contractual rights" protected by the safe harbor provisions of the Bankruptcy Code, as is

argued by the Defendants.  That setoff is not the normal course of action in these circumstances

is demonstrated by the Formal Directions of the CBB, requiring that the Defendants either: (i)

immediately return the Transaction Proceeds to Arcapita, or (ii) seek permission from the Court

in accordance with the Bankruptcy Code to withhold the funds, and return the funds if such

permission is not granted.  Comm. BisB SMF ¶ 92; Comm. Tadhamon SMF ¶ 127.  The

Defendants did not seek the permission of this Court either prior or subsequent to asserting

setoff, a violation of both the Formal Directions and, as further discussed below, the automatic

stay under Section 362 of the Bankruptcy Code.  Furthermore, the Defendants' expert asserts that

the market convention in Bahrain in the event of an insolvency was a negotiated workout,

including the rolling over of debts, extension of maturities and avoidance of capital losses.

Thomas BisB Report at 32-33; Thomas Tadhamon Report at 36.  Under such circumstances, the

Court cannot find such setoffs to constitute normal business practice against an insolvent entity

such as Arcapita.

### F.    <u>Committee's Causes of Action</u>

Having rejected the various defenses raised by the Defendants, the Court is left to address

the merits of the Committee's claims.  While the Defendants did not raise any challenge to the

elements of the Committee's claims, it is nonetheless appropriate to briefly review each of the

Committee's claims in evaluating the Committee's request for summary judgment.[63]

---

[63]    The Committee's statements of fact assert that certain amounts were owed from Arcapita to the Defendants under the Investment Agreements as of the Petition Date and that by exercising setoff, the Defendants recovered in

1.  Breach of Contract

The Committee asserts a claim for breach of contract against the Defendants, alleging

that they breached the applicable contracts by withholding the Transaction Proceeds owed to

Arcapita past the maturity dates set forth in those agreements.[64]  The parties agree that the breach

of contact claims are governed by Bahraini law.  *See* Comm. BisB SJM at 15; Comm. Tadhamon

SJM at 15; BisB SJM at 41, 43; Tadhamon SJM at 45-47; BisB Reply at 9; Tadhamon Reply at

7.

Article 129 of the Bahraini Civil Code provides that "a contract must be performed in

accordance with its contents and in compliance with the requirements of good faith and

honesty."  Raees BisB Report ¶ 4.2.16 (quoting Art. 129 of Bhr. Civil Code); Raees Tadhamon

Report ¶ 4.2.16 (same).  Article 140(a) states that "[i]n bilateral binding contracts if one of the

parties does not perform his obligation, the other party may . . . demand from the judge the

performance or dissolution of the contract, with damages, if due, in either case, unless the party

demanding dissolution does not also perform his obligation."  Khani BisB Report ¶ 4.2.17

(quoting Art. 140(a) of Bhr. Civil Code); Khani Tadhamon Report ¶ 4.2.17 (same).

The Committee asserts that the Defendants' breached the agreements by failing to

transfer the Transaction Proceeds to Arcapita upon maturity of the applicable contracts, thus

entitling the Committee to recover the outstanding balance of the Transaction Proceeds and

---

full on these debts.  *See* Comm. BisB SMF ¶¶ 23, 89; Comm. Tadhamon SMF ¶¶ 21, 119.  The Defendants'
response to those statements of fact disputes the characterization of those amounts as "antecedent debt," but this
argument was not raised in the Defendants' briefs.  *See* BisB Resp. to Comm SMF ¶¶ 23, 89; Tadhamon Resp. to
Comm. SMF ¶ 21.  While the issue might be relevant to the Committee's claims regarding a preferential transfer by
Arcapita to BisB, the Court does not need to reach that issue today.  *See* Comm. BisB SJM at 27 (raising the
preference argument as an alternative to claims regarding breach of contract and turnover).

[64]     The Committee asserts that BisB breached the March 14, 2012 BisB Placement and 2003 Investment
Agreement and that Tadhamon breached the Tadhamon Rollover Contracts and Master Wakala Agreement due to
their respective withholding of the Transaction Proceeds past the maturity dates of the March 14, 2012 BisB
Placement and the Tadhamon Rollover Contracts.

associated damages.  The contracts required that Arcapita deposit the investment amounts with

the Defendants on the specified investment dates, with the Defendants then transferring such

proceeds when they were due.[65]  Both Defendants admittedly failed to remit the Transaction

Proceeds to Arcapita when the respective contracts matured.  *See* BisB Answer ¶¶ 34, 36 [Adv.

Pro. No. 13-01434, ECF No. 62]; Tadhamon Answer ¶¶ 27, 36, 38 [Adv. Pro. No. 13-01435,

ECF No. 58]; Khani Tadhamon Decl., Ex. M at TAD_000413-14, Ex. N at TAD_000293-95; Ex.

B at 47:2-48:3.  Having concluded that the Defendants' purported setoffs are invalid—and

having rejected the Defendants' other defenses—the Court finds that the Defendants' failure to

remit the Transaction Proceeds constitutes a breach of the applicable agreements.

2.  <u>Turnover</u>

The Committee asserts that the Transaction Proceeds are subject to turnover under

Section 542(b) of the Bankruptcy Code.  Section 542(b) provides, in part, that "an entity that

owes a debt that is property of the estate and that is matured, payable on demand, or payable on

order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt

may be offset under [S]ection 553 of this title against a claim against the debtor."  11 U.S.C. §

542(b).  The Committee asserts that the Defendants' failure to return the Transaction Proceeds to

---

[65]     The Master Wakala Agreement obligated Tadhamon to "transfer the Maturity Proceeds on the Maturity
Date to such account" as was designated by Arcapita.  *See* Khani Tadhamon Decl., Ex. G at TAD_000406.
Additionally, the March 28, 2012 Rollover Contract required Arcapita to invest $10 million already on deposit with
Tadhamon on March 30, 2012 and Tadhamon to transfer to Arcapita the proceeds of that investment on April 30,
2012.  *See* Khani Tadhamon Decl., Ex. F at TAD_006435; Ex. M at TAD_000413–14.  Similarly, the April 15, 2012
Rollover Contract required Arcapita to invest $10 million already on deposit with Tadhamon on April 16, 2012, and
required Tadhamon to transfer the proceeds of that investment on May 16, 2012.  *See id.*

Under the 2003 Investment Agreement, BisB was required to repurchase commodities from Arcapita on the
"deferred payment date'—*i.e.*, the maturity date—by sending Arcapita payment for the purchased commodities.  *See*
Khani BisB Decl., Ex. B at BISB_000010-11, BISB_000013-14; Ex. G at ARCAPITA_0000024-29.  The March 14
Placement required Arcapita to invest $10,000,000 with BisB on March 14, 2012, and required BisB to transfer the
proceeds of that investment on March 29, 2012.  *See* Khani BisB Decl., Ex. G at ARCAPITA_0000024-29.

Arcapita upon maturity of the March 14, 2012 BisB Placement and the Tadhamon Rollover

Contracts created debts that are property of the Debtors' estate and are matured.

Section 542(b) is "a mechanism for monetizing a receivable that is property of the

estate." *Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B. R. 78, 97 (Bankr.

S.D.N.Y. 2016). Debts owing to the debtor under a contract constitute property of the estate for

purposes of Section 542(b) where it has been established that the contracting party was

"unconditionally liable" under the contract's terms. *In re MF Glob., Inc.*, 531 B.R. 424, 437–38

(Bankr. S.D.N.Y. 2015). As to whether the debts are matured, "'[m]atured' refers to 'debts that

are presently payable, as opposed to those that are contingent and become payable only upon the

occurrence of a certain act or event.'" *Porter-Hayden Co. v. First State Mgmt. Group, Inc. (In re

Porter-Hayden Co.)*, 304 B.R. 725, 732 (Bankr. D. Md. 2004) (quoting 5 Collier on Bankruptcy

¶ 542.03 n.1 (15th ed. rev. 2003)). A court should examine whether the party pursuing turnover

"seeks the collection rather than the creation, recognition, or liquidation of a matured debt." *In

re Porter-Hayden Co.*, 304 B.R. at 732 (quoting *In re Gulf Apparel Corp.*, 140 B.R. 593, 596

(M.D. Ga. 1992)). The statute "provides for turnover of undisputed debts. . . . 'The terms

'matured, payable on demand, or payable on order' create a strong textual inference that an action

should be regarded as a turnover only when there is no legitimate dispute over what is owed to

the debtor.'" *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez

Constr., Inc.)*, 373 B.R. 262, 273 (Bankr. S.D.N.Y. August 14, 2007) (quoting *In re CIS

Corp.,* 172 B.R. 748, 760 (S.D.N.Y. 1994)). But the fact "[t]hat a party owing an account may

assert a valid defense to payment of the debt is contemplated in [Section] 542(b) and does not

require a holding that the debt is not matured." *Pardo v. Pacificare of Tex., Inc. (In re APF Co.)*,

264 B.R. 344, 356 (Bankr. D. Del. 2001) (noting that defendant did not give a reason why the

debts were not fully matured other than to assert a right to setoff as a defense and did not

otherwise dispute its liability under the contracts).

Applying these principles here, the Committee has established that the Defendants are

unconditionally liable for the Transaction Proceeds. There is no legitimate dispute with respect

to the actual dollar amounts under the various contracts, the dates that such amounts were

payable and that these amounts were not directly remitted to Arcapita. *See* Khani BisB Decl.,

Ex. G at ARCAPITA_0000024–29 (transaction documents); Khani Tadhamon Decl., Ex. F at

TAD_006435 (worksheet of Tadhamon's calculations for Arcapita's total debt to Tadhamon,

Tadhamon's total debt to Arcapita, the amount to be set off, and the net balance owed to

Arcapita); *see also* Tadhamon Answer to Complaint ¶ 36 [Adv. Pro. No. 13-01435, ECF No. 58

("Tadhamon admits that pursuant to the Rollover Schedules, at Arcapita's request Tadhamon

invested the Placements in new investments with maturity dates of April 30, 2012 and May 16,

2012 respectively. Tadhamon *also admits that the amounts due under the Rollover Schedules*

were not remitted but were instead set off against amounts owed by Arcapita to Tadhamon under

the Tadhamon Agreements.") (emphasis added).[66]

---

[66]      Indeed, the Defendants expert maintains that the debts between the Defendants and Arcapita are both matured and undisputed; this would be required for any a statutory setoff under Article 353 of the Bahraini Civil Code, which provides as follows:

> (1) each party should be a creditor and a debtor simultaneously, (2) both debts should be due for payment (i.e. matured), (3) the debts should be for monies or of equivalent description and type, and (4) the debts must be undisputed.

Mansoori BisB Report ¶ 25; Mansoori Tadhamon Report ¶ 26. The Defendants' expert further maintains that the validity and enforceability of the agreements between the parties, each of Arcapita and the Defendants' right to the payment of the debt owing to it under the agreements and the value of each debt owed to each party are undisputed. Mansoori BisB Report ¶ 26; Mansoori Tadhamon Report ¶ 27. Rather, "[t]he Dispute is limited to [the Defendants'] entitlement to maintain the set-off so exercise by [the Defendants']. . . ." Mansoori BisB Report ¶ 26; Mansoori Tadhamon Report ¶ 28.

The Court also finds that the Defendants are unconditionally obligated to pay the debts

under the March 14, 2012 BisB Placement and the Tadhamon Rollover Contracts, and the debts

constitute property of the estate. *See In re MF Glob., Inc.*, 531 B.R. at 437-38 ("Because the

Trustee has established that Sonson is unconditionally liable to MFGI for the debit balance of his

account, this debt constitutes estate property under section 541(a) of the Bankruptcy Code" and

noting that "[t]he debit balance of Sonson's customer account with MFGI constitutes a debt

owed to MFGI pursuant to a prepetition contract."). Such debts are also matured for purposes of

Section 542(b). *See In re MF Glob.*, 531 B.R. at 438 (citing *Tese-Milner v. TPAC, LLC (In re*

*Ticketplanet.com*), 313 B.R. 46, 67 (Bankr. S.D.N.Y. 2004) ("In order for a claim to be

considered a matured debt, it must be specific in its terms as to amount due and date

payable."); *Kenston Mgmt. Co. v. Lisa Realty Co. (In re Kenston Mgmt. Co.*), 137 B.R. 100, 108

(Bankr. E.D.N.Y. 1992) ("[F]or an action to be a turnover proceeding, it is not relevant that [all]

the defendant[s] dispute the existence of the debt by, perhaps, denying the complaint's

allegations, as long as these allegations state the existence of a mature debt.")).

Having found that the Defendants' purported setoffs are invalid and having rejected the

Defendants' other defenses, the Court finds that the Transaction Proceeds are debts that are

property of the estate, are matured, and are subject to turnover under Section 542(b) of the

Bankruptcy Code.[67]

### 3. Violation of the Automatic Stay

The Committee also asserts that the Defendants' setoff violated the automatic stay

provisions of Sections 362(a)(3) and (a)(7) of the Bankruptcy Code. Section 362 is meant to

---

[67]     In light of turnover being granted, the Court does not address the Committee's request for claims
disallowance under Section 502(d) of the Bankruptcy Code. *See* Comm. BisB SJM at 34 (citing 11 U.S.C. §
502(a)); Comm. Tadhamon SJM at 35 (same).

provide "complete, immediate, albeit temporary relief to the debtor from creditors, and also to

prevent dissipation of the debtor's assets before orderly distribution to creditors can be

effected." *SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000) (quoting *Penn Terra Ltd. v.

Department of Envtl. Resources*, 733 F.2d 267, 271 (3d Cir. 1984)).  Importantly, the automatic

stay allows the bankruptcy court "to centralize all disputes concerning property of the debtor's

estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in

other arenas." *Brennan*, 230 F.3d at 70 (quoting *In re United States Lines, Inc.*, 197 F.3d 631,

640 (2d Cir. 1999)).  "[S]o central is the [Section] 362 stay to an orderly bankruptcy process that

actions taken in violation of the stay are void and without effect." *In re Colonial Realty Co.*, 980

F.2d 125, 137 (2d Cir. 1992) (citations and quotations omitted); *see also Rexnord Holdings, Inc.

v. Bidermann,* 21 F.3d 522, 527 (2d Cir. 1994); *In re Signature Apparel Grp.*, 577 B.R. 54, 88

(Bankr. S.D.N.Y. 2017) ("Actions taken in violation of the automatic stay are void.").

The Committee asserts a stay violation under Section 362(a)(3) of the Bankruptcy Code,

which provides that the filing of a bankruptcy petition "operates as a stay, applicable to all

entities, of . . . any act to obtain possession of property of the estate or of property from the estate

or to exercise control over property of the estate. . . ." 11 U.S.C. § 362(a)(3).  Property of the

estate is broadly defined to include "all legal or equitable interest of the debtor in property as of

the commencement of the case," as well as "[p]roceeds product, offspring, rents, or profits of or

from property of the estate," and "[a]ny interest in property that the estate acquires after the

commencement of the case." 11 U.S.C. §§ 541(a)(1), (6), (7).  "Every conceivable interest of the

debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of

[Section] 541." *Chartschlaa v. Nationwide Mut. Ins. Co*., 538 F.3d 116, 122 (2d Cir. 2008); *see

also Pereira v. Summit Bank*, 2001 U.S. Dist. LEXIS 1712, at *35, *37 (S.D.N.Y. Feb. 21,

2001).  The receivables owing to the Arcapita estate upon execution of the March 14, 2012 BisB

Placement and the Tadhamon Rollover Contracts constitute "property of the estate" under the

Bankruptcy Code.  By the time the Defendants exercised their setoffs in June 2012, the Debtors'

entitlement to those receivables had matured.  *See* Khani BisB Decl., Ex. O at

ARCAPITA_0000032; Khani Tadhamon Decl., Ex. F at TAD_006435.

Additionally, the Defendants exercised control over that estate property.  "To 'exercise

control' means 'to exercise restraining or directing influence over' or 'to have power over.'"  *In*

*re Weidenbenner*, 521 B.R. 74, 79 (Bankr. S.D.N.Y. 2014) (quoting *Thompson v. GMAC, LLC*,

566 F.3d 699, 702 (7th Cir. 2009) ("Holding onto an asset, refusing to return it, and otherwise

prohibiting a debtor's beneficial use of an asset all fit within this definition, as well as within the

commonsense meaning of the word.").  The Defendants' declaration of a setoff and their refusal

to return the receivables to the Debtors upon request was an improper exercise of control over

property of the Debtors' estate, and thus a violation of Section 362(a)(3) of the Bankruptcy

Code.  *See, e.g.*, *In re Metromedia Fiber Network, Inc.*, 290 B.R. 487, 493 (Bankr. S.D.N.Y.

2003).

At the time the setoffs were taken, the Defendants were well aware of the existence of

the automatic stay, having previously received letters from Arcapita's bankruptcy counsel

discussing the imposition of the stay by Arcapita's bankruptcy filing and demanding payment of

the Transaction Proceeds as property of Arcapita's bankruptcy estate.  Comm. BisB SMF ¶ 78;

Comm. Tadhamon SMF ¶ 101.[68]  Moreover, the Defendants had advice of U.S. bankruptcy

---

[68]      Additionally, Section 362(a)(7) of the Bankruptcy Code explicitly prohibits "the setoff of any debt owing
to the debtor that arose before the commencement of the case . . . against any claim against the debtor."  11 U.S.C. §
362(a)(7).  As the Supreme Court has noted, "the proper procedure for a creditor-bank that wishes to exercise a right
of setoff against a debtor is to place a temporary administrative hold on the debtor's account while promptly seeking
relief from the stay."  *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)*, 439
B.R. 811, 834 (Bankr. S.D.N.Y. 2010) (citing *Citizens Bank v. Strumpf*, 516 U.S. 16, 19-20 (1995)); *see also In re
Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 112 (Bankr. S.D.N.Y. 2010) ("[E]ven where a valid right of setoff may

counsel at the time they asserted the setoffs. Comm. BisB SMF ¶¶ 80, 81, 84; Comm.

Tadhamon SMF ¶¶ 104, 107. It is undisputed that the Defendants exercised their setoffs without

first seeking this Court's approval. BisB Resp to Comm. SMF ¶ 97; Tadhamon Resp. to Comm.

SMF ¶ 135. Furthermore, the Defendants' continued maintenance of the setoffs is in direct

contravention of the CBB's Formal Directions that require the Defendants to either return the

funds to Arcapita or obtain this Court's approval to retain them. Comm. BisB SMF ¶¶ 90, 92;

Comm. Tadhamon SMF ¶¶ 126, 127.

Finally, the Committee requests that this Court grant it damages and attorneys' fees for

the Defendants' violation of the automatic stay. Section 362(k) of the Bankruptcy Code provides

that "an individual injured by any willful violation of a stay provided by this section shall

recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances,

may recover punitive damages. 11 U.S.C. § 362(k)(1). Given the facts set forth above, the

Court believes that the Defendants' stay violation was willful.[69] But under established Second

Circuit law, the requested relief is limited to natural persons and is not available to corporate

debtors. *See Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,

920 F.2d 183, 184-87 (2d Cir. 1990) ("We now hold that a bankruptcy court may impose

sanctions pursuant to [Section] 362(h) [now Section 362(k)] . . . only for violating a stay as to

debtors who are natural persons. . . . For other debtors, contempt proceedings are the proper

means of compensation and punishment for willful violations of the automatic stay."); *Ames*

---

exist, a creditor-bank must immediately move for relief from the automatic stay rather than to freeze the account
indefinitely.").

[69]       "A creditor willfully violates [S]ection 362 when it knows of the filing of the petition (and hence of the
automatic stay) and has the general intent simply to perform the act found to violate [S]ection 362; no specific intent
to violate [S]ection 362 is necessary." *Weber v. SEFCU (In re Weber)*, 719 F.3d 72, 83 (2d Cir. 2013). "[A]ny
deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual
damages." *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1105 (2d Cir. 1990).

*Dep't Stores, Inc. v. Lumbermens Mut. Cas. Co. (In re Ames Dep't Stores, Inc.)*, 542 B.R. 121, 141 n.83 (Bankr. S.D.N.Y. 2015) ("In the Second Circuit, corporate debtors do not have a private right of action for stay violations under [S]ection 362(k) (formerly [S]ection 362(h)), and seek and obtain relief for automatic stay violations by means of contempt."). Accordingly, the request for damages and attorney's fees under Section 362 is denied.

## CONCLUSION

For the reasons stated above, the Committee's Motions are granted and the Defendants' Motions are denied. The Committee should settle an order on five days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon opposing counsel.

Dated: New York, New York
       April 23, 2021

*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE